## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY PAPE, an individual, | ) | |
| STACEY PAPE, as trustee for the | ) | |
| Gregory Pape Irrevocable Life Insurance | ) | |
| Trust; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 18-cv-01481 |
| | ) | |
| MARK BRAATEN, an individual; | ) | Judge Rebecca R. Pallmeyer |
| MARKBRAATEN, INC. a Wisconsin | ) | |
| Corporation;   VOYA FINANCIAL | ) | |
| ADVISORS, INC.; a Minnesota | ) | |
| Corporation;   PACIFIC LIFE | ) | |
| INSURANCE COMPANY, a Nebraska | ) | |
| corporation; ROHE LEVY, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

### SECOND AMENDED COMPLAINT

NOW COME the Plaintiffs, GREGORY PAPE, and STACEY PAPE as trustee for the GREGORY PAPE IRREVOCABLE LIFE INSURANCE TRUST, by and through their undersigned counsel at GRIFFIN | WILLIAMS LLP, and for their Second Amended Complaint against the above-named Defendants herein, respectfully state as follows:

### NATURE OF THE CASE

1. This matter arises from a life insurance sales scheme involving multiple premium financed life insurance policies insuring the life of Plaintiff, Gregory Pape.

2. Defendant Mark Braaten, while acting as an authorized agent of Pacific Life Insurance Company and as a registered representative and agent of Defendant Voya Financial Advisors, Inc., solicited Plaintiffs to purchase two life insurance policies from Pacific Life Insurance Company and to borrow excessive amounts of money from a third-party

premium finance company to pay for the policies. Braaten did not disclose to Plaintiffs that the only purpose for two nearly identical policies, (as opposed to one policy), was to allow him to make an undisclosed commission split with Defendant Rohe Levy and was not for the purpose of ensuring the policies were suitable for Mr. Pape's investment and insurance needs. Braaten and Levy provided Mr. Pape with false illustrations for the policies that misrepresented to Mr. Pape that he could secure the policies without making any future out-of-pocket payments after his initial payment. This action arises as a result.

### PARTIES

3.  Gregory Pape is an individual and a resident and citizen of Naperville, Illinois.

4.  Stacey Pape is the trustee of the Gregory Pape Irrevocable Life Insurance Trust, an Illinois trust, (hereafter, the "Trust"). As the Trust is an Illinois trust situated in Illinois, it is a citizen of Illinois. Stacey Pape is plaintiff Gregory Pape's sister and brings the claims herein on behalf of the Trust in her capacity as trustee, not as an individual. Stacey Pape is a resident and citizen of Venetia, Pennsylvania.

5.  Mark Braaten is an individual and a resident and citizen of the state of Wisconsin.

6.  MarkBraaten, Inc. is a Wisconsin corporation with its principal office located in Waukesha, Wisconsin. As such, MarkBraaten, Inc. is a citizen of the state of Wisconsin.

7.  Voya Financial Advisors, Inc. is a Minnesota corporation with is principal executive office located in Des Moines, Iowa. As such Voya Financial Advisors, Inc. ("Voya") is a citizen of Iowa. The sole claim against Voya, sounding in Negligence, was dismissed without prejudice on July 13, 2018. Plaintiffs replead the allegations and count as to Voya in this Second Amended Complaint for the sole purpose of preservation of any appeal.

8.      Pacific Life Insurance Company (hereafter, "Pacific Life") is a Nebraska corporation with its principal office located in Newport Beach, California. As such, Pacific Life is a citizen of California.

9.      Rohe Levy is an individual and a resident and citizen of California. Specifically, and upon information and belief, Rohe Levy is a citizen of San Diego, California.

### JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter herein pursuant to 28 U.S.C. §1332(a)(1), as the present matter is a civil action between parties that are citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest and costs. As more fully set forth herein, Plaintiffs have suffered over one million dollars in losses as a result of the conduct of Defendants.

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events, omissions, actions and transactions at issue occurred within the Northern District of Illinois.

12.     This Court has personal jurisdiction over the Defendants named herein pursuant to 735 ILCS 5/2-209 in that the claims asserted herein, as more specifically set forth below in the allegations of fact and counts of the Complaint, arise from:

   a.  Defendants' transaction of business within Illinois (§2-209(a)(1));

   b.  Defendants' committing tortious acts of negligence and misrepresentations within Illinois (§2-209(a)(2));

   c.  Defendants' soliciting and selling of multiple contracts to insure a citizen of Illinois (§2-209(a)(4));

d. The making or performance of contracts substantially connected with a citizen of Illinois (§2-209(a)(7));

e. Breaches of fiduciary duty within Illinois (§2-209(a)(11)); and,

f. Defendants' otherwise sufficient minimal contacts with Illinois such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice (§2-209(c)).

### COMMON ALLEGATIONS OF FACT

13. Mark Braaten is a licensed insurance producer in the state of Illinois and, upon information and belief, has held that license since approximately 1997.

14. Rohe Levy is a licensed insurance producer in the state of Illinois and, upon information and belief, has held that license since approximately 2008.

15. Mr. Braaten is also licensed in the securities industry, having passed his Series 63 Uniform Securities Agent State Law Examination and his Series 6 Investment Company Products / Variable Contracts Representative Examination in or about January of 1996.

16. From November 2012 to April 2016, Mark Braaten was a registered representative of Defendant Voya, a member of the Financial Industry Regulatory Authority (hereafter, "FINRA").

17. As a registered representative, Mr. Braaten disclosed to Voya that he was engaged in an outside business activity with his company, MarkBraaten, Inc., including the sales of life insurance policies.

18. Upon receipt of that disclosure, Voya was required by FINRA rules, to evaluate that outside business activity and decide whether to allow Mr. Braaten to engage in insurance sales through MarkBraaten, Inc., prohibit that activity, or impose restrictions on the activity.

Ultimately, Voya had supervisory responsibility over Mr. Braaten as an associated person of Voya and over his outside business activities under FINRA rules.

19. As a part of Mr. Braaten's disclosure, Voya was made aware that Mr. Braaten had a customer dispute on his CRD report from 2006 relative to alleged misrepresentations he made concerning variable life insurance policies, the return on those policies, associated surrender charges and withdrawals and exchanges from such policies. Accordingly, Voya was aware of a need to supervise Mr. Braaten's insurance related activities.

20. Mr. Braaten was also expressly authorized by Pacific Life to act as its agent for the purposes of soliciting the public to purchase Pacific Life insurance products and to act as its agent in soliciting, accepting and preparing applications for Pacific Life insurance policies. Pacific Life further authorized Mr. Braaten to act as its agent in preparing life insurance policy illustrations for Pacific Life policies, presenting those illustrations to proposed insured's and in submitting those illustrations with the Pacific Life applications.

21. Beginning in or about June, 2014 Mr. Braaten began to solicit Mr. Pape to purchase a premium financed life insurance policy through MarkBraaten, Inc. Mr. Braaten was aware that Mr. Pape already had $5,000,000.00 in life insurance, but set up a meeting on the pitch that he could obtain Mr. Pape twice as much coverage while saving him $500,000.00.

22. Mr. Pape was retired and informed Mr. Braaten that his goals for his estate included investments that would allow for cash flow and to avoid high risk investments with large commitments of capital.

