## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY PAPE, an individual, and STACEY PAPE, as trustee for the Gregory Pape Irrevocable Life Insurance Trust, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 18 C 1481 |
| MARK BRAATEN, an individual; VOYA FINANCIAL ADVISORS, INC., a Minnesota Corporation; PACIFIC LIFE INSURANCE CO., a Nebraska corporation; MARKBRAATEN, Inc., a Wisconsin Corporation; ROHE LEVY, an individual, Defendants. | ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINIONS AND ORDER

In 2015, Plaintiff Gregory Pape borrowed approximately $1.1 million from a financing company to fund the purchase of two sizeable life insurance policies.  In the years that followed, Mr. Pape borrowed another $1.2 million to continue paying the premiums on those policies.  But in 2017, according to Mr. Pape, he discovered that these financial transactions were "not suitable" for his goals.  He then cancelled the policies, paid off the loans, and—together with Stacey Pape[1]—sued several of the individuals and entities involved in selling him the insurance, claiming negligence, breach of fiduciary duty, fraudulent misrepresentation, and unjust enrichment. Plaintiffs allege that prior to Mr. Pape's original purchase, and throughout his three years of coverage, Defendant Mark Braaten, an insurance producer who pitched Mr. Pape on the policies, and Defendant Rohe Levy, who prepared financial analyses regarding the policies, misrepresented key details of the financial transactions they were encouraging Mr. Pape to enter into.  Those two Defendants along with MarkBraaten, Inc., Braaten's company, now move to

---

[1]       Stacey Pape, Mr. Pape's sister, joins in her capacity as trustee for the Gregory Pape Irrevocable Life Insurance Trust.  (Second Am. Compl. ¶ 4.)

dismiss, arguing that all the claims against them are barred by a statute of limitations or, in the alternative, that several fail as a matter of law. For the reasons stated herein, Defendants' motions are granted in part and denied in part.

## STATEMENT OF FACTS

The following allegations are derived from the Second Amended Complaint, and assumed true for purposes of this motion. As of 2014, Mr. Pape, a retiree living in Naperville, Illinois, carried approximately $5,000,000 in life insurance coverage. (Second Am. Compl. [104] ¶¶ 3, 21-22.) In June of that year, Mr. Pape met for the first time with Mark Braaten, a licensed insurance producer. (*Id.* ¶¶ 13, 21.) The Complaint does not specify how Mr. Pape came to meet Braaten, but states that Braaten set up a meeting at Mr. Pape's home, where Braaten proposed that Mr. Pape double his insurance coverage, while saving $500,000, through the use of "premium financing."[2] (*Id.* ¶¶ 21, 23.) In doing so, Braaten made the following representations about the policies: (1) "Mr. Pape would only have to make one initial premium payment on the policies;" (2) "Mr. Pape would not have to make any additional payments after the initial premium payment;" and, (3) "Interest would accrue on the policies." (*Id.* ¶ 24.)

In the months that followed, Braaten and Mr. Pape held several more meetings, during which Braaten repeated his initial representations, and assured Mr. Pape that a premium-financed insurance policy was "a suitable strategy for Mr. Pape's goals," which were to make "investments that would allow for cash flow" and "avoid high risk investments with large commitments of

---

[2]     The Complaint includes no information about how "premium financing for life insurance" works. According to Forbes, premium financing for life insurance involves "borrowing money from a third party to pay the policy premiums. Once the policy generates enough surplus cash value in later years, the owner of the policy can then pay back the premium finance loan from policy values." David Kleinhandler, FORBES, *The Benefits of Premium Financing For Life Insurance* (Mar. 29, 2018), https://www.forbes.com/ sites/forbesfinancecouncil/2018/03/29/the-benefits-of-premium-financing-for-life-insurance (last visited September 29, 2019) The parties have not specifically explained how this arrangement was expected to be advantageous for Pape.

capital." (*Id.* ¶¶ 22, 30, 32.) The two also participated in multiple conference calls,[3] during which Braaten reiterated the same representations, and also made two others: (1) "The death benefit on each policy could be lowered at any time without any charges or other issues;" and (2) "Mr. Pape could get out of the policies at any time without any penalties or charges." (*Id.* ¶ 31.) The Complaint does not specify why Mr. Pape considered either of these features to be desirable in a life insurance policy that purportedly called for a single initial premium payment.

At some point, although the Complaint does not specify when, Braaten involved Rohe Levy, another licensed insurance producer, in this endeavor, apparently due to Levy's "experience and purported expertise in the area of premium financing policies." (*Id.* ¶ 25.). Unbeknownst to Pape, who never met Levy, Braaten and Levy agreed to split the commission on an eventual sale of insurance, with Braaten receiving an 80% share and Levy receiving 20%. (*Id.* ¶¶ 25, 34, 42.) For some reason, this arrangement could only be facilitated by selling Mr. Pape two different policies at once, a maneuver that conferred no benefit on Mr. Pape (Plaintiff also does not allege that it caused a detriment). (*Id.* ¶ 35.)

By July 2014, while Braaten was in the process of soliciting a sale from Mr. Pape, Levy was communicating with Mike Howell, a business supervisor and field case manager for Pacific Life Insurance Company ("Pacific Life"), to discuss Mr. Pape's potential application for a Pacific Life policy. (*Id.* ¶ 26.) Notably, although Pacific Life allegedly authorized Braaten to act as its agent throughout this process (*id.* ¶ 20), the Complaint alleges no such relationship with Levy, and the Complaint does not explain Levy's role in communicating with Pacific Life about Pape's potential application.

By August 2014, Levy was communicating with Thomas McGee, a Morgan Stanley affiliate "who worked with Mr. Pape on matters of financial planning." (*Id.* ¶ 26.) The Complaint does not

---

[3]     Although the term "conference call" suggests the presence of a third party, the Complaint does not allege the involvement of any other individuals in these conversations.

explain how the two came into contact, or what they discussed. Thereafter, Levy's primary role appears to have been to prepare loan analysis documents for Mr. Pape's review, which detailed the terms of a potential financing arrangement to fund the insurance policies. (*Id.* ¶ 27.)

On or before September 19, 2014, Levy prepared the first of three documents titled "Life Insurance Premium Finance Analysis Prepared for Greg Pape." (*Id.* ¶ 27.) On September 19, Braaten attached an excerpt from this document—the section titled "loan analysis"—to an e-mail to McGee. (*Id.*) This numbers in this excerpt, in the Complaint's characterization, showed that (1) "Any interest on the premium financed loan was capitalized into the loan"; (2) "Mr. Pape would not have to make any loan payments after the first year;" and (3) "Mr. Pape would have an annual net outlay of zero after the first year." (*Id.*) At some point not specified, Braaten reaffirmed these representation to Mr. Pape in a conference call.[4] (*Id.* ¶ 31.) Segments of the document Levy prepared that were not included in this excerpt (and thus, potentially, not shown to McGee or Mr. Pape) state information "explaining how the rate of return related to the costs of the plan." (*Id.* ¶ 28.)