23. In or about June, 2014 Mr. Braaten visited Mr. Pape at his home in Naperville, Illinois to discuss the idea of purchasing life insurance through a premium financing arrangement.

24.     During the initial meeting at Mr. Pape's home, Mr. Braaten made the following representations of fact to Mr. Pape concerning the purchase of the premium financed policies (hereafter, the "Meeting Representations"):

    a.   Mr. Pape would only have to make one initial premium payment on the policies;

    b.   Mr. Pape would not have to make any additional payments after the initial premium payment; and,

    c.   Interest would accrue on the policies.

25.     At the time of the initial meeting, Mr. Braaten was already working with Rohe Levy on the potential sale of premium financed insurance to Mr. Pape. Rohe Levy's involvement in the deal was based on his experience and purported expertise in the area of premium financing of policies and Levy was working with Braaten on the analysis of how premium financing would work for Mr. Pape.

26.     By no later than July of 2014, Rohe Levy was communicating with Pacific Life new business supervisor and field case manager Mike Howell about Mr. Pape applying for a Pacific Life Policy. See Pacific Life "New Business Worksheet" attached hereto as **Exhibit A**. By August of 2014, the Pacific Life logs indicate that Rohe Levy was working on Mr. Pape's "Morgan Stanley guy." That "Morgan Stanley guy" was Mr. Thomas McGee, who worked with Mr. Pape on matters of financial planning.

27.     On September 19, 2014, Mark Braaten emailed Thomas McGee a document that Braaten represented to be an "illustration" for Mr. Pape. **Exhibit B-1.** The illustration attached to that email was a Loan Analysis for Mr. Pape, which came from a document titled "Life Insurance Premium Finance Analysis Prepared for Greg Pape," produced or created by Rohe Levy. **Exhibit B-2** at Levy 1108. The September 2014 loan analysis again stated that:

    a.  Any interest on the premium financed loan was capitalized into the loan;

    b.  Mr. Pape would not have to make any loan payments after the first year; and,

    c.  Mr. Pape would have an annual net outlay of zero after the first year.

28.    The September 2014 Life Insurance Premium Finance Analysis omitted information in a section labeled "What are the benefits" by taking out information explaining how the rate of return related to the costs of the plan. **Exhibit B-2** at Levy 1106.

29.    The September illustration did not disclose what the policy charges for the Pacific Life insurance policies would be each month or take the charges into account in calculating the value projections of the policy.

30.    Between about June and September of 2014, Mr. Braaten and Mr. Pape held multiple additional meetings at Mr. Pape's home in Naperville, Illinois concerning the premium financing plan. During those meetings, Mr. Braaten reiterated his previous representations about payment and interest, and pushed Mr. Pape to move forward on the deal telling him that he needed to act quickly.

31.    Mr. Braaten also engaged in several conference calls with Mr. Pape concerning the premium financed Pacific Life policies. In those telephone calls he reaffirmed the Meeting Representations and the representations in the September 2014 loan analysis documents to Mr. Pape concerning the policies, financing, accrued interest and annual payments, and made the additional material representations that:

    a.  The death benefit on each policy could be lowered at any time without any charges or other issues; and,

    b.  Mr. Pape could get out of the policies at any time without any penalties or charges.

32.  At all times during the meetings and conference calls, Mr. Braaten stressed that premium financed life insurance was a suitable strategy for Mr. Pape's goals. At no time did Mr. Braaten discuss other insurance options or non-financed options.

33.  At no time did Mr. Braaten disclose the risks associated with the premium financed life insurance arrangement or the monthly costs of the life insurance policies and how those monthly insurance costs calculated into the financial success of the premium financed strategy.

34.  Braaten entered into an arrangement with his colleague, Rohe Levy, whereby Mr. Levy would receive a commission cut from the sale of the premium financed policies to Plaintiffs. This financial arrangement was never disclosed to Mr. Pape and Mr. Pape never personally had any direct communications or meetings with Mr. Levy.

35.  In furtherance of that "percentage split," Mr. Braaten solicited Mr. Pape to purchase two indexed adjustable policies from Pacific Life Insurance totaling $10,000,000.00 in coverage instead of purchasing one policy with the same total face amount. The sole purpose of the sale of two indexed adjustable policies was to allow Mr. Braaten to share commissions with Rohe Levy. There were no legitimate investment purposes to selling Mr. Pape two Pacific Life Insurance indexed adjustable policies as opposed to selling him one with the same characteristics and total coverage.

36.  Based on the representations of Mr. Braaten and the illustrations and analysis provided to Mr. Pape, on or about September 29, 2014, Mr. Pape signed Pacific Life Insurance Company applications for two Pacific Life policies (hereafter, the "Applications"). Mr. Pape signed the Applications as the proposed insured and Joyal Marie Pape, who was the trustee for the Trust at that time, signed for the Trust.

37. Mr. Braaten signed off on the Applications for each Pacific Life policy as the licensed insurance producer.

38. At the time of signing the Applications, Mr. Pape held two existing life insurance policies with total coverage of $5,000,000.00, including an existing Pacific Life policy (Policy No. VF51950760) with a $2,500,000.00 death benefit (hereafter, the "Pre-existing Policies").

39. In preparing and submitting the Applications to Pacific Life Insurance Company, Mr. Braaten did not submit the Pacific Life Policy illustration previously provided to Mr. Pape. Under Pacific Life's own internal rules and guidelines, a copy of the illustration was required to be signed and submitted to Pacific Life with the application. Instead, Mr. Braaten falsely represented in the Application that he had not provided an illustration to Mr. Pape.

40. Had Mr. Braaten submitted the September illustration with each Application, Pacific Life would have been able to determine that the September illustration violated Pacific Life's "Life Insurance Premium Financing Guide" and the "premium financing parameters" therein, which forbid the capitalizing of loan interest into the premium financed loan and require loan interest to be paid out of pocket annually, quarterly or monthly. **Exhibits C-1 and C-2.**

41. The September illustration also violated Pacific Life Insurance guidelines requiring illustrations to be signed and to reflect the loan fees on the term sheet.

42. On October 4, 2014, Pacific Life field recruiter David Rand prepared a document titled Premium Finance Case Eligibility – Preliminary Review & Sponsorship Form. **Exhibit D.** That form was not disclosed to Greg Pape but indicates that Mark Braaten was acting as

the primary producer and was splitting the case with Rohe Levy as the "3ʳᵈ party premium finance program" and giving Rohe Levy 20% of the commissions.

43.     On October 24, 2014, Mr. Braaten emailed Thomas McGee, Mr. Pape's Morgan Stanley representative, a document that Braaten represented to be "the illustration" of the "death benefit for Greg" if the policies were for $5,000,000.00 or $10,000,000.00. **Exhibit E-1.** Both October 24, 2014 illustration documents showed:

   a.     Mr. Pape would only have to make one initial payment on the policies;

   b.     Mr. Pape would not have to make any additional payments after the initial payment; and,

   c.     Interest would accrue and be capitalized into the loan.

44.     As with the September Illustration, the October 2014 loan analysis came from a Life Insurance Premium Finance Analysis Prepared for: Greg Pape, produced or created by Levy. **Exhibit E-2.** As with the September 2014 Premium Finance Analysis, the October 2014 analysis omitted and removed information in a section labeled "What are the benefits" by taking out information concerning how the rate of return related to the costs of the plan.