On September 29, 2014, Mr. Pape signed applications for two life Pacific Life insurance policies, as did the then-appointed trustee for his trust. (*Id.* ¶ 36.) Braaten signed the policies as the licensed insurance producer, and submitted the applications to Pacific Life. (*Id.* ¶¶ 37, 39.)

At some point prior to October 24, 2014, Levy prepared another document titled "Life Insurance Premium Finance Analysis Prepared for Greg Pape." (*Id.* ¶ 44.) On October 24, Braaten e-mailed the "loan analysis" section of this document to McGee, writing that the analysis illustrated Mr. Pape's death benefit under either a $5 million or $10 million policy. (*Id.* ¶ 43.) This analysis again confirmed that (1) "Mr. Pape would only have to make one initial payment on the policies;" (2) "Mr. Pape would not have to make any additional payments after the initial payment;" and (3) "Interest would accrue and be capitalized into the loan." (*Id.*)

---

[4]        *See* note 4, *supra.*

As of January 14, 2015, Levy had prepared a third document bearing the title "Life Insurance Premium Finance Analysis Prepared for Greg Pape." (*Id.* ¶ 47.) Although the Complaint does not specify how, the "loan analysis" section of this document found its way to McGee, who on January 14, 2015 e-mailed it to Braaten, writing, "I have spoken to [Mr. Pape] and he has determined that he will be going with the policy that has the attached illustration." (Ex. G-1 to Second Am. Compl.) This document, in the Complaint's characterization, showed "that Mr. Pape would only have to make one initial payment and would have an annual net outlay of zero after year one," and "showed interest capitalizing into the premium finance loan." (Second Am. Compl. ¶ 46.)[5]

The next day, Levy prepared a "premium financing input summary for Pacific Life that was for producer use only." (*Id.* ¶ 48.) The Complaint does not explain what a "premium financing input summary" is, why Levy was preparing an internal document for a company with which he is not alleged to have had a formal relationship, how Plaintiffs came to be in possession of this document, or why it is relevant to their claims. The following day, Levy exchanged e-mails with a Pacific Life employee; these emails, according to the Complaint, "indicat[ed] that Mr. Levy was working on new loan term sheets" that would, pursuant to Pacific Life's underwriting guidelines, match the illustration for which Mr. Pape had already given approval. (*Id.* ¶ 49.) Plaintiffs further allege that Mr. Pape's application "was not in compliance with [Pacific Life's] guidelines because loan fees were not reflected in the illustrations and the illustrations were not signed." (*Id.*)

On January 27, 2015, McGee sent an e-mail to Levy, copying Braaten and Pape, stating that Mr. Pape wished to "move forward with the insurance." (*Id.* ¶ 50.) The next day, Pacific Life issued two policies insuring Mr. Pape's life, one for $2 million, and another for $8 million. (*Id.*

---

[5]     On January 14, 2015, Levy e-mailed Braaten a different loan analysis excerpt, showing "interest capitalizing into the loan" and "an annual net outlay of zero after the first year." (*Id.* ¶ 45.) This analysis, as discussed later, is not alleged to have been sent to Mr. Pape or McGee until December 2016.

¶ 51.) Based on the reference numbers Pacific Life assigned these policies, the Complaint refers to them as "Policy 550" and "Policy 540," respectively. (*Id.*) The annual premiums for these policies exceeded $750,000 in total. (*Id.* ¶ 53.) (It is unclear at what point Mr. Pape learned that he would be making "annual" premium payments; as described above, Braaten allegedly promised there would be just one initial payment.) Around this time, Braaten also advised Mr. Pape to cease making payments on life insurance policies that he held prior to this purchase. (*Id.* ¶ 59.)

Braaten furthermore encouraged Pape to enter into an agreement with First Insurance Funding Corp., a Wintrust Company ("Wintrust") to finance the premiums on his new life insurance policies. (*Id.* ¶ 55.) On February 12, 2015, Mr. Pape obtained a loan from Wintrust in the amount of $1,192,564.49. (*Id.* ¶ 56.) For reasons not explained in the Complaint, Mr. Pape immediately tendered an "initial payment" on the Wintrust loan, which totaled approximately $33,379. (*Id.* ¶ 58.) Levy earned a commission on this loan as its broker, a fact that was not shared with Mr. Pape. (*Id.* ¶¶ 55, 57.)

In early 2016, following Braaten's recommendation, Mr. Pape took out an additional loan from Wintrust in the amount of $605,065. (*Id.* ¶ 62.) Despite the apparent conflict with Braaten's purported promise of a one-time payment, there is no indication in the Complaint that this transaction set off alarm bells for Pape or his financial advisor, McGee. The Complaint alleges that Braaten "continued to represent to Mr. Pape that the premium financed policy strategy was suitable for his investment and insurance needs and encouraged Mr. Pape to continue with the financing of the [p]olicies." (*Id.*) (The Complaint does not identify Pape's insurance "needs" with any specificity.) On this loan, as with the prior one, Levy received an unspecified commission. (*Id.* ¶ 63.)

Around December 2016, Mr. Pape began a relationship with new investment advisors, and requested that Braaten provide information relating to the "approaching second anniversary" on his Wintrust loan, which apparently required renewal by the end of January 2017. (*Id.* ¶¶ 64-

65.) (What led Mr. Pape to believe the loan required "renewal," given information allegedly given to him earlier, is a mystery.) On December 21, 2016, Braaten sent Mr. Pape and McGee a loan analysis section excerpted from yet another "Life Insurance Premium Financing Analysis" prepared by Levy, showing "an annual net outlay of zero" and "interest . . . capitalized into the loan." (*Id.* ¶ 66.)