45.     On January 14, 2015, Rohe Levy sent Mark Braaten an email with the subject line "pape 10m gross" with an attached loan analysis. **Exhibit F.** The January 2015 loan analysis violated Pacific Life's premium financing guidelines in that it showed interest capitalizing into the loan. The January 2015 loan analysis also once again showed an annual net outlay of zero after the first year.

46.     On January 14, 2015, Thomas McGee emailed Mark Braaten stating that Mr. Pape had decided to go with a policy in an attached illustration (the "January 2015 Illustration"). **Exhibit G-1.** Once again, the attached illustration showed that Mr. Pape would only have

to make one initial payment and would have an annual net outlay of zero after year one. The attached illustration also once again showed interest capitalizing into the premium finance loan, in violation of Pacific Life guidelines.

47. As with the previous September 2014 and October 2014 illustration and loan analysis documents, the January 2015 Illustration was a loan analysis table from a document titled "Life Insurance Premium Financing Analysis Prepared for: Greg Pape" that was created or otherwise caused to be created and produced by Rohe Levy. **Exhibit G-2.**

48. On January 15, 2015, Levy prepared a premium financing input summary for Pacific Life that was for producer use only. **Exhibit H.** Thus, Rohe Levy was preparing internal premium financing documents for Pacific Life while also preparing premium financing illustrations for Mr. Pape related to Pacific Life's products.

49. On January 16, 2015, Mike Howell of Pacific Life exchanged emails with Rohe Levy, indicating that Mr. Levy was working on new loan terms sheets. **Exhibit I**. The term sheets were important because Pacific Life's own underwriting guidelines required the illustration to match the loan fees on the term sheet. A guideline sheet attached as **Exhibit J** from Pacific Life's underwriting file indicates that the policy Application was not in compliance with the guidelines because the loan fees were not reflected in the illustrations and the illustrations were not signed.

50. On January 27, 2015, Thomas McGee sent an email to Rohe Levy, copying Mr. Braaten and Mr. Pape, to inform Mr. Levy that Mr. Pape wanted to move forward with the insurance. **Exhibit K.** Mr. McGee sent this email in response to an email from Rohe Levy from the day prior concerning the funding of the policies. **Ex K**.

51.  On or about January 28, 2015, Pacific Life issued the following indexed universal life insurance policies insuring the life of Gregory Pape with the following values:

   a.  Policy No. VF52785550 in the amount of $8,000,000.00, owned by the Gregory Pape Irrevocable Insurance Trust ("Policy 550");

   b.  Policy No. VF52785540 in the amount of $2,000,000.00 owned by the Gregory Pape Irrevocable Insurance Trust ("Policy 540") (collectively hereafter Policy 550 and Policy 540 referred to as the "Pacific Life Policies").

52.  Upon issuing the Pacific Life Policies or at some time shortly thereafter unknown to Plaintiffs, Pacific Life designated its Great Lakes Regional Office in Chicago, Illinois as the Pacific Life servicing office for Plaintiffs' Pacific Life Policies.

53.  The annual premiums on the Pacific Life Policies exceeded $750,000.00, with Policy 550 having annual premiums of approximately $605,065.00 and Policy 540 having annual premiums of approximately $151,265.00.

54.  At the urging of Mr. Braaten in his meetings and communications with Mr. Pape, Plaintiffs arranged to finance the premiums through First Insurance Funding Corp., a Wintrust Company (hereafter, "Wintrust").

55.  Unbeknownst to Mr. Pape, Mr. Braaten encouraged this premium financing strategy with Wintrust due to his relationship with Rohe Levy. Mr. Braaten and Mr. Levy had worked out an undisclosed arrangement between themselves whereby Mr. Braaten would solicit the premium financed policies and Mr. Levy would earn commissions as the purported "broker" on the premium finance loan.

56.  Based on the representations, omissions and advice of Braaten to Mr. Pape, on or about February 12, 2015, the Trust entered into loan number 44-103936 as witnessed by a

promissory note with Wintrust to finance the premiums on the Pacific Life Policies (the "Wintrust Premium Financing Loan"). The initial loan amount on the Wintrust Premium Financing Loan was $1,192,564.49.

57.    Unbeknownst to Mr. Pape at the time of entering into the loan, Rohe Levy was the commissioned broker on the Wintrust Premium Financing Loan.

58.    At the time of entering into the Wintrust Premium Financing Loan, Mr. Pape, through the Trust, tendered an initial payment to Wintrust of approximately $33,379.00.

59.    During this same time, Mr. Braaten instructed Mr. Pape that he had paid enough into his other Pre-existing Policies to not make any further payments for a couple of years and still keep them in force on the same terms. Based on the advice of Mr. Braaten, Plaintiffs stopped making payment on the Pre-existing Policies.

60.    From 2015 to 2016, Plaintiffs held the Pacific Life Policies without any reason to believe that any of the prior representations made by Mr. Braaten concerning the policies were false.

61.    In early 2016, Mr. Pape reached the initial financing anniversary on the Wintrust Premium Financing Loan.

62.    Based on the recommendations and advice of Mr. Braaten, Plaintiffs took out an additional loan of $605,065.00 in 2016 to keep the Pacific Life Policies in force until 2017, having no reason to believe that Mr. Braaten had made any misrepresentations concerning the Pacific Life Policies at that time. Indeed, during the first financing anniversary, Mr. Braaten continued to represent to Mr. Pape that the premium financed policy strategy was suitable for his investment and insurance needs and encouraged and advised Mr. Pape to continue with the financing of the Policies.

63. Upon information and belief, Rohe Levy received additional commissions on the 2016 additional loan, but those commissions were not disclosed to Plaintiffs. Plaintiffs' belief is predicated on the fact that Mr. Levy was the broker on the Wintrust Premium Financing Loan and further based on the Pacific Life form indicating Braaten was splitting commissions with Levy as part of "3rd party premium finance program."

64. In or about December 2016, Mr. Pape began a relationship with new investment advisors.

65. Also in approximately December 2016, Mr. Pape began to request information from Mr. Braaten related to the approaching second anniversary on the Wintrust Premium Financing Loan. The second anniversary would require renewal by the end of January 2017.

66. On December 21, 2016, Mark Braaten sent an email to Mr. Pape and Mr. McGee with the Subject Line "Greg Pape Premium Finance Illustration." **Exhibit L-1.** The attached illustration provided the same analysis as in January 2015 and continued to represent that Mr. Pape would have an annual net outlay of zero and that interest was capitalized into the loan. That December 21, 2016 loan analysis came from a document title "Life Insurance Premium Financing Analysis Prepared for: Greg Pape," which was created, or caused to be created, and produced by Rohe Levy and once again omitted information concerning how the costs of the policy could offset its performance. **Exhibit L-2.**

67. Mr. Pape requested an illustration of what his costs would be if he lowered the death benefit. In January 2017, Levy and Braaten were in communication about the possibility for providing two illustrations: one with everything kept as-is but with a 6.48% rate and, the other, with a lowered death benefit, but without the policies becoming modified endowment contracts. These communications were not provided to Mr. Pape. During this time, Levy prepared the 6.48% rate loan analysis and emailed it to Braaten. That analysis

once again had interest capitalizing into the loan and annual net outlay of zero. **Exhibit M-1.** The next day, Mark Braaten, Inc. prepared a very similar analysis but with the annual interest calculated differently. **Exhibit M-2.** Rohe Levy continued to make illustrations, sending Braaten another 6.48% analysis with the same misrepresentations concerning annual outlay and interest rolling into the loan into February of 2017. **Exhibit M-3.**

68.     On January 30, 2017, Pacific Life informed Rohe Levy via an email from Samantha Logan, the case design analyst, that the reduction in death benefit requested by Mr. Pape could not be completed until after year seven due to modified endowment contract ("MEC") testing. Mr. Pape was not a party to this communication from Pacific Life about MEC testing.