Mr. Pape thereafter requested an illustration of what his costs would be if he were to reduce the death benefit on his insurance policy. (*Id.* ¶ 67.) (The court notes that Pape's request suggests that he knew, by this point, that his policies required recurring payments.) In January 2017, Braaten and Levy discussed with one another the possibility of providing Mr. Pape with two loan analyses: "one with everything kept as-is but with a 6.48% rate and, the other, with a lowered death benefit, but without the policies becoming modified endowment contracts."[6] (*Id.* ¶ 67.) The Complaint does not specify what the 6.48% interest rate refers to, be it loan payment that Mr. Pape was making, or interest that would be capitalized into the loan amount, to be paid ultimately from insurance proceeds. Levy prepared the first of these analyses and e-mailed it to Braaten. (*Id.*) Like its predecessors, this document showed interest capitalizing into the loan and an annual net outlay of zero. (*Id.*) MarkBraaten, Inc. then prepared "a very similar analysis but with the annual interest calculated differently."[7] (*Id.*) Levy followed up with yet another draft, which

---

[6] "[M]odified endowment contract (MEC) is the term given to a life insurance policy whose funding has exceeded federal tax law limits" and thereby is no longer considered to be a life insurance contract by the IRS. INVESTOPEDIA, Akhilesh Ganti, *Modified Endowment Contract* (updated Sept. 13, 2019), https://www.investopedia.com/terms/m/modified-endowment-contract. asp (last visited September 29, 2019). One consequence of a life insurance policy's becoming a modified endowment contract is the loss of preferable tax treatment used for life insurance policies. *Id.*

[7] As explained further *infra* Part I.A, little is known about MarkBraaten, Inc., other than that it is a company through which Braaten sells insurance, and which is named as a Defendant in this case. The Complaint does not specify with whom, if anyone, MarkBraaten, Inc. shared this loan analysis document. Nor does it clarify why this allegation, unlike others throughout the Complaint, is attributed to MarkBraaten, Inc. rather than Braaten himself.

included "the same misrepresentations concerning annual outlay and interest rolling into the loan." (*Id.*)

On January 30, 2017, a Pacific Life representative informed Levy via email that Mr. Pape's desired reduction in his insurance policy's death benefit could not be accomplished until "year seven," due to "modified endowment contract testing."[8] (*Id.* ¶ 68.) Braaten then told Mr. Pape that Braaten could not provide an illustration of the adjusted policy until after February 2017—Mr. Pape's apparent deadline for renewing the loan, although the Complaint does not specify who or what imposed such a deadline—and encouraged Mr. Pape to sign the documents to obtain a new loan. (*Id.* ¶ 69.) Pape allegedly did so, taking out an additional loan from Wintrust in the amount of $605,065 (the same amount he had borrowed a year earlier), from which Levy received another commission. (*Id.* ¶ 71.) After Mr. Pape renewed the policy, Braaten allegedly relayed to Pape that his death benefit could not be lowered without "triggering a modified endowment contract with negative consequences to Plaintiffs," presumably related to taxes. (*Id.* ¶ 72.)

After hearing this, Mr. Pape asked his financial advisors to evaluate the Pacific Life policies and the Wintrust loan, as well as the other life insurance policies on which, at Braaten's direction, Mr. Pape had ceased making payments. (*Id.* ¶ 73.) Mr. Pape thereafter purportedly learned that "the representations of Mr. Braaten concerning the Pacific Life Insurance Policies were false"; the Complaint does not specify to which representations this allegation refers. (*Id.* ¶ 74.) Plaintiffs also assert that Mr. Pape at this point learned that the policies were "not suitable" for him in light of (1) "[h]is retirement"; (2) "[h]is investment goals"; (3) "[t]he undisclosed costs of the policies and the impact of those costs on the need to take out additional loans"; (4) "[t]he high costs of the premium financed structure"; (5) "[t]he additional costs of riders on each policy"; (6) Mr. Pape's previously existing insurance policies; and (7) "[t]here being no legitimate investment reason to

---

[8] The Complaint does not specify what "modified endowment contract testing" is, and neither party has enlightened the court.

place Mr. Pape in two indexed universal life insurance policies as opposed to one."[9] (*Id.* ¶ 74.) Mr. Pape also allegedly discovered that ceasing payment on his other insurance policies had caused "a change in lapse structure" that would cost $100,000 to repair. (*Id.* ¶ 75.)

The Complaint emphasizes that Braaten "never disclosed" that "unlike whole life policies where costs are already deducted from guaranteed and projected results, indexed universal policies have monthly deducted costs for insurance charges, policy charges, transaction charges, policy issue charges, premium charges and costs for additional riders." (*Id.* ¶ 76.) Nor did Braaten reveal "that the policy expenses and fees each month would be 7% or more, which would offset the performance of the index and cause the policies to lose money unless Plaintiffs took out more and more loan money to cover the gap." (*Id.* ¶ 77.)

In November of 2017, Mr. Pape sent Pacific Life a letter asserting that he believed Braaten and Levy had misrepresented details about the life insurance policies they had sold him, including that (1) "He would not have to make any additional payments after the first year;" and (2) "The policies would make enough money after the first year to pay the lender back the premiums borrowed plus the accrued interest at a future date." (*Id.* ¶ 79.) Pape's letter also stated that "[t]he illustration provided by Braaten violated Pacific Life Insurance Company's own rules concerning premium financed policies." (*Id.*) Pacific Life did not respond to this letter. (*Id.* ¶ 80.)

Braaten thereafter advised Mr. Pape to take out yet another loan to keep the Pacific Life policies in force. (*Id.*) Pape did not do so, instead surrendering the policies in January 2018. (*Id.* ¶ 81.) This yielded $1.8 million in surrender values, which Pape used to pay part of an outstanding $2,542,406.02 owed on the Wintrust loan, including over $250,000 in interest. (*Id.* ¶ 82.) To pay off the remainder of the Wintrust loan, Mr. Pape took out a separate $700,000 loan. (*Id.* ¶ 82.) Mr. Pape also incurred approximately $150,000 in "surrender charges," and was deprived of $33,379 in "cash collateral" previously posted. (*Id.* ¶ 84.)

---

[9] As stated previously, there is no allegation that covering Mr. Pape with two policies instead of one worsened Mr. Pape's liabilities or coverage in any way.

In total, Plaintiffs allege that they have incurred more than $1 million in damages as a result of Mr. Pape's purchase of the Pacific Life policies.  (*Id.* ¶ 86.)  Mr. Pape further alleges that, at some point, Braaten acknowledged that he received commission in the approximate amount of $240,000 on the policies.  (*Id.* ¶ 85.)

**PROCEDURAL HISTORY**

On February 28, 2018, Plaintiffs filed the original complaint [1] in this court.  The Second Amended Complaint [104] (the "Complaint"), filed January 30, 2019, names as Defendants Levy, Braaten, and Pacific Life, along with Markbraaten, Inc. and Voya Financial Advisors, Inc. ("Voya").  MarkBraaten, Inc. is a company owned by Braaten, through which Braaten sells life insurance policies.  (*Id.* ¶ 17.)  Voya is a Minnesota corporation of which Braaten was allegedly a registered representative, and which is not a party to this motion.[10]  (*Id.* ¶¶ 7, 16.)