69.     Ultimately, Mr. Braaten informed Mr. Pape that it would not be possible to provide the illustration with the reduced death benefit until February of 2017 – after the renewal deadline. However, Mr. Braaten continued to assure Mr. Pape that the premium financed policy arrangement was in his best interests and instructed Mr. Pape to sign the documents for renewal prior to the January deadline and that he would provide Mr. Pape a new illustration afterword.

70.     Trusting the advice and recommendation of Mr. Braaten and the loan analysis and illustrations, Plaintiffs took out an additional loan from Wintrust at the second anniversary in the amount of $605,065.00 to keep the Pacific Life Policies in force until 2018. Thus, Plaintiffs became obligated on the loan in a total amount of approximately $2,400,000.00. Plaintiffs took on those obligations because of the repeated representations and advice of Mr. Braaten that the premium financed strategy on the Pacific Life Policies was suitable for Mr. Pape's goals, objectives and insurance needs and Mr. Braaten assuring Mr. Pape he would provide him a new illustration for moving forward with a lower death benefit.

71.    Upon information and belief, Rohe Levy received additional commissions on the 2017 additional loan, but those commissions were not disclosed to Plaintiffs. Plaintiffs' belief is predicated on the fact that Mr. Levy was the broker on the Wintrust Premium Financing Loan and further based on the Pacific Life form indicating Braaten was splitting commissions with Levy as part of "3rd party premium finance program.

72.    After the second anniversary renewal was completed, Mr. Braaten informed Mr. Pape that the death benefit could not be lowered without triggering a modified endowment contract with negative consequences to Plaintiffs. Mr. Pape was surprised by this news as Mr. Braaten had previously assured him that the death benefit could be lowered at any time without any negative consequences and Mr. Pape had relied on that critical and material representation in making his decision to proceed with obtaining the Policies.

73.    Based on Mr. Braaten's representations and perceived "foot dragging" on getting Mr. Pape information during the second anniversary of the Wintrust Premium Financing Loan, Mr. Pape decided to have his new financial advisors look into the Pacific Life Policies, Wintrust Premium Financing Loan and Pre-existing Policies in detail.

74.    It was not until after Mr. Pape was locked in on the second anniversary renewal until 2018 and meeting with his new financial advisors in 2017 about their review of the situation that Mr. Pape learned that the representations of Mr. Braaten concerning the Pacific Life Insurance Policies were false and that the policies were not suitable for Mr. Pape in light of:

   a.   His retirement;

   b.   His investment goals at the time of purchasing the Pacific Life Policies;

    c.   The undisclosed costs of the policies and the impact of those costs on the need to take out additional loans;

    d.   The high costs of the premium financed structure;

    e.   The additional costs of riders on each policy;

    f.   His two previously existing life insurance policies with coverage of $5,000,000.00; and,

    g.   There being no legitimate investment reason to place Mr. Pape in two indexed universal life insurance policies as opposed to one.

75.    As the advisors looked into matters further, Plaintiffs also learned that Mr. Braaten's advice to not make payments on the Pre-existing Policies had caused a change in the lapse structure. In order to bring the policies back to the proper state of coverage, Plaintiffs had to pay $100,000.00.

76.    Ultimately, Mr. Braaten never disclosed that the Pacific Life Policies were a ticking time bomb due to the undisclosed costs. Braaten and MarkBraaten, Inc. never disclosed to Plaintiffs that, unlike whole life policies where costs are already deducted from guaranteed and projected results, indexed universal policies have monthly deducted costs for insurance charges, policy charges, transaction charges, policy issue charges, premium charges and costs for additional riders.

77.    Braaten and MarkBraaten, Inc. did not disclose that the policy expenses and fees each month would be 7% or more, which would offset the performance of the index and cause the policies to lose money unless Plaintiffs took out more and more loan money to cover the gap. In one quarter in 2017 alone, Policy 550 had over $25,000.00 in charges while Policy 540 had over $6,500.00 in charges. Thus, the Pacific Life Policies often had over

$30,000.00 in quarterly costs (or $120,000.00 per year) that were never explained by Mr. Braaten, nor were they set forth in any of the illustrations.

78.   In soliciting Mr. Pape to purchase the Pacific Life Insurance Policies, Mr. Braaten never explained that the success of the investment strategy would also depend on the value generated by the Pacific Life Policies compared to the nearly $120,000.00 in annual costs.

79.   Mr. Pape sent a letter to Pacific Life Insurance Company in November of 2017, informing Pacific Life Insurance of the misrepresentations made by Braaten and Levy on the Pacific Life Policies, including that:

   a.   He would not have to make any additional payments after the first year;

   b.   The policies would make enough money after the first year to pay the lender back the premiums borrowed plus the accrued interest at a future date;

   c.   The illustration provided by Braaten violated Pacific Life Insurance Company's own rules concerning premium financed policies.

80.   Pacific Life did not respond to Mr. Pape's letter. Shortly thereafter, Mr. Pape again received solicitations from Mr. Braaten to keep the policies in force by taking out an additional loan from Wintrust and was told he would need to do so by the end of January 2018.

81.   In January of 2018, after learning of the previously concealed policy costs, unsuitable nature of the policies, annual expenses and collateral requirements and realizing Pacific Life was not responding to Mr. Pape's letter, Plaintiffs elected to take the only rational course of conduct to mitigate their losses and surrendered the Pacific Life Policies.

82. Plaintiffs used the $1,800,000.00 surrender values to repay a portion of the outstanding $2,542,406.02 of principal and interest on the Wintrust Premium Financing Loan, but were forced to take out a loan in the amount of $700,000.00 to pay the difference.

83. Plaintiffs never would have incurred the over $2.5 million in the Wintrust Premium Financing Loan had they known of the omissions and misrepresentations of Braaten or known that the premium financed strategy recommended by Braaten was not primarily based on what was suitable for Plaintiffs and their interests, but largely based on an agreement between Braaten and Levy to push premium financed products and increase their own commissions at Plaintiffs' expense.

84. In addition to the $1,800,000.00 in cash surrender values paid to Wintrust, Plaintiffs incurred approximately $150,000.00 in surrender charges, the $33,379.00 in cash collateral previously posted, incurred interest charges on the Wintrust Loan in amounts exceeding $250,000.00, $100,000.00 to cure the Pre-existing Policies after non-payment and additional out-of-pocket sums as a result of Defendants' acts and omissions.

85. In addition, Mr. Braaten, MarkBraaten, Inc. and Rohe Levy have been improperly enriched by the receipt of commissions on the Policies, which were unsuitable and improper. When Mr. Pape asked Mr. Braaten how much the commissions were on the Pacific Life Policies, Mr. Braaten informed Mr. Pape that they were approximately $240,000.00.