Relevant here, the Second Amended Complaint brings two counts against both Braaten and MarkBraaten, Inc. (together, the "Braaten Defendants"), one count against only Braaten, and three counts against Levy.  Specifically: Counts I and II charge the Braaten Defendants with common law negligence and breach of fiduciary duty, respectively; Count III charges Braaten individually with fraudulent misrepresentation; and Counts VII, VIII, and IX charge Levy with aiding and abetting a breach of fiduciary duty, unjust enrichment, and negligence, respectively.

On February 20, 2019, the Braaten Defendants moved to dismiss Counts I, II, and III for failure to state a claim, arguing that all three counts are time-barred or, in the alternative, that Count II fails as a matter of law.  (Braaten MTD [116].)  On February 22, 2019, Levy moved to dismiss Counts VII, VIII, and IX, arguing that all three counts are time-barred or, in the alternative, that they all fail as a matter of law.  (Levy MTD [121].)  The court addresses both motions in this

---

[10]     Plaintiffs' sole claim against Voya was dismissed without prejudice on a prior version of the Complaint.  (Order of July 13, 2018 [].)  Plaintiffs replead that claim and related factual allegations in the Second Amended Complaint "for the sole purpose of preservation of any appeal."  (2nd Amend. Compl. [104] ¶ 7.)  Voya remains dismissed.

opinion. As neither Pacific Life nor Voya are parties to this motion, the opinion refers to the Braaten Defendants and Levy as, collectively, the "Defendants."

**DISCUSSION**

A motion to dismiss under Rule 12(b)(6) is a challenge to the legal sufficiency of the complaint, testing whether it provides the defendant with fair notice of a claim's basis. Fed. R. Civ. Pr. 12(b)(6). On this motion, the court accepts as true all well-pleaded, non-conclusory facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1951, 556 U.S. 662, 681 (2009). Where, as here, a plaintiff alleges "fraud or mistake," the complaint is also subject to heightened pleading requirements under Rule 9(b). *See* Fed. R. Civ. Pr. 9(b).

In testing the legal sufficiency of Plaintiffs' claims, which are all brought under state law, the court applies Illinois substantive law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The same rule holds with regard to Defendants' statute of limitations challenge. See *Guaranty Trust v. York*, 326 U.S. 99 (1945). In this endeavor, the court "must make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002).

Defendants raise a statute of limitations challenge to all claims at issue here. They also argue, in the alternative, that the breach of fiduciary duty claims fail as a matter of law because they could not have owed Plaintiffs a fiduciary duty. Additionally, Levy argues that that he did not owe Plaintiffs any duty at all, and thus that the negligence and unjust enrichment claims should be dismissed as well.

**I.    Statute of Limitations**

Defendants first argue that Counts I, II, III, VII, VIII, and IX are time barred by Section 5/13-214.4 of the Illinois Code of Civil Procedure, which provides,

> All causes of action brought . . . under any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative, concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance shall be brought within 2 years of the date the cause of action accrues.

735 ILCS 5/13-214.4. The Complaint acknowledges that Braaten and Levy are licensed insurance producers, and Defendants characterize this case as concerning the sale of insurance policies. Defendants argue, moreover, that Plaintiffs' causes of action accrued on the date the life insurance policies were first procured: January 28, 2015. Thus, because Plaintiffs did not file the original complaint in this case until February 28, 2018, Defendants argue that Section 13-214.4 bars relief.

Plaintiffs purport to identify six flaws in this argument, asserting that (1) MarkBraaten, Inc. is not "an insurance producer, registered firm, or limited insurance representative"; (2) Plaintiffs' claims arise not from the sale of insurance policies, but instead from the provision of financing loans; (3) Plaintiffs' causes of action accrued less than two years prior to the time of filing; (4) Plaintiffs' causes of action were tolled by Illinois' "discovery rule"; (5) Plaintiffs' causes of action were tolled by fraudulent concealment; and (6) Plaintiffs' causes of action were tolled by equitable estoppel. The court addresses these argument in turn.

### A. Insurance Producer

Section 13-214.4 applies only to actions brought against "an insurance producer, registered firm, or limited insurance representative." 735 ILCS 5/13-214.4. As the Braaten Defendants highlight, "insurance producer" is defined elsewhere as "[an individual or business entity] required to be licensed under the law of this State to sell, solicit, or negotiate insurance," and neither Plaintiffs nor Levy contest that this definition applies here. *See* 215 ILCS 5/500-10.

The Complaint expressly alleges that Braaten and Levy are "licensed insurance producer[s] in the state of Illinois," thus entitled to the protection of Section 13-214.4. (Second Am. Compl. ¶¶ 13-14.) Plaintiffs dispute, however, that Braaten's company is similarly entitled, because the Complaint lacks similar language directed at MarkBraaten, Inc., in particular. In other

words, Plaintiffs assert that absent an express allegation that MarkBraaten, Inc. "acted as a producer, registered firm or life insurance representative . . . [it] does not fall within the plain language of the statute." (Pl.'s Resp. to Braaten Defs. [125] at 6.)

The court declines to accept this argument, because MarkBraaten, Inc.'s role in this action is functionally inseparable from Braaten's. The Complaint introduces MarkBraaten, Inc. as a company with which Braaten "was engaged in outside business activity . . . including the sale of life insurance policies." (Second Am. Compl. ¶ 17.) It further asserts that Braaten's goal was for Pape "to purchase a premium financed life insurance policy through MarkBraaten, Inc." (*id.* at ¶ 21), and alleges much of Braaten's activity vis à vis Mr. Pape to have been conducted by both "Braaten and MarkBraaten, Inc." (*E.g. id.* ¶¶ 76-77, 85, 88, 97-99, 102, 116, 125, 150-51, 153.) There is no allegation that MarkBraaten, Inc. has any employees, or engages in any conduct of which Braaten is not the true participant, and further alleges that "[a]t all times relevant, Braaten was acting as an agent of MarkBraaten, Inc." (*Id.* ¶ 95.) On these facts, the court sees no basis for treating MarkBraaten, Inc. as anything other than an arm of Braaten himself. Given that it is undisputed that Braaten is an insurance producer, the court deems MarkBraaten, Inc. an insurance producer under Section 13-214.4, as well. Thus, actions against the Braaten Defendants and Levy are all potentially covered by Section 13-214.4.

> **B.** **"Concerning" the Sale of Insurance**

Section 13-214.4 applies only to actions "concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance." 735 ILCS 5/13-214.4. Plaintiffs dispute that this requirement is met as to any of their claims, arguing that because Defendants' alleged scheme involved the use of financing agreements to pay for insurance policies, Plaintiffs' claims "concern" those financing agreements, rather than the insurance policies they were used to finance. Plaintiffs identify no Illinois case in which a court followed similar reasoning, instead relying principally on an Illinois Consumer Fraud and Deceptive Business Practices Act case in which the Seventh Circuit described financing agreements as

13

"contractual arrangement[s] separate from the insurance policy itself." *Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037, 1045 (7th Cir. 1998).