86. In total, Plaintiffs have incurred more than $1,000,000.00 in damages as a result of the premium financed life insurance arrangement they entered into based on the Defendants' negligence, omissions, representations and breaches of duty.

*[Remainder of page intentionally left blank]*

## COUNT I
### Negligence – *As to Mark Braaten and MarkBraaten, Inc.*

87.     Plaintiffs incorporate the allegations in paragraphs 1 through 86 as though fully restated herein.

88.     Defendants Mark Braaten and MarkBraaten, Inc. owed a duty to Plaintiffs to exercise reasonable care and skill in the procurement, binding and placing of insurance coverage.

89.     Defendants Mark Braaten and Mark Braaten, Inc. also had a duty to follow reasonable industry standards in determining the suitability of the insurance products sold to Plaintiffs in light of Mr. Pape's age, insurance and investment objectives, financial situation, needs and other information known to Defendants in making the recommendation to purchase the policies.

90.     Defendants' duties of care to Plaintiffs went beyond mere contractual duties of care. Defendants' duties were extracontractual duties imposed by Illinois Statute, the Illinois Administrative Code and FINRA Rules having the force of statutory law.

91.     Defendants breached their duties of care to Plaintiffs.

92.     As a direct and proximate result of Defendants' breaches of duty, Plaintiffs have suffered harm.

93.     Plaintiffs have been damaged in an amount to be proven at trial.

        WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendants Mark Braaten and MarkBraaten, Inc. and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, costs and fees incurred in bringing this action against Defendants herein as a result of Mark Braaten and MarkBraaten, Inc.'s conduct, and any other relief this Court deems just and equitable.

<u>COUNT II</u>
**Breach of Fiduciary Duty –** *As to Mark Braaten & MarkBraaten, Inc.*

94.     Plaintiffs incorporate the allegations in paragraphs 1 through 86 as though fully restated herein.

95.     At all times relevant, Braaten was acting as an agent of MarkBraaten, Inc.

96.     Defendant Mark Braaten owed a fiduciary duty to Plaintiffs as a licensed financial advisor and as a licensed insurance producer.

97.     Braaten and MarkBraaten, Inc. stood in a position of superior knowledge to Plaintiffs relative to the premium financing of the Policies and how the Policies themselves operated. Braaten held himself and MarkBraaten, Inc. out to Plaintiffs as experts on these types of products and, in reliance on that purported expertise, Plaintiffs reposed trust and confidence in Mr. Braaten and his company in making decisions relative to the Pacific Life Policies, including the financing of those policies.

98.     Braaten and MarkBraaten, Inc. had multiple meetings and conference calls with Mr. Pape at his Naperville home for the purpose of building Mr. Pape's trust and confidence in them as experts in the field of premium financed life insurance and for the purpose of soliciting Plaintiffs to procure those insurance products through them as parties with superior knowledge and expertise in that field.

99.     Braaten and MarkBraaten, Inc. breached their fiduciary duties to Plaintiffs in that they procured life insurance policies that were not in Plaintiffs' best interest but were in the interest of Braaten and his cohort, Rohe Levy, in splitting commissions on two policies.

100.    There was no legitimate investment purpose to place two separate but nearly identical indexed universal life policies other than to line Braaten and Levy's pockets. Indeed, Mr. Braaten split commissions on the policies 80/20 with his friend Rohe Levy. This

commission split is identical to the percentage of benefits on each of the two policies totaling $10,000,000.00 (I.E. $2,000,000.00 on Policy 540, and $8,000,000.00 on policy 550).

101. These incentives flowing from Braaten to Mr. Levy were never disclosed to Mr. Pape during the meetings at his Naperville home or in the teleconferences.

102. The placement of multiple policies with undisclosed incentives that are not in the best interest of the customer is unjust and constitutes the wrongful misappropriation of the premiums paid on each policy. Braaten and MarkBraaten, Inc. are also wrongfully retaining the benefits of commissions received on the Policies.

103. Plaintiffs have suffered harm as a direct and proximate result of Defendants' conduct.

104. Plaintiffs have been damaged in an amount to be proven at trial.

105. Defendants should be required to disgorge any ill-gotten gains on the improperly placed Policies.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendants Mark Braaten and MarkBraaten, Inc. and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, punitive damages, disgorgement of any and all profits, ill-gotten gains and commissions received by Defendants a direct consequence of their breaches of duty, attorney fees and costs incurred by Plaintiffs in having to bring this suit against Defendants herein as a result of Mark Braaten and MarkBraaten, Inc.'s conduct, and any and all other relief this Court deems just and equitable.

## COUNT III (In the Alternative)
### Fraudulent Misrepresentation – *As to Mark Braaten*

106. Plaintiffs incorporate the allegations in paragraphs 1 through 86 as though fully restated herein. Plaintiffs bring this Count III in the alternative to Counts I and II in the event that

the trier of fact determines that the actions of Mark Braaten included intentional misrepresentations and omissions.

107. Mark Braaten intentionally made false statements of material fact or otherwise failed to disclose material facts in the Meeting Representations and illustrations.

108. Mark Braaten annually made further omissions and misrepresentations in advising and inducing Plaintiffs to take out additional loans in 2016 and 2017.

109. Mark Braaten made further omissions of fact as to the commission arrangement between himself and Rohe Levy.

110. Mark Braaten made the false statements of material fact and omissions with the intent that Greg Pape and the Trust rely upon those statements and omissions and for the purpose of inducing Greg Pape and his Trust to rely upon the statements and omissions and act upon them.

111. Plaintiffs had a right to rely upon the statements and omissions of Mr. Braaten and did, in fact, rely upon the statements and omissions of Mr. Braaten.

112. Plaintiffs have suffered damage as a result of their reliance upon Mr. Braaten's omissions and misrepresentations.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendants Mark Braaten and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, punitive damages, disgorgement of any and all profits, ill-gotten gains and commissions received by Defendant as a direct consequence of his misrepresentations and omissions, and any other relief this Court deems just and equitable.

## COUNT IV[1]
### (Previously Dismissed)
**Negligence / Negligent Supervision –** *As to Voya Financial*

113.    Plaintiff incorporates the allegations in paragraphs 1 through 86 as though fully restated herein.

114.    Plaintiffs did not have a contractual relationship with Voya.

115.    From 2012 to 2016, and at all times relevant to the sales of the Policies to Plaintiffs, Braaten was a registered representative and associated person of Voya.

116.    Documents for the Pacific Life policies listed the life insurance producer as Mark P. Braaten, Voya Financial Advisors, Inc. at the MarkBraaten, Inc. address on Swenson Drive in Waukesha, Wisconsin.

117.    Voya is in the business of selling insurance and other investment products and does so through its associated persons and agents.

118.    Pursuant to FINRA rules, including Rule 3110, Voya was required to supervise the activities of Braaten as an associated person and have supervisory systems in place.

119.    Under Illinois law, every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon a contract, privity of interest or the proximity of the relationship, but extends to remote and unknown persons.

120.    Voya Financial owed a duty of care to Plaintiffs due to:

    a.   The reasonable foreseeability of Plaintiffs' injury;

    b.   The likelihood of the injury;

    c.   The magnitude of the burden of guarding against the injury; and,

---

[1] Plaintiffs include this dismissed Count solely for the purposes of preservation for appeal.

d. The consequences of placing that burden on Voya.