This argument wins points for creativity, but it is not supported by law. The text of Section 13-214.4 does not exclude actions concerning insurance policies simply because they involve other financial instruments as well. Rather, the statute applies to "[a]ll causes of action brought . . . under any legal or equitable theory . . . concerning the sale . . . of any policy of insurance." This language, by its plain and ordinary meaning, encompasses all suits emerging from the sale of insurance policies, even those that also involve financing agreements.

The court has little difficulty concluding that this case "concern[s]" the sale of insurance policies. The Complaint begins with the statement, "This matter arises from a life insurance sales scheme involving multiple premium financed life insurance policies insuring the life of Plaintiff, Gregory Pape." (Second Am. Compl. ¶ 1.) Each of the counts at issue here, moreover, turn on the sale of insurance policies to Plaintiffs. Counts I and IX charge that Defendants breached their duty "to exercise reasonable care and skill in the procurement, binding and placing of insurance coverage." (*Id.* ¶¶ 88, 181.) Counts II and VII allege that the Braaten Defendants breached their fiduciary duty to Plaintiffs "in that they procured life insurance policies that were not in Plaintiffs' best interest," and that Levy aided and abetted that breach. (*Id.* ¶¶ 99, 153-55.) Count III alleges the Braaten made fraudulent misrepresentations that, while unspecified in the Count itself, are alleged elsewhere to regard features of the insurance policies he sold to Pape. (*Id.* ¶¶ 24, 27, 31, 43, 106.) And Count VIII alleges that Levy unjustly retained fees obtained, in part, from the sale of insurance policies to Plaintiffs. (*Id.* ¶ 172.) Because each of these claims plainly concern the sale of insurance policies, they fall within the purview of Section 13-214.4.

## C. Date of Accrual and Tolling

Section 5/13-214.4 bars suits filed more than two years after "the date the cause of action accrues." Because Section 13-214.4 governs this action, and because the original complaint was filed on February 28, 2018, Plaintiffs' claims must have accrued on or after February 28, 2016 in

order to remain live. Defendants contend that each of Plaintiffs' causes of action accrued months earlier, on January 28, 2015, when Pacific Life first issued the insurance policies to Pape, and therefore expired on January 28, 2017. Although Plaintiffs do not specify when, exactly, they believe the causes of action accrued, they argue that all counts were tolled until 2017, either by Illinois' "discovery rule," by fraudulent concealment, or through equitable tolling.

Although Section 13-214.4 does not specify what constitutes accrual, or under what circumstances its limitations period may be tolled, the Illinois Supreme Court recently examined these issues in *American Family Mutual Ins. Co. v. Krop*, 2018 IL 122556, ¶ 18, 120 N.E.3d 982 (Ill. 2018), *reh'g denied* (Nov. 26, 2018). In *Krop*, the insured parties (the Krops) alleged that an agent of their insurance company, American Family, had promised to sell them a policy "equal to or better than" one which the Krops had previously held. *Id.* ¶ 4, 120 N.E.3d 982. After purchasing the policy from American Family, and renewing it in each of the following three years, the Krops were sued in an unrelated action; American Family denied coverage, and sought a declaratory judgment of non-coverage. *Id.* ¶¶ 5-6, 120 N.E.3d 982. The Krops countersued, and brought a third-party complaint against American' Family's agent for "negligently fail[ing] to provide them with an insurance policy equal to [the prior policy], as they had requested." *Id.* ¶ 8, 120 N.E.3d 982. American Family and its agent argued that the Krops' claims accrued when they procured the policy more than three years earlier, and when the case reached the Illinois Supreme Court, that argument prevailed. The Supreme Court observed that "Illinois courts have typically treated allegations of negligence in relation to insurance policies, such as the negligent procurement claim here, as torts arising out of contractual relationships." *Id.* ¶ 18, 120 N.E.3d 982. "Unlike other torts," the court stressed, "the earliest date of accrual for torts arising out of contractual relationships is the date of the breach of the duty or the contract, not the date of the damages." *Id.* Thus, for purposes of Section 13-214.4, the Krops' cause of action accrued on the date they received an insurance policy that was missing terms they had requested, rather than the date they were denied coverage on account of that alleged breach. *Id.*

The court then turned to the issue of tolling and, specifically, Illinois' "discovery rule," which "delays the start of the limitations period until the claimant knew or reasonably should have known of the injury and that the injury was wrongly decided." *Id.* ¶ 21, 120 N.E.3d 982. Although the application of this rule creates a factual issue ("when should a complainant have discovered the injury?"), Illinois courts have leeway to resolve it as a matter of law "if the facts are undisputed and only one answer is reasonable." *Id.* In determining the date of discovery, American Family urged the court to follow Illinois cases holding "that insurance customers should know the specifics of their policy as soon as they purchase it," and thereby conclude that the Krops' discovery date was the same as their date of accrual. *Id.* ¶ 22, 120 N.E.3d 982. The Krops countered with several cases in which Illinois courts found that insurance brokers owed customers a fiduciary duty and, relying on this fact, held that customers had no obligation to read and understand their policies, such that the date of discovery was the date when coverage was denied. *Id.* ¶¶ 23-25, 120 N.E.3d 982.

The Illinois Supreme Court concluded that American Family did not owe the Krops a fiduciary duty. *Id.*[11] Because insurance agents and brokers are subject only to a general duty of care, the court concluded, "insurance customers' obligation to read their policy controls," *id.* ¶¶ 28, 29, meaning that the Krops' cause of action was not tolled beyond the date of accrual. The Court recognized exceptions not available to the Krops in circumstances where a policyholder "reasonably could not be expected to learn the extent of coverage simply by reading the policy." *Id.* ¶ 36, 120 N.E.3d 982. For example, "[i]n some cases the insurance policies may contain contradictory provisions or fail to define key terms. In others, the circumstances that give rise to the liability may be so unexpected that the typical customer should not be expected to anticipate how the policy applies." *Id.* The Krops' case did not present such an exceptional circumstance, however, and therefore their cause of action was not tolled. *Id.* ¶¶ 37-38, 120 N.E.3d 982.

---

[11]     This aspect of *Krop* is discussed in greater detail in Part II, *supra*.