121. Voya was aware of Braaten's business activity selling life insurance products and his history of having at least one previous customer dispute related to making misrepresentations concerning such products. It was reasonably foreseeable that an investor or consumer, including Mr. Pape and his Trust, would purchase life insurance products from Mr. Braaten in his operation of his outside business activity at MarkBraaten, Inc., which he disclosed to Voya.

122. Pursuant to FINRA rules, including Rule 3270, upon receipt of notice of Mr. Braaten's outside insurance sales activity, Voya had an obligation to evaluate the advisability of imposing specific conditions or limitations on Braaten's activity, including prohibiting the activity. Thus, Voya was able to exercise control over the activities of Braaten in selling insurance products.

123. Voya, as a FINRA member firm, had a duty to comply with FINRA industry standards and rules and guard against improper outside business activities. FINRA, through these industry rules, has determined that the burden of guarding against improper outside business activities lies with its members, including Voya. Thus, the magnitude of guarding against the injury and the consequences of placing that burden on Voya have been determined by FINRA industry standards. As a FINRA member, Voya has consented to having that onus of responsibility.

124. Voya breached its duties to properly supervise and guard against Braaten's improper actions in his outside business activity at MarkBraaten, Inc.

125. As a direct and proximate result of that breach, Plaintiffs have suffered harm in that Braaten and MarkBraaten, Inc. sold and otherwise procured the unsuitable premium financed Pacific Life Policies to Plaintiffs through repeated misrepresentations of fact.

126. Plaintiffs have been damaged in an amount to be proven at trial.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendant Voya Financial, Inc. and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, and any other relief this Court deems just and equitable.

## <u>COUNT V</u>
### Respondeat Superior – *As to Pacific Life Insurance Company*

127. Plaintiffs incorporate paragraphs 1 through 86 above as though fully stated herein.

128. Pacific Life is liable for the negligent acts, misrepresentations and omissions of its apparent or actual agent, Mark Braaten under the doctrine of *respondeat superior*.

129. Defendant Pacific Life authorized Mark Braaten to act on its behalf for the purposes of soliciting and accepting Pacific Life insurance policies and policy applications.

130. On letters Pacific Life sent to Plaintiffs concerning the policies on Pacific Life letterhead, Pacific Life listed Mr. Braaten as the servicing producer on the Pacific Life Policies.

131. Pacific Life also authorized Mark Braaten to act as their agent for the purposes of preparing policy illustrations for the Pacific Life policies and for submitting those illustrations with Pacific Life policy applications.

132. Pacific Life prepared quarterly statements for the Pacific Life Policies, which listed Mark Braaten as Plaintiffs' designated contact relative to the Pacific Life Policies.

133. Pacific Life put Mr. Braaten in a position that allowed him to make representations on behalf of Pacific Life for the purpose of soliciting policies, soliciting and preparing applications,

acting as the point of contact for Pacific Life policy holders relative to their policy statements and in preparing and presenting Pacific Life policy illustrations.

134. Plaintiffs had a good faith and reasonable belief that Mark Braaten was acting as an authorized agent on behalf of Pacific Life at all times relevant.

135. While acting as the actual or apparent authorized agent of Pacific Life in soliciting and preparing the applications for the Pacific Life Policies and in presenting the illustrations to Mr. Pape, Mark Braaten:

    a.  Omitted and otherwise misrepresented information concerning the costs and characteristics of the Pacific Life Policies;

    b.  Misrepresented the characteristics of the premium financing arrangement for the Pacific Life Policies, including on the illustrations;

    c.  Omitted or otherwise negligently represented the costs of the premium financing for the Pacific Life Policies;

    d.  Represented to Mr. Pape that the two Pacific Life Policies were suitable for his insurance needs and investment goals;

    e.  Failed to disclose that the costs of the policies would offset the potential benefits of the premium financing arrangement;

    f.  Provided Mr. Pape with illustrations that were contrary to Pacific Life Insurance companies internal guidelines and Premium Financing Parameters for premium financed policies in the Pacific Life Premium Financing Guide;

    g.  Represented to Mr. Pape that the loan interest on the premium finance loan could be capitalized into the loan despite Pacific Life Insurance having a Life Insurance Premium Financing Guide which included Premium Financing

       Parameters indicating that interest must be paid out of pocket and cannot be capitalized into the loan;

h.   Failed to disclose the commission split with Rohe Levy; and,

i.   Failed to submit illustrations with the application for the Pacific Life Policies.

136.   As a direct and proximate result of Mr. Braaten's breaches of duty, misrepresentations and omissions while acting as an actual or apparent agent of Pacific Life, Plaintiffs have suffered harm.

137.   Plaintiffs have been damaged in an amount to be proven at trial.

       WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendant Pacific Life Insurance Company and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, punitive damages, and any other relief this Court deems just and equitable.

## COUNT VI
### Negligence – *Pacific Life Insurance*

138.   Plaintiffs incorporate the allegations set forth in paragraphs 1 through 86 as though fully set forth herein.

139.   Pacific Life owed a duty of due care to Plaintiffs, which included the duty of due care in the solicitation, procurement and placing of its policies, the duty to supervise its agents, and the duty to ensure that its agents were exercising due care.

140.   Pacific Life also owed a duty of care to Plaintiffs due to:

a.   The reasonable foreseeability of Plaintiffs' injury;

b.   The likelihood of the injury;

c.   The magnitude of the burden of guarding against the injury; and,

d.   The consequences of placing that burden on Pacific Life.

141.    Pacific Life breached its duties of care to Plaintiffs.

142.    Pacific Life Insurance Company was, or should have been, aware of various red flags that that occurred during the procurement, solicitation and placement of the Pacific Life Policies that should have led to additional investigation, including that:

    a.    Braaten did not attach the required, signed illustrations to the policy applications;

    b.    Pacific Life could not determine if the illustrations complied with their Premium Financing Parameters, guidelines and policies without the illustrations being included with the application;

    c.    Rohe Levy was occasionally listed on the Pacific Life Policy documents as a producer on the policies with a Texas license number – a state having no relation to Plaintiffs' residence or domicile;

    d.    Both Braaten and Levy were listed as producers on the policies from time to time, but Rohe Levy was not listed as the producer on any of the application documents;

    e.    Rohe Levy was listed as receiving a 20% commission on Pacific Life insurance forms even though Rohe Levy was not listed as a producing agent on the applications;

    f.    Mr. Pape was already the insured of a Pacific Life policy, and the purchase of two additional, but substantially identical policies, should have triggered a review of the suitability of the transactions;

    g.    Pacific Life guideline forms for the Pacific Life Policies noted that the illustrations were not signed and even marked this as a "critical requirement;"

h. The Pacific Life guideline form indicated "no" in the "meets guidelines" category for the Pacific Life Policies under the category of "Loan fees indicated on term sheet are reflected in illustration;" and,

i. A Pacific Life guidelines sheet marked "n/a" in the category of "exit strategy" despite Pacific Life having Premium Financing Parameters that require the client to have a clear exit strategy to pay the premium financing loan.

143. Pacific Life had a duty to investigate these red flags and violations of its internal policies and to supervise the conduct of Mark Braaten as a Pacific Life authorized agent for soliciting and procuring Pacific Life policies, including the policies insuring Mr. Pape.