Defendants argue that *Krop*'s holding applies to all six of the claims at issue here, and thus that all six claims accrued when the insurance policies were procured, then expired two years after, on January 27, 2017. Although there is some appeal to the simplicity of this argument, it extends *Krop* well beyond its intended reach. *Krop* did not hold that all claims to which Section 13-214.4 applies will necessarily accrue as soon as the claimants receive the insurance policy. If the parties dispute that a claimant's injury would have been reasonably apparent from the text of an insurance policy, or dispute other facts relevant to determining when the claimant "should have discovered an injury," it is the province of the jury to resolve that dispute. *Id.* ¶ 21, 120 N.E.3d 982. The court here concludes that Plaintiffs have alleged a basis for dispute as to whether any of their claims would have been reasonably apparent from the text of the two life insurance policies. Plaintiffs did not attach a copy of the policies to the Complaint, but argue that their claims involve "violations of information that would only be internal to Pacific Life relative to its guidelines," and that allegedly misrepresented details—like "the annual net outlay, the accrual of interest into the loan and the relation of the performance of the index over time compared to the costs on each policies"—would not be reflected in the policies themselves. (Pl.'s Braaten Resp. [125] at 8.)

The Braaten Defendants counter that Plaintiffs would necessarily have been informed of these alleged issues by McGee, Mr. Pape's financial advisor, while Levy insists that the claims against him are simply "that the various illustrations and premium finance analyses prepared by [him] contradicted the terms and provisions of the policies." (Braaten Reply [135] at 3; Levy Reply [137] at 3.) A motion to dismiss is not the appropriate stage at which to resolve these disputes. "[A] motion to dismiss based on failure to comply with the statute of limitations should be granted only where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir.2014) (*quoting United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)). It is "[o]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable

defense—[that] a complaint that otherwise states a claim [may] be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol–Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir.2004). Defendants have not satisfied the court that the Complaint itself demonstrates that any of Plaintiffs' claims are barred, and the court need not consider Plaintiffs' additional tolling arguments. The motion to dismiss claims as untimely is denied without prejudice.

## II.     Fiduciary Duty

Defendants additionally assert that Counts II and VII fail as a matter of law. Count II charges the Braaten Defendants with a breach of fiduciary duty, and Count VII charges Levy with aiding and abetting Braaten's breach. All Defendants argue that Illinois law precludes the possibility that the Braaten Defendants owed Plaintiffs a fiduciary duty, and Levy adds that because no breach occurred, there was nothing for him to "aid and abet." Plaintiffs respond that a carve-out to the relevant law applies or, in the alternative, that the Braaten Defendants owed a separate fiduciary duty as financial advisors.

The Braaten Defendants raised a similar argument in support of their motion to dismiss the original complaint. (*See* Braaten Defs. First Mot. Dismiss [39] at 2-5.) In a hearing on July 13, 2018, the court rejected this argument and denied the Braaten Defendants' motion from the bench. (Minute Entry of July 13, 2018 [64].) Two factors counsel in favor of reconsidering that ruling: First, as Levy was not a party to the earlier motion, this is his first opportunity to address the issue himself. Second, this court's ruling preceded *Krop*, in which the Illinois Supreme Court addressed the relevant law, and emphasized that insurance producers may be held to a fiduciary standard only in rare circumstances. 2018 IL 122556, ¶ 27, 120 N.E.3d 982 (Ill. 2018).

Section 2-2201 of Illinois' Insurance Placement Liability Act provides, in relevant part,

No cause of action brought . . . against any insurance producer . . . concerning the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance shall subject the insurance producer . . . to civil liability under standards governing the conduct of a fiduciary or a fiduciary relationship except when the conduct upon which the cause of action is based involves the wrongful retention or misappropriation by the insurance producer . . .

of any money that was received as premiums, as a premium deposit, or as payment of a claim.

735 ILCS 5/2-2201. In *Krop*, described in more detail in Part I.C, *supra*, the Illinois Supreme Court concluded that this provision prevented American Family or its agent from being held to a fiduciary standard. And, more broadly, the court held that Section 2-2202 "prevents *any* insurance producer from being held to the fiduciary standard, except in a narrow set of circumstances not relevant to this case" (i.e., cases involving the "wrongful retention or misappropriation" of premiums). *Krop*, 2018 IL 122556, ¶¶ 27-28 (emphasis added).

This court has already concluded that the Braaten Defendants qualify as insurance producers under Illinois law. *See* Part I.A, *supra*. They are thus subject to Section 2-2201's protections against being held to a fiduciary standard in most circumstances. Plaintiffs argue, however, that the Complaint adequately alleges the "narrow set of circumstances" in which Section 2-2201 allows insurance producers to be held to a fiduciary standard: where the conduct upon which a cause of action is based involves the "wrongful retention or misappropriation" of premiums. The statute does not expound upon what constitutes "wrongful retention or misappropriation," however, and the court is aware of just one Illinois case that actually interprets the phrase: *DOD Technologies v. Mesirow Ins. Svs., Inc.*, 381 Ill. App. 3d 1042, 887 N.E.2d 1 (1st Dist. 2008). There, the plaintiff (DOD) retained the services of the defendant (Mesirow), an insurance broker, expecting Mesirow would seek out insurance on its behalf "at the lowest possible price." *Id.* at 1044, 887 N.E.2d 1. DOD sent Mesirow a payment comprising both Mesirow's commission and a premium payment, which Mesirow was to forward on to the insurer. *Id.* Unbeknownst to DOD, Mesirow recovered an additional commission from the insurer; DOD contended this additional compensation caused DOD to overpay, and constituted a breach of fiduciary duty. The trial court dismissed the claim, and DOD appealed, arguing that it had alleged "wrongful retention or misappropriation" by exposing Mesirow's diversion of "funds intended to pay premiums for another wrongful purpose." *Id.* at 1048, 887 N.E.2d 1. The court agreed.

Although the court found "no cases explaining what constitutes 'wrongful retention or misappropriation' of premiums in [S]ection 2-2201(b)," two cases applying Illinois statutes with similar language were "instructive": *Western Life Ins. Co. of Am. v. Chapman*, 31 Ill. App. 3d 369, 334 N.E.2d 806 (4th Dist. 1975), and *People v. Lambert*, 195 Ill. App. 3d 314, 552 N.E.2d 300 (4th Dist. 1990). *Western Life* held that a law prohibiting misappropriation or conversion of premiums was violated by an insurance agent who gave premium money received from a client "directly to his brother or placed the money in an account which was not a premium trust account." *Western Life*, 31 Ill. App. 3d at 372, 334 N.E.2d 806. The *Lambert* court affirmed a defendant's criminal conviction for "misappropriat[ing] or convert[ing] to his own use or illegally withhold[ing] premiums," where the defendant received checks from a widow for insurance coverage that she did not, in fact, have. *Lambert*, 195 Ill. App. 3d. at 324-29, 552 N.E.2d 300.