144. Pacific Life had additional duties to exercise reasonable care and skill in soliciting, placement and procuring the policies. These duties were extracontractual duties that arose prior to, and independent of, any insurance contract entered.

145. Pacific Life insurance breached its duties of care by:

a. Failing to investigate the red flags;

b. Failing to supervise Mark Braaten;

c. Failing to ensure that the representations and illustrations as to the Pacific Life Policies complied with Pacific Life's Premium Financing Parameters and guidelines; and,

d. Failing to properly assess the suitability of Mr. Pape being insured by three Pacific Life policies totaling $12,500,000.00.

146. As a direct result and proximate result of Pacific Life insurance companies breach of duties, (that existed prior to and were beyond and in addition to any contractual duties to Plaintiffs), the Plaintiffs have suffered a harm.

147.    Plaintiffs have been damaged in an amount to be proven at trial.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendant Pacific Life Insurance Company and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, and any other relief this Court deems just and equitable.

### COUNT VII
**Participation / Aiding and Abetting Breach of Fiduciary Duty –** *As to Rohe Levy*

148.    Plaintiffs incorporate the allegations in paragraphs 1 through 86 and the allegations of Count II sounding in Breach of Fiduciary Duty at paragraphs 95 through 105 as though fully restated herein.

149.    Mr. Braaten and Mark Braaten, Inc. owed fiduciary duties to Plaintiffs as investment advisors, insurance producers and as parties that Plaintiffs reposed trust and confidence in that stood in a position of superior knowledge to Plaintiffs relative to the premium financed policies. Those fiduciary duties were breached, causing harm and injury to Plaintiffs.

150.    Rohe Levy participated in Mark Braaten and MarkBraaten, Inc.'s breaches of duty, committed acts and omissions in furtherance of those breaches of duty, and aided Mark Braaten and MarkBraaten, Inc. in performing wrongful, injury causing acts.

151.    Rohe Levy was regularly aware of his role as a part of the overall tortious activity at the time he provided assistance to Mark Braaten and MarkBraaten, Inc. and knowingly and substantially assisted in their violations and breaches of duty through sufficient and active participation.

152.    At the time of taking actions with Mr. Braaten relative to the Pacific Life Policies, Rohe Levy knew or possessed the legal equivalent of knowledge that Mr. Braaten's actions amounted to a breach of duty.

153.  As an insurance producer himself, Rohe Levy was aware of the obligations that Mark Braaten had to act in the interests of Plaintiffs in the solicitation, placement and procurement of life insurance policies and to further only solicit and sell Plaintiffs policies that were suitable and in Plaintiffs' best interests. Rohe Levy was also aware of Mark Braaten and MarkBraaten, Inc.'s obligations to make accurate representations to Mr. Pape about the nature and characteristics of the premium financed policies and to not omit material information concerning the premium financed policies.

154.  Braaten breached his fiduciary duties and misappropriated premiums on the policies by placing Plaintiffs in the Policies when that placement was not in the best interest of Plaintiffs and the illustrations and premium finance analysis documents for the Policies were contradictory to the products that Pacific Life offered.

155.  Rohe Levy performed acts in concert with Braaten pursuant to a common design. Levy and Braaten reached an agreement to procure and sell the premium financed policies to Plaintiffs and to collect undisclosed commissions on that sale despite the premium financing structure being improper for Plaintiffs' investment purposes and insurance needs. Rohe Levy reached a further agreement with Mark Braaten whereby Plaintiffs would be sold two policies, (as opposed to one with the same value), as a means of allowing Braaten and Levy to heighten their undisclosed commissions. This agreement was not made in furtherance of the best interests of Plaintiffs, but in furtherance of Rohe Levy and Mark Braaten's agreement and goals to sell premium financed policies that maximized and benefited their commission structure.

156. Rohe Levy knowingly, substantially, aided, assisted and encouraged Braaten in soliciting and selling Plaintiffs the unsuitable premium financed Policies, the associated Wintrust Premium Finance Loan and each annual renewal.

157. Rohe Levy's conduct, separately considered, also constitutes a breach of the duty of care he owed to Plaintiffs.

158. Rohe Levy actively participated in the underwriting, soliciting and issuing of the Policies by acting as the primary point of contact with Pacific Life during the underwriting of the policies between July of 2014 and February 2015. During that time, Rohe Levy repeatedly communicated with Mike Howell of Pacific Life concerning the status of the applications, additional work required, and information needed to complete the issuing and funding of the Policies.

159. Rohe Levy sufficiently and actively participated in breaches of duty and tortious conduct by repeatedly preparing loan analysis and premium financing analysis documents for the Policies in 2014, 2015, 2016 and 2017 which incorrectly stated that:

    a. Any interest on the premium financed loan was capitalized into the loan;

    b. Mr. Pape would not have to make payments after the first year; and,

    c. Mr. Pape would have an annual net outlay of zero after the first year.

160. Levy created the loan analysis documents with the knowledge that they were for Pacific Life insurance products and were being provided to Mr. Pape to induce the purchase of the Policies and the annual renewals of the financing loan. The representations in the loan analysis documents prepared by Levy violated Pacific Life's Premium Financing Parameters and requirements for premium financed policies, including the requirement that

interest cannot be capitalized into the loan but must be paid out of pocket. Levy did not disclose the Pacific Life parameters and requirements to Plaintiffs.

161. Rohe Levy directly and actively participated in the creation of multiple Pacific Life policy documents for Mr. Pape and was listed as the insurance producer on those Pacific Life documents as well as on the policy value ledgers and on Pacific Life internal documents, including premium financing documents, worksheets and loan term sheets. Accordingly, Rohe Levy actively and knowingly prepared documents related to the Policies for Pacific Life, Mark Braaten and Mr. Pape while Levy was aware that these documents were all being prepared in furtherance of the sale, solicitation, issuance and annual renewals of the premium financed policies and loan.

162. Rohe Levy engaged in repeated communications with Braaten concerning the policies from 2014 to 2018, including emails concerning the creation of the loan analysis documents, illustrations for the Policies, issuance of the policies, funding, annual renewals in 2016 and 2017, Pacific Life's internal investigation in 2017, and the surrender of the Policies in 2018.

163. Rohe Levy also actively engaged in multiple communications with Thomas McGee, knowing that Mr. McGee was Mr. Pape's "Morgan Stanley guy." Levy represented to Pacific Life that he was "working on" Mr. McGee to get Mr. Pape to agree to apply for and obtain the Policies. Levy provided multiple illustration and analysis documents to Mr. McGee (for Mr. Pape) that contained inaccurate representations and material omissions. Levy and McGee also communicated about the decision of Mr. Pape to move forward with the policies based on those inaccurate representations that contained provisions contrary to what Pacific Life could offer in its premium financed insurance products.

164.   As the broker on the Wintrust Premium Financing Loan, Levy also actively and knowingly participated and engaged in regular communication with Wintrust concerning the loan and the annual renewals, including communications in January 2018 concerning the surrender of the Policies.