The *DOD Technologies* court recognized that Mesirow's alleged conduct differed, but concluded simply that "a court interpreting a statute will assume that the legislature did not intend an unjust result; the placement of policies that are not the most advantageous for the customer is most certainly unjust." 381 Ill. App. 3d at 1049, 887 N.E.2d 1 (citing *In re Marriage of Beyer and Parkis*, 324 Ill. App. 3d 305, 309, 753 N.E.2d 1032 (1st Dist. 2001)). Following this principle, the court held that Mesirow misappropriated money, stating, "a producer misappropriates premiums within the terms of section 2-2201 when it directs a premium to an insurer, the price or coverage is not in the customer's best interest, and the placement earns the producer undisclosed contingent incentives." *Id.*

Plaintiffs rely on *DOD Technologies* to argue that by advising Pape to remit premium payments to Pacific Life for an insurance policy that was not in his best interest, the Braaten Defendants "misappropriated" those premium payments within the meaning of Section 2-2201. In other words, Plaintiffs contend that the Braaten Defendants "misappropriated" funds of which they were never in actually in control, solely through the power of their alleged recommendations. This is not a faithful application of the *DOD Technologies*, or the case law it cites. In *Western*

20

*Life*, *Lambert*, and *DOD Technologies,* the defendant *actually received money* from an individual who intended for the payment to cover an insurance premium. In *Western Life*, the defendant accepted payments as an agent of the insurance company he worked for. In *Lambert*, the defendant accepted payment for an insurance policy that was not actually in force. And in *DOD Technologies*, the defendant accepted the payment as a broker to the transaction. The "misappropriation" was in what the defendants did with insured parties' money, not what the defendants advised the insured parties to do with their own money. *See also Mercola v. Abdou*, No. 14 C 8170, 2015 WL 4475287, at *1 (N.D. Ill. 2015) (Feinerman, J.) (noting that the exception in Section 2-2201(b) applies "'when the [defendant's] conduct . . . involves the wrongful retention or misappropriation . . . of any money that was *received' by the defendant*'" (emphasis added) (quoting 735 ILCS 5/2-2201(b))).

Even if the *DOD Technologies* ruling had swept as broadly as Plaintiffs believe, this court concludes that holding would have been abrogated by *Krop*, where the Illinois Supreme Court described situations in which insurance producers act as fiduciaries as "a narrow set of circumstances not relevant to this case." *Krop*, 2018 IL 122556, at ¶ 28, 120 N.E.3d 982. Allegations that an insurance producer's misconduct caused plaintiffs to purchase a conduct that is less than optimal for their interests cannot be characterized as a "narrow set of circumstances." Such was, in fact, the case in *Krop* itself, where, relying on an insurance agent's advice, the Krops purchased (and paid premiums on) an insurance plan that did not match their wishes. Yet the *Krop* court expressly stated that the misappropriation exception was "not relevant to [that] case." *Id*. Although *Krop*'s discussion of the exception to Section 2-2201 was brief, it cannot be reconciled with Plaintiffs' argument or, more fundamentally, with the assignment of a fiduciary duty to the Braaten Defendants. This court therefore concludes that Plaintiffs' claims do not constitute allegations of "wrongful retention or misappropriation" of premiums, and thus that Section 2-2201 precludes imposing a fiduciary duty on the Braaten Defendants.

Plaintiffs additionally cite *Van Dyke v. White*, 2019 IL 121452, --- N.E.3d --- (Ill. 2019), in support of the proposition that "investment advisers have a fiduciary relationship with their clients even when they are acting in a dual role as insurance producers." (Pls.' Levy Resp. [131] at 10; *accord* Pl.'s Braaten Resp. [125] at 6.) In *Van Dyke*, the Illinois Supreme Court held that a defendant who acted both "as a registered investment advisor under the [Illinois Securities Law of 1953] and as a licensed insurance producer under the Insurance Code . . . was subject to the legal duties under each regulatory regime." *Van Dyke*, 2019 IL 1291579, ¶ 73. *Van Dyke* was not a case about insurance, however; it was an appeal from the Illinois Secretary of State's decision to revoke Richard Lee Van Dyke's registration as an investment advisor for alleged investment recommendations that violated the Illinois Securities Law of 1953 (the "Securities Act"). *Id.* ¶¶ 8-9. Van Dyke was a licensed insurance producer as well as an investment advisor. In appealing the revocation of his registration, Van Dyke argued that the Securities Act did not apply to some of his challenged conduct—recommending the purchase of "various financial products, including securities and indexed annuities"—which, he argued, was undertaken only in his capacity an insurance producer, and governed by the Illinois Insurance Code. *Id.* ¶¶ 43, 67. The court rejected this argument, holding that the Secretary of State's determination that Van Dyke acted as an investment advisor was not against the manifest weight of the evidence, and reasoning that Van Dyke was therefore subject to legal duties under both the Securities Act and the Insurance Code. *Id.* ¶ 73. In affirming the Secretary of State's determination that Van Dyke had violated the Securities Act, the court did not consider how Section 2-2201 would affect these duties. As the case did not "concern[ ] the sale, placement, procurement, renewal, binding, cancellation of, or failure to procure any policy of insurance," Section 2-2201 had no application or relevance.

Here, in contrast, Section 2-2201 does apply, and its text admits of no exception for a claim brought against an insurance producer simply because he is also acting as a financial advisor. Count II of the Complaint seeks to impose "civil liability under standards governing the

conduct of a fiduciary"; it is "brought . . . against an insurance producer"; it "concern[s] the sale, placement, procurement, renewal, [and] cancellation of . . . insurance"; and it does not "involve[ ] the wrongful retention or misappropriation . . . of . . . money that was received as premiums." 735 ILCS 5/2-2201. For that reason, Section 2-2201 precludes relief. And because Plaintiffs cannot show an underlying violation, the claim against Levy for aiding and abetting fails as a matter of law. *See Mason v. Sunstar Americas, Inc.*, 2018 IL App (1st) 170042-U, ¶ 70, 2018 WL 3238705, at *11 (1st Dist. 2018). Defendants' motions to dismiss Counts II and VII are granted.

## III.    Negligence

Levy also moves to dismiss Count IX, which charges him with common law negligence, arguing that he did not owe Plaintiffs a duty of care. In Illinois, "[i]n order to succeed in a negligence action, the plaintiff must prove a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from that breach." *Rhodes v. Illinois Cent. Gulf R.R.*, 172 Ill.2d 213, 227, 665 N.E.2d 1260 (Ill. 1996). Determining whether a duty exists in a given case is an issue of law, which the court may resolve on a motion to dismiss. *See Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶ 14, 965 N.E.2d 1092 (Ill. 2012). Count IX identifies three purported duties of care that, the Complaint alleges, Levy owed to Plaintiffs: (1) a duty to "exercise reasonable care and skill in the sale, placement, procurement, binding and cancellation of insurance coverage"; (2) "a duty to follow reasonable industry standards in determining the suitability of the insurance products sold to Plaintiffs"; and (3) a duty to "exercise reasonable care" in "undertaking the preparation of the multiple premium finance loan analysis documents." (Second Am. Compl. ¶¶ 181-83.)