165.   Pacific Life investigated the policies in February 2017. During that investigation Pacific Life requested Braaten and Levy to comment on Mr. Pape's complaint. Rohe Levy acknowledged his work with Mr. Braaten on the policies in a written statement. In that written statement, Levy said that he and Braaten "have done a lot of work," "have both spent numerous hours trying to work with" Mr. Pape and that he and Braaten "have an extensive pre sale and post sale file on Mr. Pape," "extensive spreadsheet numerations" and "extensive illustrations and iterations of the policy," including illustrations for 2017.

166.   Mr. Braaten also submitted a written statement in response to Pacific Life's February 2017 request to Braaten and Levy. In that statement, Braaten acknowledged that he and Levy had performed an "enormous amount of work for Mr. Pape" and noted that over an extended period of time they "showed Mr. Pape an extensive number of illustrations and iterations of the policies." Thus, both Braaten and Levy have acknowledged that they worked closely together until at least February 2017 in providing information to Mr. Pape.

167.   Upon information and belief, Mr. Levy and Braaten shared mutual files relative to Plaintiffs that allowed Levy unfettered access to, and knowledge of, Braaten's actions relative to Mr. Pape and how Levy was assisting in the same.

168.   Rohe Levy benefitted from the breach in receiving undisclosed commissions on the Pacific Life Policies and on the Wintrust Premium Financing Loan.

169.     From January 2015 to January 30, 21017, Braaten and Levy spilt a percentage of at least $338,903.00 in undisclosed commissions and incentives as writing agents on the policies. Braaten and Levy also generated an additional $52,055.40 in undisclosed commissions through an undisclosed "exclusive marketing organization" relative to the Policies.

170.     Plaintiffs have been damaged as a result.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendant Rohe Levy Ordering Defendant Rohe Levy to disgorge any and all profits, ill-gotten gains and commissions received as direct consequence of his participation in Defendant Mark Braaten and Defendant Mark Braaten, Inc.'s breaches of fiduciary duty; and, Awarding Plaintiffs compensatory damages in an amount to be proven at trial, punitive damages, any and all other relief this Court deems just and equitable.

### COUNT VIII
### Unjust Enrichment / Constructive Trust – *As to Rohe Levy*

171.     Plaintiffs incorporate the allegations of paragraphs 1 through 86 and 150 through 170 as though fully restated herein.

172.     Rohe Levy has received and unjustly retained undisclosed commissions and fees on Pacific Life Insurance Policies and the Wintrust Premium Financing Loan that were procured under such conditions that, in equity and good conscience, he ought not be allowed to retain those commissions.

173.     The commissions and fees were generated as a result of breaches of duty and misrepresentations that were made by Braaten while acting in agreement with Levy to solicit and sell Plaintiffs the unsuitable premium financed policies. Levy directly and substantially participated in those breaches of duty and received commissions as a result of that wrongful conduct.

174.  The commissions are identifiable property upon which a trust can be imposed.

175.  A constructive trust should be imposed on the commissions received by Rohe Levy and Rohe Levy should be charged as the constructive trustee over the commissions for the benefit of Plaintiffs.

176.  As constructive trustee, Rohe Levy should be required to turn over the commissions he received to Plaintiffs.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray the Court enter an Order imposing a constructive trust upon the commissions earned by Rohe Levy and further Ordering Rohe Levy to act as the constructive trustee holding those commissions for the benefit of Plaintiffs and requiring Defendant Rohe Levy to turn over those commissions to Plaintiffs.

**COUNT IX**
**Negligence (as to Rohe Levy)**

177.  Plaintiffs incorporate the allegations in paragraphs 1 through 86 as though fully restated herein.

178.  Defendant Rohe Levy is a licensed insurance producer.

179.  In his capacity as a licensed insurance producer, Rohe Levy prepared multiple policy illustrations and reissued illustrations for the Policies as well as premium financed policy loan analysis documents in 2014, 2015, 2016 and 2017 in furtherance of the sale, procurement, binding and placement of the Policies, and in furtherance of the annual renewals. Those documents contained contradictory terms and provisions to the premium financed policies and loan that were sold and provided by defendants to Plaintiffs.

180.  In his capacity as a licensed insurance producer, Rohe Levy also was paid commissions on each of the Policies from January 2015 until at least January 30, 2017.

181. As a licensed insurance producer, Rohe Levy owed a duty to Plaintiffs to exercise reasonable care and skill in the sale, placement, procurement, binding and cancellation of insurance coverage.

182. Defendant Rohe Levy also had a duty to follow reasonable industry standards in determining the suitability of the insurance products sold to Plaintiffs in light of Mr. Pape's age, insurance and investment objectives, financial situation, needs and other information known to Defendants Levy and Braaten in making the recommendation to purchase the policies.

183. In undertaking the preparation of the multiple premium finance loan analysis documents in 2014, 2015, 2016 and 2017, Levy had a duty and obligation to exercise reasonable care.

184. Defendant's duties of care to Plaintiffs went beyond mere contractual duties of care. Defendant's duties were extracontractual duties imposed by Illinois law.

185. Defendant Rohe Levy breached his duties of care to Plaintiffs.

186. Defendant Rohe Levy prepared the illustrations and premium financed life insurance loan analysis documents setting forth the representations that:

   a. Any interest on the premium financed loan was capitalized into the loan;

   b. Mr. Pape would not have to make payments after the first year; and,

   c. Mr. Pape would have an annual net outlay of zero after the first year.

187. Levy created the loan analysis documents with the knowledge that they were for Pacific Life insurance products and were being provided to Mr. Pape in connection with the sale, procurement, binding and placement of the Policies.

188. The representations in the loan analysis and "illustration" documents prepared by Levy and provided to Mr. Pape violated and contradicted Pacific Life's requirements for premium

financed policies, which forbid the capitalization of interest into the loan and require annual, quarterly or monthly out-of-pocket payments of interest.

189.    Defendant Rohe Levy further breached his duties by failing to have a single conversation with Mr. Pape or any other communication for the purposes of determining the suitability of the Policies or if Mr. Pape had the requisite exit strategy for the premium financed policies.

190.    As a direct and proximate result of Defendants' breaches of duty, Plaintiffs have suffered harm.

191.    Plaintiffs have been damaged in an amount to be proven at trial.

WHEREFORE, in reliance on the foregoing, Plaintiffs pray that the Court enter judgment in their favor and against Defendant Rohe Levy and award Plaintiffs compensatory damages in an amount to be proven at trial exceeding $75,000.00, costs and fees incurred in bringing this action against Defendants herein as a result of Defendant Rohe Levy's conduct, and any other relief this Court deems just and equitable.

Respectfully submitted,

GREGORY PAPE and STACEY PAPE,
as trustee for the Gregory Pape
Irrevocable Life Insurance Trust,

/s/ Jordan B. Dorrestein
One of Plaintiffs' Attorneys

Jordan B. Dorrestein (IL Atty. No. 6308902)
Joshua M. Feagans (IL Atty No. 6286141
GRIFFIN | WILLIAMS LLP
21 N. Fourth St.
Geneva, IL 60134
P: (630) 402-9802
F: (630) 262-0644
jdorrestein@gwlllaw.com
jfeagans@gwlllaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing **Second Amended Complaint, Exhibit List and all exhibits thereto** with the Clerk of the Court using the CM/ECF system and thereby served all parties of record with the same on January 25, 2019.


<u>/s/ Jordan B. Dorrestein</u>
Jordan B. Dorrestein