In his opening brief, Levy disputes that any of these purported duties have a basis in law as applied to him. He notes, correctly, that only the first of these duties is codified in law, and it applies only when the would-be insured party requests the insurance. *See* to 735 ILCS 5/2201(a) (imposing a duty to "exercise ordinary care and skill in renewing, procuring, binding, or placing the *coverage requested by the insured or proposed insured*"); *see also Skaperdas v. County*

*Casualty Ins. Co.*, 2015 IL 117021, ¶ 42, 28 N.E.2d 747 (Ill. 2015).  Levy argues that because Plaintiffs never specifically requested insurance from him, this legal duty was not triggered.  He further avers that recognizing either of the other two purported duties would improperly broaden the statutory duty of care.  *See generally M.G. Skinner and Associates Insurance Agency, Inc. v. Norman–Spencer Agency, Inc.*, 845 F.3d 313, 320 (7th Cir. 2017) ("After the enactment of § 2–2201, Illinois courts considering negligence claims against insurance brokers have been reluctant to expand the duties of brokers and agents beyond those articulated in the statute.")

In their Response, Plaintiffs appear to abandon any argument supporting the first two purported duties, instead defending only the third: a duty to exercise ordinary skill and care in preparing loan analysis documents for Mr. Pape's review.  In support of the imposition of such a duty, Plaintiffs cite a single line from *Skaperdas* in which the Illinois Supreme Court briefly mentioned the concept of a "duty of care based on the negligence principle of affirmative undertaking, providing that a person who begins a service for another must exercise reasonable care in performing it to avoid injury to the beneficiary of the undertaking."  2015 IL 117021 ¶ 35, 28 N.E.3d 747 (Ill. 2015).  Levy's decision to prepare loan analyses, Plaintiffs contend, constituted such an "affirmative undertaking."  (Pls.' Levy Resp. [131] at 15.)

Levy's negligence claim is thus predicated on the proposition that Levy was preparing the loan analysis documents for Plaintiffs, with Plaintiffs being the "beneficiary of the undertaking."  In Levy's view, this argument is precluded by Plaintiffs' admission that Levy never had any form of direct contact with Mr. Pape.  But the court disagrees with this assessment.  The documents Levy allegedly prepared were, after all, each titled "Life Insurance Premium Finance Analysis Prepared for Greg Pape."  Assuming the truth of the allegations in the Complaint, Levy was fully aware that he was preparing documents on which Mr. Pape would rely in selecting a life insurance policy, and was kept apprised of Mr. Pape's requests and expectations.  The court does not believe that, as a matter of law, Levy relieved himself of any obligation to exercise care in that endeavor simply because Braaten was doing the talking.

The more fundamental rule about duty of care has some force here: "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins*, 2012 IL 110662, ¶ 19, 965 N.E.2d 1092. Assuming the truth of the allegations in the Complaint, it was reasonably probable and foreseeable to Levy that an error in the financial analyses he prepared could cause Mr. Pape injury. Accordingly, Levy's motion to dismiss Count IX is denied.

## IV. Unjust Enrichment / Constructive Trust

Finally, Levy moves to dismiss Count VIII, which alleges that Levy was unjustly enriched and requests the imposition of a constructive trust. Levy asserts that Plaintiffs have not stated a claim for unjust enrichment, and also argues that the imposition of a constructive trust is not an appropriate remedy.

To state a claim for unjust enrichment in Illinois, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Colagrossi v. UBS Securities, LLC*, 2015 IL App. (1st) 133694-U, ¶ 76, 2015 WL 5042899 (5th Dist. 2015) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160, 545 N.E.2d 672 (Ill. 1989)). Such claims typically result from wrongdoing, although "it is possible to be unjustly enriched without having done anything wrong." *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 27, 47 N.E.3d 579 (4th Dist. 2015.) If, however, "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will . . . stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

A constructive trust is a type of remedy whereby the trial court "declares the party in possession of wrongfully acquired property as the constructive trustee of that property." *Citimortgage, Inc. v. Gordon*, 2017 IL App (2d) 160846-U, ¶ 22, 2017 WL 2461383 (2d Dist. 2017).

It "is generally imposed in two situations: first, where actual or constructive fraud is considered as equitable grounds for raising the trust and, second, where there is a fiduciary duty and a subsequent breach of that duty." *Id.* (quoting *Suttles v. Vogel*, 126 Ill. 2d 186, 193, 533 N.E.2d 901 (Ill. 1988)).  As it is an equitable remedy, a constructive trust is "inappropriate where there is an adequate remedy at law," such as "legal damages." *Id.*

Count VIII alleges that Levy retained "undisclosed commissions and fees" from Pacific Life and Wintrust that "were generated as a result of breaches of duty and misrepresentations that were made by Braaten while acting in agreement with Levy." (Second Am. Compl. ¶¶ 172-73, 175.)  Levy argues that this count is based solely on conduct alleged in the aiding and abetting claim, and therefore must fall with that claim.  But the Count itself refers not just to breaches of fiduciary duty, but all "breaches of duty and misrepresentations that were made by Braaten."  This reaches the misconduct alleged against Braaten in Counts I and III, which have not been dismissed.  The Complaint adequately states a claim that because Levy obtained commissions on insurance policies and loans that were the fruits of Braaten's misconduct, he has been unjustly enriched.  Accordingly, Levy's motion to dismiss Count VIII is denied.[12]

## CONCLUSION

For the reasons stated herein, Defendants' motions [115, 120] are granted in part and denied in part.  Defendants Braaten and MarkBraaten, Inc.'s motions to dismiss Counts I and III are denied, but their motion to dismiss Count II is granted.  Defendant Levy's motion to dismiss Counts VIII and IX are denied, but his motion to dismiss Count VII is granted.  The parties are encouraged to confer regarding settlement.

---

[12]     The parties further dispute whether the imposition of a constructive trust would be appropriate in this circumstance.  The court does not believe it is necessary to resolve this dispute at the motion to dismiss stage.  A constructive trust is a remedy, and not a separate cause of action.  Determining whether, hypothetically, the court may ultimately impose a constructive trust, is not necessary resolve Levy's motion to dismiss Count VIII.

ENTER:

Dated: September 30, 2019

REBECCA R. PALLMEYER
United States District Judge