**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **GREGORY PAPE, in his individual;** | ) |
| **STACEY PAPE, as trustee for the** | ) |
| **Gregory Pape Irrevocable Life Insurance** | ) |
| **Trust,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 18 C 1481** |
| | ) |
| **MARK BRAATEN, an individual;** | )   **Judge Rebecca R. Pallmeyer** |
| **MARKBRAATEN, INC., a Wisconsin** | ) |
| **Corporation; VOYA FINANCIAL ADVISORS,** | ) |
| **INC., a Minnesota Corporation; PACIFIC** | ) |
| **LIFE INSURANCE COMPANY, a Nebraska** | ) |
| **Corporation; ROHE LEVY, an individual,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In January 2015, Plaintiff Gregory Pape purchased two premium-financed life insurance policies with a combined face value of $10 million, issued by Defendant Pacific Life Insurance Company. In this lawsuit, Pape alleges that Defendants Rohe Levy, Mark Braaten, and Braaten's company (MarkBraaten, Inc.), who played various roles in the transaction, misrepresented several aspects about the policies and the premium financing strategy. Specifically, Plaintiffs allege that Defendants represented that the premium financing arrangement would enable Pape to purchase a $10 million life insurance policy with an upfront payment of approximately $33,000. After initiating the purchase, Pape would take out loans to pay the policy premiums (the "premium financing" component of the program). The loan balance would increase over time as interest on the borrowed amount accumulated. Defendants represented, however, that by Year 20, the policies would have generated enough revenue through investment returns of 7% that the policies' cash surrender value would be sufficient to pay off the loan and accrued interest. In the meantime, apart from the $33,000 up-front payment, Pape would pay nothing out of pocket and would stand to recover $10 million in death benefits.

At some point after renewing the policies in 2016 and 2017, Pape realized the program was untenable. He surrendered the policies in January 2018 and filed this lawsuit against the insurer and the persons and entities involved in promoting the purchase to him. Plaintiffs Pape and his trustee have alleged various state-law claims against Defendants Braaten, MarkBraaten, Inc., Levy, and Pacific Life, including fraudulent misrepresentation against Braaten; unjust enrichment against Levy; and negligence against Pacific Life (under both direct and *respondeat superior* theories), Braaten and MarkBraaten, Inc., and Levy. Defendants Pacific Life [200], Braaten and MarkBraaten, Inc. [203], and Levy [207] now move for summary judgment on all counts against them. For reasons discussed below, the court denies the Braaten Defendants' motion for summary judgment. Levy's motion and Pacific Life's motion are granted in part and denied in part.

## FACTUAL BACKGROUND

The facts are set forth in the Defendants' separate Rule 56.1 statements submitted in support of the three defense motions for summary judgment, as well as Plaintiffs' Rule 56.1 responses and statements of additional facts.[1] Before reviewing those facts, the court presents background information on premium-financed life insurance.

### I. Premium Financed Life Insurance

Some life insurance policies, in addition to providing financial compensation upon the insured's death, accumulate cash value over time. 8 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Edition* § 88.03, Lexis Nexis (2021). This cash value is based on the

---

[1] The parties make numerous objections in their Rule 56.1 statements, including that various factual assertions are irrelevant or not supported by the cited evidence. In deciding the Defendants' motions for summary judgment, the court considers only material facts supported by admissible record evidence. *See Stinson v. Cty. of Cook*, No. 18 C 1614, 2020 WL 6870816, at *1 n.1 (N.D. Ill. Nov. 23, 2020). The court has spent considerable time ensuring that it has included only statements of fact supported by the underlying record; where necessary, the court cites to the underlying record to clarify factual disputes. The court addresses other significant objections as necessary, and incorporates its other evidentiary decisions into the recitation of the factual background.

premiums paid and, for insurance products with an investment component, the investment performance of the premium dollars. *Id.* When a policy has an investment component, there is ordinarily a "separate account mechanism," meaning the cash value is placed in a separate account for investment purposes; the funds in that account belong solely to the policyowner. *Id.* at § 81.02. In this case, Plaintiff Gregory Pape bought two universal life insurance policies. Universal life insurance policies have adjustable death benefits and flexible premiums, meaning the policyholder may vary the death benefit and premium. *See id.* at §§ 1.08, 81.02. Additionally, once the policy's cash value has generated enough income, it may fully fund the policy's premiums, and no further premium payments are needed. *Id.* at § 81.02. The policies Pape purchased were "indexed"—that is, the cash value in those policies would accumulate according to an external index, such as a stock market index. *See* https://www.investopedia.com/articles/ personal-finance/012416/pros-and-cons-indexed-universal-life-insurance.asp (last visited March 25, 2022).

To fund his policies, Pape used premium financing, a funding mechanism in which the proposed insured obtains a loan from a third-party lender (who, in this case, was not affiliated with the insurance carrier) in order to pay premiums. (Pls.' Statement of Additional Facts to the Braaten Defs. [220] (hereinafter "Pls.' Braaten Ad. SOF"), at ¶ 5; Pls.' Statement of Additional Facts to Levy [218] (hereinafter "Pls.' Levy Ad. SOF"), at ¶ 40; Pacific Life Statement of Facts [205] (hereinafter "Pacific Life SOF"), at ¶ 17.) Premium financing does not change the underlying insurance product. (Pls.' Braaten Ad. SOF ¶ 5; Pls.' Levy Ad. SOF ¶ 40; Pacific Life SOF ¶¶ 19– 20.) But if a policy is purchased using premium financing rather than liquid assets, the accumulated cash value of the policy (once it has generated sufficient income in later years) can pay off the premium finance loan. *New Appleman* § 1.06. The cash value of the policy may also be used as collateral for all or some portion of the premium finance loan; if the loan interest rate rises or the policy's investment component underperforms, the policyholder may be required to

post additional collateral to secure the full loan balance.   *See* https://www.investopedia.com/insurance/life-insurance-premium-financing-worth-risk/ (last visited March 25, 2022).

Plaintiffs assert that throughout the relevant time period, the Defendants represented the plan for Pape's premium-financed polices (including aspects about the loan and investment component of the policies) through "life insurance illustrations."  An "illustration" is "a presentation or depiction that includes non-guaranteed elements of a policy of life insurance over a period of years."   National Association of Insurance Commissioners, Life Insurance Illustrations Model Regulation (hereinafter "NAIC Model Regulation"), at § 4.H, https://content.naic.org/cipr_topics/topic_life_insurance_illustrations.htm (last visited March 25, 2022); *see also* Ill. Admin. Code tit. 50, § 1406.30.   There are three types of illustrations:   a "basic" illustration is "a ledger or proposal used in the sale of a life insurance policy that shows both guaranteed and non-guaranteed elements"; a "supplemental" illustration is furnished in addition to a basic illustration, but may be presented in a different form; and an "in force" illustration depicts the policy while in effect.  NAIC Model Regulation, § 4.H; *see also* Ill. Admin. Code tit. 50, § 1406.30.  Pacific Life's Compliance Manual adopts these definitions.   (Compliance Manual, Ex. 3 to Pls.' Resp. to Braaten SOF [221] (hereinafter "Compliance Manual"), at 3.)   For these illustrations, "non-guaranteed" elements are "the premiums, benefits, values, credits, or charges . . . that are not guaranteed or not determined at [issuance of the policy]," while "guaranteed" elements are anything "guaranteed and determined at issue."  NAIC Model Regulation, § 4.F.

According to Plaintiffs, the plan was for Pape to take out loans to pay for the premiums on his two policies; the interest on these loans would capitalize into the loan principal, meaning the interest would be added to the long-term, total loan balance, rather than immediately paid.  *See* https://www.investopedia.com/ask/answers/040915/what-does-it-mean-capitalize-accrued-interest.asp (last visited March 25, 2022).  Then, the investment component of Pape's policies would generate a return that would increase the policies' cash value; eventually, in Year 20, the cash surrender value would be sufficient to pay off the loan principal and accumulated interest.

(Pls.' Braaten Ad. SOF ¶ 17; Pls.' Opp'n to Braaten [222] at 5.)  In other words, the plan was for the policies to be entirely self-sustaining:  the investment component would pay for the policies themselves.

## II.    The Parties

The Plaintiffs in this case are Gregory Pape ("Pape") and, as trustee for the Gregory Pape Irrevocable Life Insurance Trust, his sister Stacey Pape.[2]  (Levy Statement of Facts [209] (hereinafter "Levy SOF"), at ¶ 2; Second Am. Compl. [104] ¶ 4.)  Pape sold his medical imaging company for $25 million in 2005, and is currently a retiree.  (Levy SOF ¶¶ 1, 8.)  The Defendants are Mark Braaten ("Braaten") and his company, MarkBraaten, Inc. (collectively, the "Braaten Defendants"), Rohe Levy ("Levy"), and Pacific Life Insurance Company ("Pacific Life").  Pacific Life is a life insurance company that issued the policies at issue in this lawsuit.  (Pacific Life Resp. to Pls.' Statement of Additional Facts [228] (hereinafter "Pacific Life Resp. to Ad. SOF"), at ¶ 35.)  Pacific Life was not party to Pape's third-party loan agreement to pay for the policies' premiums, and played no role in negotiating or securing the loan.  (Pacific Life SOF ¶ 19.)

According to Pacific Life, Braaten and Levy "were appointed as insurance producers pursuant to Illinois law to sell insurance product on behalf of Pacific Life."  (Pacific Life's Answer to Pls.' First Interrogs., Ex. 10 to Pls.' Resp. to Braaten SOF [220-10], Ex. 19 to Pls.' Resp. to Levy SOF [218-12], Ex. 22 to Pls.' Resp. to Pacific Life SOF [223-2] (hereinafter "Interrogs."), at ¶ 2.)  In Illinois, an "insurance producer" is "a person required to be licensed under the laws of this State to sell, solicit, or negotiate insurance," which encompasses both insurance agents and insurance brokers.  *Skaperdas v. Country Cas. Ins. Co.*, 2015 IL 117021, ¶¶ 29, 43, 28 N.E.3d 747, 754, 757 (quoting 215 ILCS 5/500-10).  Both Braaten and Levy entered into insurance producer agreements with Pacific Life.  (Pls.' Braaten Ad. SOF ¶ 1; Pls.' Levy Ad.

---

[2]    Pape's ex-wife, Joyal Marie Pape, was the trustee of the Trust during the application process for the insurance policies; the parties do not make clear when she left this position.  (Pacific Life SOF ¶ 29.)

SOF ¶ 2.)  Braaten signed his on November 18, 2013; Levy's is undated, but an addendum to his agreement is dated December 28, 2015.  (Braaten Agreement, Ex. 8 to Pls.' Resp. to Braaten SOF [220-8], Ex. 9 to Pls.' Resp. to Levy SOF [218-2], Ex. 1 to Pacific Life SOF [205-1], (hereinafter "Braaten Agreement"), at 9; Levy Agreement, Ex. 9 to Pls.' Resp. to Braaten SOF [220-9], Ex. 11 to Pls.' Resp. to Levy SOF [218-4], Ex. 21 to Pls.' Resp. to Pacific Life SOF [223-1], (hereinafter "Levy Agreement"), at PLIL 2879.)  The parties disagree on whether these agreements render Pacific Life responsible for Braaten's actions (Plaintiffs do not assert a *respondeat superior* theory for Levy).  According to Pacific Life, these agreements made clear that Braaten was an independent contractor, which was confirmed by his dealings with Pacific Life.  (Pacific Life SOF ¶¶ 1–15.)  Plaintiffs, on the other hand, argue that the agreement (and other documents) made Braaten an express agent of Pacific Life.  (Pls.' Opp'n to Pacific Life [225] at 5–8.)

Braaten was the insurance producer who led the solicitation of Pape's premium-financed policies.[3]  He interacted with Pape and Pape's professional advisors throughout the relevant time frame, and brought Levy in to assist with the "Pacific Life contracts" and prepare documents containing information about the policies and loan.  (Braaten Defs.' Statement of Facts [206] (hereinafter "Braaten SOF"), at ¶ 9; Braaten Dep., Ex. 2 to Pls.' Resp. to Braaten SOF [220-2], Ex. 4 to Levy SOF [209-4], Ex. 2 to Pacific Life SOF [205-2] (hereinafter "Braaten Dep."), at 37:4–12.)  As the court noted at the motion to dismiss stage, "little is known about MarkBraaten, Inc., other than that it is a company through which Braaten sells insurance."  *Pape v. Braaten*, No. 18 C 1481, 2019 WL 4750036, at *4 n.7 (N.D. Ill. Sept. 30, 2019).  Braaten testified that he is the sole owner of the company, which employed two other people in 2014 (Braaten was not sure how many employees worked at the company after that year).  (Braaten Dep. 13:4–14:8.)  The parties

---

[3]     Levy asserts that Pacific Life authorized Braaten to act as Pape's insurance broker, which Plaintiffs dispute. (Pls.' Resp. to Levy SOF ¶ 11.)  The court finds this dispute immaterial, as under Illinois law, both insurance brokers and insurance agents are considered insurance producers.  *Skaperdas*, 2015 IL 117021, ¶ 29, 28 N.E.3d at 754.

have not provided further insight on MarkBraaten, Inc.; as before, the court views the company's role in the case as "functionally inseparable from Braaten's." *Pape*, 2019 WL 4750036, at *7.

Levy's role was primarily related to premium financing and preparing the illustrative documents about Pape's policies. He is a licensed insurance producer in Illinois, and his producer agreement with Pacific Life authorized him to solicit applications for Pacific Life products and "estimate future contract performance" on behalf of Pacific Life using authorized insurance illustrations (presumably this means projecting the performance of the policies' investment component). (Pls.' Levy Ad. SOF ¶¶ 1–2, 6.) Levy never met Pape in person; his contacts were with Pape's professional advisor, Thomas McGee, with whom he communicated by "a few" emails and less than five phone calls. (Pls.' Resp. to Levy's Statement of Facts [218] (hereinafter "Pls.' Resp. to Levy SOF"), at ¶¶ 16–17; McGee Dep., Ex. C to Braaten SOF [206-3], Ex. 5 to Levy SOF [209-5], Ex. 13 to Pacific Life SOF [205-13] (hereinafter "McGee Dep."), at 167:18–168:13.) Levy also received at least one email from McGee where Pape also received a copy, and may have been on a conference call with Pape at one point. (Pls.' Resp. to Levy SOF ¶ 18.) Pape never directly told Levy his goals for the insurance policies, and Levy never provided advice on how to invest the policies' funds, or whether the insurance amounts were suitable or sufficient, though he did review Pape's tax returns to determine that Pape could afford the policies. (Levy SOF ¶¶ 21, 33; Pls.' Resp. to Levy SOF ¶ 34.)

## III.    Timeline of Events

The court now details the timeline of events relevant to this lawsuit, starting in June 2014 and ending when Pape surrendered the policies in January 2018.

### A.    Pre-Purchase Discussions

#### 1.    Summer 2014

As noted, until 2005, Pape operated a medical imaging company. Eric Mezmar was the insurance broker for that company. (Pls.' Resp. to Braaten Statement of Facts [220] (hereinafter "Pls.' Resp. to Braaten SOF"), at ¶ 10; Mezmar Dep., Ex. D. to Braaten SOF [206-4], Ex. 6 to

Levy SOF [209-6], Ex. 25 to Pls.' Resp. to Pacific Life SOF [223-5] (hereinafter "Mezmar Dep."),
at 10:16–11:8.)  Mezmar is not a life insurance broker, but he described the concept of premium
financed life insurance to Pape and introduced him to Defendant Mark Braaten at some time
around June 2014.  (Pls.' Resp. to Braaten SOF ¶ 12; Pls.' Resp. to Levy SOF ¶ 9; Pls.' Resp. to
Pacific Life Statement of Facts [223] (hereinafter "Pls.' Resp. to Pacific Life SOF"), at ¶ 21.)
Mezmar had met Braaten as early as 1995, when Mezmar's insurance company purchased the
agency where Braaten worked.  Mezmar introduced Pape to Braaten in 2014 because he thought
there may be "better financial options out there" for life insurance for Pape.  (Mezmar Dep. 16:4–
15, 141:10–142:10.)  At this time in 2014, before Pape purchased the Pacific Life policies at issue
in this lawsuit, Pape had a total of $5 million in pre-existing life insurance:  a $2.5 million policy
from "Principal" (presumably another insurance company) and a $2.5 million policy from Pacific
Life.  (Pls.' Braaten Ad. SOF ¶ 10; Pls.' Levy Ad. SOF ¶ 18.)

     In the months after first meeting Braaten, Pape had several (at least two, and perhaps as
many as eight) meetings at his home with Mezmar, Braaten, and Thomas McGee (Pape's
professional advisor at Morgan Stanley).  (Braaten SOF ¶¶ 1, 3; Pls.' Resp. to Braaten SOF ¶ 2;
Pape Dep., Ex. B to Braaten SOF [206-2], Ex. 2 to Levy SOF [209-2], Ex. 4 to Pacific Life SOF
[205-4] (hereinafter "Pape Dep."), at 56:1–57:4; McGee Dep. 38:3–39:20; Mezmar 19:10–22.)
The parties also do not say specifically what happened during these meetings,[4] beyond noting
that at some point after the initial introduction, Braaten (not Mezmar) gave a more meaningful
presentation on premium financing to Pape; the record does not make clear what this presentation
entailed.  (Pls.' Resp. to Braaten SOF ¶ 12; Pls.' Resp. to Levy SOF ¶ 9; Pacific Life SOF ¶ 21.)

---

[4]     Levy asserts that "Pape and his advisors" discussed the "terms, risks, and benefits
of the policies" at meetings between June and September 2014.  (Levy SOF ¶ 12.)  He cites only
to Plaintiffs' Complaint, which alleges that Pape had meetings with Braaten during this time, where
Braaten *did not* disclose risks associated with the polices.  (Second Am. Compl. ¶ 33.)

Mezmar received a finder's fee (a portion of Braaten's commission, around $78,000) for making the introduction.[5]  (Mezmar Dep. 135:4–136:12.)

Defendant Rohe Levy, who had no (or very limited) direct contact with Pape, was not present at the summer 2014 meetings.  Levy became involved in Pape's case in June 2014, by preparing documents that depicted aspects of the proposed policies and loan.  Starting in June 2014 and ending in February 2017, the record contains two types of these illustrative documents: more formal illustrations (which include the Pacific Life logo and additional pages of text) and less formal spreadsheets (which contain only the spreadsheet and no additional text).  Plaintiffs characterize both types of documents as life insurance illustrations (which, as discussed above, depict the non-guaranteed elements of a policy over time), while Levy and Braaten claim that they were only spreadsheets or financing analyses.[6]  (Braaten Defs.' Resp. to Pls.' Statement of Additional Facts [230] (hereinafter "Braaten Resp. to Ad. SOF"), at ¶¶ 14, 16, 22; Levy Resp. to Pls.' Statement of Additional Facts [233] (hereinafter "Levy Resp. to Ad. SOF"), at ¶¶ 16–18.) Plaintiffs only submitted the spreadsheets (not the more formal documents) as exhibits against Pacific Life; according to Pacific Life, these documents are not "[Pacific Life] illustrations,"

---

[5]      Because Mezmar was not a licensed life insurance agent, he could not directly accept the commission; the finder's fee was instead wired to his wife, who was a licensed life agent.  (Pls.' Levy Ad. SOF ¶ 39; Mezmar Dep. 135:4–136:12.)

[6]      As best this court can tell, the significance of the parties' nomenclature dispute hinges on whether certain Pacific Life guidelines apply only to illustrations, as opposed to other documents depicting information about the policies.  Plaintiffs seem to suggest that the spreadsheets constitute "supplemental illustrations" as defined in Pacific Life's Compliance Manual, meaning illustrations furnished in addition to and in a different format from the basic illustration; this presumably means the formal illustrations would be "basic illustrations," at least according to Plaintiffs.  (Pls.' Resp. to Braaten SOF ¶ 15; Compliance Manual at 3.)  The court does not find this dispute material; it uses the terms "spreadsheets" and "illustrations" only to distinguish among the different documents in the record.

because they were just loan analysis spreadsheets that did not come from Pacific Life.[7]  (Pacific Life Resp. to Ad. SOF ¶ 26.)  Neither Braaten nor Levy ever provided these specific spreadsheets to Pacific Life during the solicitation process; Levy testified, however, that he showed Pacific Life the "template" (that is, the "Excel template [for the spreadsheets] without any case-specific information") at an unspecified time.  (Braaten Dep. 278:1-19; Levy Dep., Ex. 5 to Pls.' Resp. to Braaten SOF [220-5], Ex. 3 to Levy SOF [209-3], Pacific Life as Ex. 12 to Pacific Life SOF [205-12] (hereinafter "Levy Dep."), at 136:5–140:9.)  Pape also testified that Braaten always "indicated" the spreadsheets came from Pacific Life.  (Pape Dep. 207:10–16.)  Levy prepared the formal illustrations using Navigator software (which Pacific Life producers are supposed to use for illustrations of premium-financed policies) and the spreadsheets using Microsoft Excel.  (Pls.' Levy Ad. SOF ¶ 21; Pls.' Statement of Additional Facts to Pacific Life [223] (hereinafter "Pls.' Pacific Life Ad. SOF"), at ¶ 10; Levy Dep. 50:2–16, 57:9–20, 64:15–19, 65:14–66:4.)  Levy created the spreadsheets after Braaten sent him the necessary "facts" (precisely which facts he refers to is not clear).  (Levy Dep. 19:19–20:7.)

In any event, in the summer of 2014, Levy prepared three formal Pacific Life-branded illustrations, dated June 5, June 12, and July 24, which list Levy as the "insurance producer." (Pls.' Braaten Ad. SOF ¶ 14; Pls.' Levy Ad. SOF ¶ 16.)  The parties do not clarify how or whether Pape received these illustrations.  The illustrations include pages of text about the proposed policy, show the death benefits starting at around $6 million, and contain a ledger setting forth "non-guaranteed policy values" (which, as mentioned previously, are any premiums, values, or other aspects of the policy not guaranteed at issue, as opposed to values guaranteed at issue). This non-guaranteed ledger projected the policy's accumulated cash value, projecting a 7% rate

---

[7]        Pacific Life objects to the spreadsheets as "irrelevant as to [Pacific Life]" on this basis.  (Pacific Life Resp. to Ad. SOF ¶ 26.)  The objection is overruled.  The spreadsheets are admissible against Pacific Life if Pacific Life's negligent supervision enabled or resulted in Levy and Braaten's issuance of those documents.  Additionally, they are admissible to the extent Pacific Life is vicariously liable for Braaten's issuance of the spreadsheets.

of return (the rate at which the policy's cash value would accumulate); the June 12 and July 24 illustrations also include non-guaranteed projections about the "policy loan."  Another section in each of the illustrations contains a chart listing the "guaranteed values" of the policy; these charts appear to reflect a rate of return of 0%.  (June 5 Illustration, Ex. 18 to Pls.' Resp. to Braaten SOF [220-18], Ex. 12 to Pls.' Resp. to Levy SOF [218-5], at Levy 0441–43, 0457–58; June 12 Illustration, Ex. 19 to Pls.' Resp. to Braaten SOF [220-19], Ex. 13 to Pls.' Resp. to Levy SOF [218-6], at Levy 0493–96, 0512–13; July 24 Illustration, Ex. 20 to Pls.' Resp. to Braaten SOF [220-20], Ex. 15 to Pls.' Resp. to Levy SOF [218-8], at Levy 0556–60, 0576–77.)

There is evidence in the record suggesting that Levy also prepared spreadsheets as early as June 2014 (*see* Levy Dep. 69:15–70:24), but the parties do not discuss any June spreadsheet on summary judgment.[8]  Instead, Plaintiffs first point to a spreadsheet sent by Braaten to McGee on September 19, 2014. (Emails and Spreadsheets Sent Between Braaten, Levy, McGee, and Pape, Ex. 4 to Pls.' Resp. to Braaten SOF [220-4], Ex. 25 to Pls.' Resp. to Levy SOF [218-18], Ex. 24 to Pls.' Resp. to Pacific Life SOF [223-4] (hereinafter "Spreadsheets"), at 3–5.)  This spreadsheet, and other spreadsheets in the record leading up to Pape's purchase of the policies, illustrate several key aspects about the program.  The spreadsheets contemplate just one out-of-pocket payment, about $25,000 to $33,000 in Year 1 (the "Annual Net Outlay" and "Loan Payment" columns match).  The spreadsheets show, in the policy's first seven years, policy premiums being paid for by loans (the "Loan Amount" and "Policy Premium" columns match); after Year 7, the policy premiums disappear and there are no more loans (presumably because

---

[8]     Though the parties do not attach as an exhibit any June spreadsheet, several were included as exhibits to depositions, as provided by Levy.  On June 11, Mezmar emailed McGee a spreadsheet, and on June 16, Braaten emailed McGee various spreadsheets showing versions of life insurance policies with and without premium financing, as well as documents explaining the concept of premium financing.  (Braaten Dep., Ex. 4 to Levy's SOF [209-4] at 132–62.)  These spreadsheets show illustrated rates of return of 7%, but it does not appear that they show a policy disbursement paying off the full loan and loan interest.  The documents do not make clear whether Pape ever saw them.  Though Braaten suggested at his deposition that even more spreadsheets, with different rates of return, were prepared and sent to McGee (*see* Braaten Dep. 96:15–21), neither he nor any other Defendant provided such spreadsheets on summary judgment.

the policy cash value is sufficient to fully fund the premiums, though the parties do not make this clear). The spreadsheets also show interest accumulating into the loan principal, rather than being paid out-of-pocket annually (the "Interest" and "Total Loan" columns increase each year, even though no more loans are taken out after Year 7). It appears that the cash value of the policy is used as collateral to obtain these loans (though, again, the parties do not make this clear). The cash value does not initially provide sufficient collateral (the "Net Collateral via Policy" equals the "Cash Surrender Value" less the "Total Collateral Required," and is negative for the first several years), but by Year 16, the accumulated cash surrender value has grown to cover the total collateral required. Then in Year 20, the spreadsheets show the loan's principal and accrued interest paid from the policy's cash surrender value (the "Loan Payment" and "Policy Disbursement" columns match). Each spreadsheet assumed a return on investment of 7% (the "Policy Illustrated Rate"), high enough to create sufficient cash value to pay off the loans.[9]

Levy asserts that all the spreadsheets presented to Pape were merely "part of the education process the client goes through, of seeing many different models to evaluate which is the best course of action for them." (Levy Dep. 92:2–5.) As Defendants note, each of these

---

[9]  What appears in the text is the court's own understanding of the spreadsheets. It is not clear whether or how the parties dispute the meaning of the representations that appear on those spreadsheets. Plaintiffs assert that all spreadsheets show "interest accumulating into the loan, interest being paid out of policy cash values, and illustrated rates over 6.25%." (Pls.' Levy Ad. SOF ¶ 17; Pls.' Pacific Life Ad. SOF ¶ 26; *see also* Pls.' Braaten Ad. SOF ¶ 16 (further asserting that "interest and principal on the loan" is paid out of policy cash values).) Braaten and Pacific Life blankly object to this assertion, but offer no alternative characterization of the documents' content; Levy admits the interest accumulation and illustrated rate assertions, but says nothing about whether interest is paid by policy cash value. (Braaten Resp. to Ad. SOF ¶ 16; Levy Resp. to Ad. SOF ¶ 17; Pacific Life Resp. to Ad. SOF ¶ 26.)

Plaintiffs also assert the spreadsheets show "Pape taking out loans each year with a 'Loan Amount' equal to the 'Policy Premium' and the policies generating enough revenue through the investment returns of 7% to pay off the principal and accrued interest on the loans through a 'Policy Disbursement' that took funds from the policy 'Cash Surrender Values' in year 20 while still leaving a death benefit." (Pls.' Braaten Ad. SOF ¶ 17; Pls.' Pacific Life Ad. SOF ¶ 27.) Braaten and Pacific Life again dispute this without offering any alternative substantive explanation of the documents' content. (Braaten Resp. to Ad. SOF ¶ 17; Pacific Life Resp. to Ad. SOF ¶ 27.) Plaintiffs do not make this assertion in its response to Levy's motion.

spreadsheets contains this disclaimer: "Hypothetical and for illustrative purposes only. Actual results will vary. Please consult your tax and legal advisor regarding all matters of tax and legal nature." (Braaten SOF ¶ 16; Levy SOF ¶ 27.) Pape did not recall having seen a single spreadsheet omitting that disclosure, and acknowledged, further, that he understood the spreadsheets were hypothetical and not "etched in stone." (Pape Dep. 230:17–231:7.) Pape nevertheless testified that he relied on the spreadsheets when determining whether to proceed with the program. (*Id.* at 36:18–37:2.)

Pape also testified that he consulted with McGee about the spreadsheets, including their disclaimer language. (*Id.* at 231:11–15.) Pape did not know whether McGee himself had consulted with tax experts (*id.*), but he testified that he trusted McGee to advise him on "how much money that [he] would have to pay under a particular policy illustration for premiums." (*Id.* at 170:3–7.) Pape explained:

> [McGee] provided feedback from information that was provided. I asked [McGee] to spearhead this project on my behalf. As far as advice I asked him to evaluate what was presented to him and advise me if everything was in line to meet my best interests concerning my goal of eliminating [ ] about $500,000 of payments that were due and that's what [McGee] did.[10]

(*Id.* at 19:24–20:7.) Pape asked McGee "to interact with Mark Braaten and other associates to gather information, to review the information and to give back to me and present what he saw from the information after he reviewed it"; Pape wanted McGee to provide only "pertinent information" and handle everything else himself. (*Id.* at 20:10–14, 48:1–5.) McGee, however, testified that he had only advised one other client on premium financing (and only in the banking capacity), and did not himself "fully understand" the illustrative documents, which he found "complex and confusing." (McGee Dep. 17:16–18:14, 83:17–84:22.) The record does not make clear whether Pape knew of McGee's struggles with the illustrations. But, notwithstanding his

---

[10] This reference to $500,000 appears to refer to the five remaining payments that Pape owed on his preexisting life insurance policies. (Pape Dep. 30:3–19.)

trust in McGee, Pape testified that he viewed Braaten—not McGee—as the life insurance "expert." (Pape Dep. at 169:8–170:2.)

With this background on the spreadsheets, the court turns to the September 19 email transmitting a spreadsheet to McGee; in that email, Braaten included this message: "Enclosed is the 1 pay for Greg. As you can see, the collateral is substantially higher but we eliminate the premium. This illustration has NO rollover dollars in it. For illustrative purposes we are assuming that he is keeping all his existing insurance." The attached spreadsheet has death benefits that start around $15 million. (Spreadsheets at 3–5.) The parties have not explained this message, but the court assumes "substantially higher" collateral refers to the amount of collateral needed to obtain a loan for the high premiums associated with a $15 million policy, and that "1 pay for Greg" means a proposal for a policy with a one-time out-of-pocket payment; "rollover dollars" appears to mean taking money from Pape's then-existing insurance and rolling it into a new insurance policy. (Levy Dep. 90:3–10); *see* https://www.investopedia.com/ask/answers/09/1035-exchange.asp (last visited March 25, 2022). Levy also prepared an illustration dated about a week later, September 29, this one bearing the Pacific Life logo and additional pages of text. (Pls.' Resp. to Levy SOF ¶ 23.) Whether or how Pape received this illustration is not clear from the record. This September 29 illustration shows death benefits starting at around $6 million and lists Levy as the "insurance producer." The non-guaranteed value ledger appears to project cash value accumulating at a rate of 0% (rather than 7%, like the other illustrations), and does not include any loan projections. (September 29 Illustration, Ex. 14 to Pls.' Resp. to Levy SOF [218-7], at Levy 0469–70, 0483.)

### 2. Fall 2015

By late September, Pape had taken further steps towards completing the premium-financed insurance transaction. On September 29, Pape and his trustee (at this point, his ex-wife; his sister became the trustee some time after this) signed the signature pages of two Pacific Life insurance applications and the signature page of a Pacific Life Premium Financing Disclosure

14

and Acknowledgement. (Braaten SOF ¶ 13; Levy SOF ¶ 37; Pacific Life SOF ¶¶ 30–31, 37–38.)

The applications and disclosure identified Pape as the proposed insured and the Trust as the

policyholder.  The applications also state the death benefit coverage of the applied-for policies

(here, a $9 million and a $6 million policy, totaling $15 million), and provides some other

information about the policies, including that the premium finance loan interest will be paid

"annually" (as opposed to accruing into the principal).  (Applications, Ex. E to Braaten SOF [206-

5], Ex. 3 to Pacific Life SOF [205-3] (hereinafter "Applications"), at PLIL 3945–46, 3950, 0052–

53, 0057.)  The disclosure does not provide any information on the specific applied-for policies.

(Premium Financing Disclosure, Ex. 5 to Pacific Life SOF [205-5] (hereinafter "Premium Financing

Disclosure"), at 1–2.)

Regardless what information these documents contained, Pape only saw the signature

pages:  McGee testified that Braaten sent him the signature pages for the applications and

disclosure, and requested that McGee forward those documents to Pape; Pape signed the

signature pages (presumably after McGee forwarded them), and testified that he did not see or

receive the other pages in the applications, and did not recall the disclosure.[11]  (McGee Dep.

218:14–224:1; Pape Dep. 245:5–247:15, 290:8–291:12.)   The applications' signature pages

---

[11]        Given this evidence, the court rejects Braaten and Levy's attempt to dispute
Plaintiffs' assertion that Braaten only sent the signature pages.  (Braaten Resp. to Ad. SOF ¶ 20;
Levy Resp. to Ad. SOF ¶ 24.)  At his deposition, McGee reviewed the email from Braaten's
assistant, which stated:  "Mark asked me to forward the attached signature pages on the
application for Mr. Pape."  (McGee Dep. 218:21–23.)  Then, McGee confirmed that for the
attached premium financing disclosure, there appeared to be "just [ ] a signature page," and the
attached application "appear[ed] to be only a signature page."  (*Id.* at 221:3–15, 220:4–8.)  When
Braaten re-sent the application a few weeks later, the attached document again appeared to be
"just a signature page for the application."  (*Id.* at 222:22–223:10.)  Pacific Life also objects to
Plaintiffs' assertion as "inadmissible and irrelevant," but the court finds this information relevant
to Pacific Life's allegedly negligent supervision of Braaten and its vicarious liability for Braaten's
allegedly negligent conduct.  (Pacific Life Resp. to Ad. SOF ¶ 29.)

Finally, the court overrules Plaintiffs' objection to the applications on "foundation grounds."
Plaintiffs note that Pape signed the application before it was completed, did not see the other
pages, and selected the policies after signing the application.  (Pls.' Resp. to Braaten SOF ¶ 13;
Pls.' Resp. to Levy SOF ¶ 37; Pls.' Resp. to Pacific Life SOF ¶ 30.)  Those concerns do not render
the signed pages inadmissible.

contain several declarations about the program, including that insurance producers lack authority to "make or change" insurance policies on behalf of Pacific Life. (Applications at PLIL 3957, 0064.) The signature page of the premium financing disclosure further states that Pacific Life's "role is limited solely to providing you with, and servicing, your life insurance policy." (Premium Finance Disclosure at 2.) Pape acknowledges that his signature on this document "would imply that [he] had" "committed to all the terms of [that] document," and that it was his normal custom and practice to read insurance contracts before signing them; but he did not recall reading the premium financing disclosure or the signature page of the applications. (Pape Dep. 18:24–19:2; 290:8–295:4.)

Sometime after Pape signed the application, someone completed a Pacific Life Premium Finance Case Form dated October 4, 2014. Plaintiffs seem to suggest that it was Braaten who filled out this form and presented it to Pacific Life; Braaten and Levy dispute this, and the record does not reveal who prepared the document. (Braaten Resp. to Ad. SOF ¶ 15; Levy Resp. to Ad. SOF ¶ 15.) In any event, the form is filled with handwritten responses, lists Braaten as the producer, and states that Braaten will "split the case" with Levy at a percentage of 20% (the court assumes this means that Braaten and Levy would share the commission earned for sale of this policy). The form also contains the following statements, both of which have a checked box next to them: "I have: Reviewed the Premium Financing Underwriting Eligibility Guidelines," and "Attached are 2 Pacific Life Illustrations (required): [one] using the Premium Finance template illustrating the policy as premium financed . . . [and one] illustrating the sample policy without premium financing." That section also states: "The premium financed illustration (check all that apply)," with the following statements checked: the illustration shows an "exit strategy" from premium financing using "outside sources" (the court assumes this means the loans are, at some point, paid by outside assets rather than the policy's cash value), does not have illustrated rates greater than 6.25%, and does not "illustrate a roll-up or deferral of interest." (Eligibility Form, Ex. 16 to Pls.' Resp. to Braaten SOF [220-16], Ex. 17 to Pls.' Resp. to Levy SOF [218-10], Ex. 32 to

16

Pls.' Resp. to Pacific Life SOF [223-12] (hereinafter "Eligibility Form")).) It appears that "roll-up" or "deferral" of interest means capitalizing interest into the loan principal, or otherwise delaying the payment of interest until after a certain period. *See* https://www.investopedia.com/ask/answers/040915/what-does-it-mean-capitalize-accrued-interest.asp; https://www.investopedia.com/terms/d/deferredinterest.asp (last visited March 25, 2022). In other words, according to the checkmarks, the illustrations attached to the form (which are not included in the version submitted on summary judgment) show a program which—unlike the spreadsheets—does not entail the capitalization of interest into the loan, a 7% rate of return, or loans being paid by accumulated cash value.

As the parties made progress on what Pacific Life insurance policies Pape would purchase, it appears they were also working on obtaining a loan to fund those policies. The record contains pages of an October 7, 2014 letter to the trustees of the Gregory Pape Irrevocable Trust from FIRST Insurance Funding Corp. ("FIFC"), a Wintrust Company bank that eventually loaned Pape the money to fund his insurance premiums (the premium finance loans). (Ex. 14 to Pacific Life SOF [205-14]; *see* Braaten SOF ¶ 29; Levy SOF ¶ 43.) Though the timeline is not clear, Levy chose FIFC as the lender for Pape's premium finance loans, presumably at some point before this October 7 letter, because Pape wanted to use his Morgan Stanley investment account as collateral for the loan; FIFC (unlike other lenders) allowed outside assets to be used as collateral. (Pacific Life SOF ¶ 28; Levy Dep. 20:8–22:3.) (Though the parties do not discuss this, the eventual loan agreement with FIFC makes clear that the cash value of Pape's purchased insurance policies was also used as collateral.) The October 7 letter contains information regarding this potential loan. It identifies the Trust as the borrower and states that "[p]repaid interest is due at deal inception and each annual anniversary." (Pacific Life SOF ¶¶ 52–53.) Pape produced this document in discovery but testified that he did not recall the document, and it appears that pages three to five of the five-page document are missing. (Pls.' Resp. to Pacific Life SOF ¶¶ 52–53; Pape Dep. 102:3–20.)

17

Though Pape had already sought out a premium finance loan and applied for Pacific Life insurance policies, he had not made final decisions about the premium financing program. At this point in fall of 2014, Pape had two life insurance policies worth $5 million, not funded through premium financing. He explained that, in conjunction with McGee, he decided "[t]o keep exploring and fill out an application so we could keep the ball rolling without committing ourselves" to Braaten's program; based on this exploration, he and McGee would "make a determination" about keeping or getting rid of the old policies, and whether Pape should "add or substitute" policies worth $5 or $10 million, for a total coverage amount of $5 to $15 million. (Pape Dep. 94:19–95:23.) Pape asked McGee to "keep working with Mark Braaten on this." (*Id.* at 95:9–12.)

McGee did, in fact, work with Braaten to determine the amount of life insurance Pape should purchase: on October 24, 2014, Braaten sent McGee two spreadsheets by email, with the message: "Enclosed are the illustration[s] for a net $5mm & net $10mm death benefit for Greg. Based on 1st year outlay and collateral, I don't believe the $5mm makes any sense." (Spreadsheets at 7.) One of the attached spreadsheets appears identical to the September 19 spreadsheet (projecting coverage providing death benefits starting at $15 million), and the other has death benefits starting at $10 million; both (like other spreadsheets in this case) refer to a transaction requiring a single one-time payment. (*Id.* at 8–11.) It is not clear, given the illustrated death benefits, how the spreadsheets showed "net $5mm & net $10mm death benefit," as described in Braaten's email. McGee did remember discussions with Braaten about why $10 million of insurance (but not $5 million) would "make sense," but could not recall any specifics. (McGee Dep. 211:1–10.)

### 3. Winter 2014–2015

There is no evidence in the record that Pape saw any additional communications or illustrations after October in 2014.[12] Then, on January 2, 2015, Braaten emailed Pape about

---

[12] The Braaten Defendants have submitted Pacific Life-branded illustrations dated October 21, 2014 and November 25, 2014, but Plaintiffs object to their admission because there

18

premium financing.  Braaten noted that he was enclosing "a page of the original loan documents on the contracts that have a net benefit of approximately $10,000,000," and explained several of the legally required "assumptions" made in the enclosed loan document (Plaintiffs did not include this attachment on summary judgment).  (January 2 Email, Ex. 21 to Pls.' Resp. to Braaten SOF [220-21] (hereinafter "January 2 Email").)  The last paragraph in Braaten's email states:

> In reference to the premium financial insurance, I want to reiterate *we can always lower the current amount of coverage down the road* (i.e. year 3, 4 or 5).  The collateral required would also decrease accordingly.  I've been doing estate planning for 30+ years and believe these recommendations are in your best interest.

(*Id.* (emphasis added).)  McGee confirmed that, in addition to this email, Braaten told Pape that he could terminate or reduce the amount of coverage in the future; McGee did not recall whether Braaten informed Pape there would be "fees and penalties" associated with that.  (McGee Dep. at 226:18–230:5.)

The parties have not been explicit about the value to Pape in a reduction of his death benefits, but the court assumes such a reduction would also reduce the amount of collateral necessary to secure the premium finance loan that Pape would use to pay the premiums for the Pacific Life insurance policies.  As noted, the collateral for this loan consisted of Pape's Morgan Stanley investment account and, it appears, the cash value of the policies he ultimately purchased.  The FIFC loan agreement that Pape ultimately signed identifies, as collateral, an assignment in two life insurance policies issued by Pacific Life (presumably the two policies being litigated in this lawsuit) and an interest in a securities account held by Pape's Trust (presumably the Morgan Stanley account).  (Promissory Note, Ex. J to Braaten SOF [206-10], Ex. 15 to Pacific Life SOF [205-15] (hereinafter "Promissory Note"), at 2.)  This appears to match the plan represented in the spreadsheets:  for the first several years of the program, the policies' cash

---

is no evidence that Pape or McGee ever received these illustrations.  (Pls.' Resp. to Braaten SOF ¶¶ 20–21.)  The court sustains the objection and will not consider these illustrations as evidence of what Defendants disclosed to Pape about the policies.

value would not be sufficient to cover the loan, and Pape would need to provide collateral to secure the indebtedness.

The option of reducing the policies' death benefits—and, correspondingly, the size of the premiums and the loan needed to pay them—would be helpful to Pape if the policies' investment component underperformed (meaning the cash value was less than projected) or if the loan interest rate rose (meaning the loan balance was greater than projected). Pape explained that he was aware that the program had "risks"— that interest rates could fluctuate and that the policies "could underperform such that the interest rate that [he was] earning on [his] premium account would be lower than the interest rate [he was] paying to the bank." (Pape Dep. 44:3–11, 45:9–15.) Pape further testified that he and McGee were concerned that "if these illustrations that Mark [Braaten] presented weren't going to take place, that . . . [he] would have to come up with more and more collateral in order to keep [the program] in place. . . ." (*Id.* at 233:13–19.) McGee also recalled general discussions with Pape about the possibility of the policy underperforming "depending upon any number of unknown variables"; these discussions were "focused on the underlying cash value relative to the growing loan balance and what that would mean and potential future collateral value." (McGee Dep. 112:6–18.)

Plaintiffs contend, however, that Braaten made representations or reassurances that alleviated Pape's concerns about these risks. Pape says he "asked Mr. Braaten . . . [whether] I could protect myself in the event that these policies did not perform and ask[ed] for his assurances and relied upon those assurances that he provided to me verbally." (Pape Dep. 44:9–16.) Pape testified that Braaten assured him, "this program is a very acceptable program that I have in place for you, but I'm happy to go and demonstrate to you as time goes on. . . . [and] you can take this

20

death benefit down as low as you need to, Greg."[13]  (*Id.* at 36:12–38:1.)  Additionally, at some time before he signed the loan promissory note, Pape asked Braaten, "Mark, if these things could go upside down[,] basically if the interest, these projections that you're presenting to me do not hit, can I get out of this for any reason without any issues," and Braaten responded, "Greg, you can take this death benefit down as low as you need to at any time in order to solve that issue . . . ." (*Id.* at 220:8–17.)

Presumably after or around these assurances, on January 14, McGee emailed Braaten with the message, "I have spoken to Greg and he has determined that he will be going with the policy that has the attached illustration."  (Spreadsheets at 16.)  That spreadsheet, like the others, reflected a transaction in which Pape would make just one initial payment (here, $34,570), with the premiums in Years 1–7 being funded by loans, a 7% illustrated rate of return, and a policy disbursement paying off the loan principal and accrued interest (totaling $10,692,691) in Year 20. Plaintiffs assert that Pape selected his policies on this day, based on the January 14 spreadsheet. (Pls.' Resp. to Braaten ¶ 13; Pls.' Resp. to Levy ¶ 37; Pls.' Resp. to Pacific Life ¶ 30.)  Defendants, meanwhile, point out that McGee confirmed that the January 14 spreadsheet was only a "framework," and that "there was more to be done in terms of reviewing an actual policy and an actual loan to set the terms and conditions for the premium financed program"—though McGee

---

[13]     Plaintiffs also assert that Pape was not aware of the risks of the program because the email from Braaten listing the risks of the program was, in McGee's opinion, inadequate. (Pls.' Resp. to Pacific Life SOF ¶ 25; Pls.' Resp. to Levy SOF ¶ 48.)  The parties did not submit this email as an exhibit on summary judgment, but it was included as an exhibit to McGee's deposition, as provided by Levy; the June 12, 2014 email from Braaten states, without elaboration, that premium finance entails a "policy crediting risk" and an "interest rate risk," and Pape could get capped loans as a "hedge."  (McGee Dep., Ex. 5 to Levy SOF [209-5] at 200.)  Additionally, Plaintiffs point to testimony from Fernando Ereneta, who replaced McGee as Pape's financial advisor in December 2016.  Ereneta testified that when Pape "signed up" for the program, Braaten made certain representations about the collateral; Ereneta personally heard Braaten make similar representations in December 2016.  (Ereneta Dep. 22:3–6, 36:1–37:18.)  The first statement (made before Ereneta become involved in the program) is inadmissible hearsay, and the second was made well after Pape purchased the policies and signed the promissory note.

also explained that he "expected [an insurance] policy that would be representative of this framework." (McGee Dep. 136:11–139:24; *see* Braaten SOF ¶ 19; Levy SOF ¶ 24.)

It is not clear when, according to Defendants, Pape selected his policies. Braaten claims that "Pape decided to proceed with procuring insurance in accordance with" two formal Pacific Life illustrations, one prepared on January 15 and the other on January 30; both were signed by Pape's trustee on January 30, two days after the policies were issued (these are the "placed" illustrations discussed below). (Braaten SOF ¶ 22.) Pape recalled receiving the January 15th illustration in mid-January (though later in his deposition, he asserted that he did not remember seeing the document), but did not recall receiving the January 30th illustration. (Pape Dep. 163:9–18, 178:11–16, 182:13–17.) Braaten's suggestion (as best this court can tell) is that these illustrations reflect the policies Pape selected sometime before January 30, though he provides no evidence clarifying when exactly Pape made this selection.

In any event, a few weeks later, on January 27, McGee emailed Levy (copying Braaten and Pape), confirming that Pape was ready to move forward with the insurance, and that, per Pape's request, McGee had included information about the account to be used as collateral for the premium finance loan agreement (presumably the Morgan Stanley investment account). (Levy SOF ¶ 40; Ex. K to Second. Am. Compl. [104-15].) The day after Pape made this final decision, Pacific Life issued the life insurance policies litigated in this lawsuit.

### B. Purchase of the Policies

#### 1. Policies and Policy Investments

On January 28, 2015, Pacific Life issued two indexed universal life insurance policies, with Pape as the named insured and the Trust as the owner: one in the amount of $2 million (Policy No. VF52785540, Ex. I to Braaten SOF [206-9] at 72–133, Ex. 6 to Pacific Life SOF [205-6] (hereinafter "Policy 540")), and another in the amount of $8 million (Policy No. VF52785550, Ex. I to Braaten SOF [206-9] at 1–71, Ex. 7 to Pacific Life SOF [205-7] (hereinafter "Policy 550")). (Braaten SOF ¶ 24; Levy SOF ¶ 41; Pacific Life SOF ¶ 39.) Both Braaten and Levy received

22

commissions on the policies; according to Pacific Life's commission reports, they received varying percentages of the premiums paid by Pape, split 80% for Braaten and 20% for Levy.[14] (Braaten SOF ¶ 50; Pls.' Levy Ad. SOF ¶ 7; Exs. 20–21 to Pls.' Resp. to Levy SOF [218-13, 218-14].)

The delivery receipts for the policies are signed by Pape's trustee and dated January 30, 2015.[15] (Ex. 8 to Pacific Life SOF [205-8].) The receipts acknowledge that the trustee had received the Pacific Life policies. (*Id.*) They also state: "I understand I must carefully review policy provisions including the risk classification on the Policy Specification Page(s) and the Free Look Right provided in the Policy . . . ." (*Id.*) The "Free Look Right" provision in the policies states that Pape could return the policies within 20 days of receipt, and the "policy will then be deemed void from the beginning and [Pacific Life] will refund any premium paid." (Policy 540 at 1; Policy 550 at 1.) The policies also include a section titled "Policy Illustrations," which states:

> Upon request [Pacific Life] will give you a hypothetical illustration of the future benefits under this policy based upon both guaranteed and current cost factor assumptions. Such illustrations reflect assumptions about the policy's non-guaranteed elements and about how you will use the policy's options. Over time the policy's actual nonguaranteed elements, and your actual use of the policy's options, are likely to vary from the assumptions used in such illustrations. For these reasons, actual policy values will likely be more or less favorable than shown in such illustrations.

(Policy 540 at 23; Policy 550 at 23.)

The Policy Specifications section set forth annual premium payments due under the policies: the "planned annual premium" was $151,265.61 for Policy 540, and $605,065.43 for Policy 550. (Policy 540 at 3.0; Policy 550 at 3.0.) The policies also disclose various charges

---

[14] The parties seem to dispute whether the amount of commissions was "fairly standard," and what Braaten and Levy "were entitled [to] from Pacific Life." (Levy SOF ¶ 56; Braaten SOF ¶ 50.) Whatever the nature of this dispute, the court does not find it material. Plaintiffs are not challenging the recovery of commissions; they are instead alleging that Braaten and Levy misrepresented the nature of the policies.

[15] Plaintiffs object to the policy delivery receipts on "foundation" grounds. (Pls.' Resp. to Pacific Life SOF ¶ 40.) They do not explain this objection. To the extent they object because only the trustee signed the receipts, the court overrules this objection: the Trust was the policyholder of the insurance policies, and the current trustee is also a Plaintiff in this lawsuit.

associated with the policies. (Pls.' Resp. to Braaten SOF ¶ 28; Pacific Life ¶¶ 42–43.) These charges include, without identifying dollar amounts or other specifics, a monthly deduction from the policies' accumulated value, equal to the "cost of insurance charge," "coverage charge," "administrative charge," and "rider or benefit charges, if any."[16] (Policy 540 at 5–7, 16; Policy 550 at 5–7, 16.)

The Policy Specifications section also includes "specifications for the policies' indexed account options." (Pacific Life ¶ 44.) The parties have not explained this, but it appears these specifications describe various investment plans for the policies' funds. There are multiple specifications, with different "segment terms" (this seems to describe an amount of time, from one to five years); "indexed accounts" ("Account 1," "Account 2," and so on, suggesting perhaps that the investment account was further segmented into various "indexed accounts"); and external market indexes (for example, the S&P 500 or MSCI Emerging Markets Index, likely the index tied to the particular specification). (Policy 540 at 4.8–4.20; Policy 550 at 4.9–4.21.) The court cannot discern whether these were various options from which Pape could choose, or whether they described how the policies were actually invested. Regardless, each specification states that the "segment guaranteed interest rate" and "cumulative segment guaranteed interest rate" is 0%; the court assumes that this language confirms there was no guaranteed rate of return for the investments.

It appears that Pape had some discretion in making these investments, perhaps by choosing among different external indexes; both Braaten and McGee advised Pape on the investments. (Braaten Resp. to Ad. SOF ¶ 19; Pls.' Resp. to Levy SOF ¶ 21; Pls.' Resp. to Pacific

---

[16] The parties do not provide much information about these charges. As set forth in the policies, the administrative charge is $7.50 per month, any rider charge is "described in the rider," and the cost of insurance and coverage charges are "adjusted based on experience factors" and limited by the maximum charge listed in the Policy Specifications. (Policy 540 at 3.0, 16; Policy 550 at 3.0, 16.) The policies also include equations for the calculation of the surrender charge (meaning the amount of money subtracted from the cash value if the policy is surrendered). (Policy 540 at 3.0, 18; Policy 550 at 4.0, 18.)

24

Life SOF ¶ 23.)  Pape confirmed that Braaten told him "what investments to take in connection with the premium account," explaining, "[Braaten] told me to get involved in the accounts S&P index, par, high par. . . .  He said he's an expert in this field. . . ."  (Pape Dep. 147:19–148:3.)  Pape and McGee therefore "relied on Mr. Braaten's experience with this program," though Pape "also asked Tom McGee from a financial aspect to look at these buckets that [Pacific] Life put out to make sure that we're going to achieve the illustrations that Mark Braaten presented to us."  (*Id.* at 148:8–13.)  McGee confirmed that Braaten assisted in advising about the policy investments; McGee recalled that he and Pape "were looking at the potential investments in consultation with Mark [Braaten]," and that "Mark and I had talked about different investment options and what might be a good fit, dollar cost averaging strategy and the like[.]"  (McGee Dep. 141:3–15.)  According to McGee, the long-term strategy was to take on increased risk over time.  (*Id.* at 142:1–5.)  The record does not make clear how this goal would be accomplished, nor is it clear when these investment decisions were made, before or after Pacific Life issued the policies.

## 2.    Placed Illustrations

On January 30, 2015, two days after the policies were issued, the trustee signed two illustrations for Pape's policies, one prepared on January 15 and one on January 30.[17]  (Pacific Life SOF ¶ 48; Placed Illustrations, Ex. H to Braaten SOF [206-8], Exs. 10–11 to Pacific Life SOF [205-10, 205-11], (hereinafter "Placed Illustrations"), at PLIL 1113, 5249.)  Each of these signed illustrations is, in Pacific Life's terminology, a "placed illustration"—that is, an illustration that is valid and effective for the insurance policy, and supersedes any unsigned, prior illustrations.  (Pacific Life SOF ¶¶ 46–47.)

Recall that the spreadsheets leading up to Pape's purchase showed interest capitalizing into the loan and the full loan amount being paid by accumulated cash value in Year 20, meaning

---

[17]    Both the Braaten Defendants and Pacific Life attached these illustrations, one prepared on January 15 and the other on January 30, to their statement of facts; as the court reads the parties' documents, they are largely identical.  The court refers to Pacific Life's versions.

Pape would make no out-of-pocket payments beyond his initial payment of less than $35,000. In contrast, the placed illustrations show that interest would be paid annually in full during the life of the loan. (Pacific Life SOF ¶ 51.) Pacific Life also asserts that the illustrations show the loan being paid back in Year 20 from outside assets, not with the policy's cash surrender value. (*Id.* ¶ 50.) Specifically, the illustrations show a negative "Out-of-Pocket Outlay" in Year 20, an amount which appears to be the sum of the "Premiums Borrowed" and the "Projected Lender Loan Interest." (Placed Illustrations at PLIL 1093, 5226.) However, the placed illustrations also project the policies' combined cash surrender value being high enough to pay off the combined "Out-of-Pocket Outlay" by Year 20. (*See id.*) The placed illustrations also include the following disclosure:

> The following hypothetical illustration seeks to demonstrate the potential impact that financing premiums would have on the net out-of-pocket cost for the life insurance coverage. This illustration is only valid when preceded or accompanied by an insurance company's basic illustration and summary pages. Please refer to it for information regarding policy charges, fees, policy guarantees and other important information. . . .
>
> [T]his conceptual presentation demonstrates the use of loans to pay premiums . . . . You may pay for any life insurance premiums in cash, a loan from the lending institution, or from cash values (if available). Regardless of the source of premiums, sufficient cash values must exist in the policy in order for the life insurance coverage to remain in force.

(Placed Illustrations at PLIL 1090, 5223.)

As mentioned, Pape recalled receiving the placed illustration prepared on January 15 sometime in mid-January; he then testified that he personally never received or saw the placed illustrations, because they were addressed to his trustee. He conceded, however, that he understood (at least as of the time of his deposition) that the trustee had approved or agreed to the illustrations by signing them. (Pape Dep. 163:9–18, 180:15–182:17.)

### 3. Promissory Note

On January 30, 2015, a few days after the policies' issuance and on the same day the placed illustrations were signed, Pape and his trustee signed a promissory note for the premium finance loan, to finance the premiums. (Braaten SOF ¶ 29; Pls.' Resp. to Levy SOF ¶ 42; Pacific

Life SOF ¶ 55.)  As mentioned, FIFC (a Wintrust Company) was the lending bank on the loan, which was secured by Pape's Morgan Stanley investment account and the cash value of his recently issued Pacific Life insurance policies.  (Promissory Note at 2.)   Pape testified that, despite signing the promissory note, he did not read the document in detail.  Instead, he gave the document to McGee for review and received McGee's blessing to sign the promissory note and purchase the insurance policies.  (Pls.' Resp. to Braaten SOF ¶ 37; Braaten SOF ¶¶ 34–35.)  For his part, McGee testified that he received "support" (he did not clarify what, exactly, this meant) from Morgan Stanley's legal and operations departments regarding the "collateral agreement," which the court understands to mean this loan agreement, or at least the agreement to pledge Pape's Morgan Stanley account as collateral.  (McGee Dep. 28:17–20.)

The promissory note contained several provisions regarding interest due under the loan, and capitalization of interest into the principal.  The note stated that Pape promised to pay the lender the principal amount of $1,192,564.49, plus interest.  (Promissory Note at 1.)  The interest rate was initially 2.75% per annum, but could change on each subsequent anniversary of the policy issue date.  (*Id.*)  The promissory note further provided:  "At Lender's sole discretion, Lender may elect to capitalize any unpaid interest, charges or fees payable hereunder, and accrue interest on such amounts at the applicable interest rate hereunder." (*Id.* at 2.)  Regarding annual interest payments, the promissory note stated:

> This Note is payable in successive annual installment payments, commencing on the Loan Date and continuing on the anniversary of the Policy Issue Date of each succeeding year . . . . Each annual installment payment shall be in an amount necessary to pay interest only on the unpaid principal balance of this Note, in advance (as opposed to in arrears), for the next succeeding year . . . .

(*Id.*)  It also included several disclaimers, including that the borrower had the opportunity to consult with competent counsel and that the borrower understands and agrees to satisfy all financial obligations under the loan agreement.  (*Id.* at 10.)

Before the note was signed, McGee understood that FIFC had discretion to capitalize interest into the loan.  (McGee Dep. at 95:4–23.)  Pape, too, understood that the bank had

discretion to capitalize interest into the loan, that the note did not require the bank to capitalize the interest, and that he would be required to pay interest at each annual policy issuance anniversary. (Pape Dep. 122:19–123:20, 109:4–15, 129:21–130:14.) Pape nevertheless believed that he would not need to make out-of-pocket interest payments, because the bank would capitalize the interest: "I had no reason to feel that [the bank] wouldn't [capitalize the interest] or Mark Braaten wouldn't have presented this bank to us or the program wouldn't have worked from the get go. If I was required to have to pay any payments, then we wouldn't have had any discussions." (*Id.* at 124:22–125:3.) Pape explained that he saw no need to communicate with Braaten or McGee about any concerns regarding FIFC's retaining discretion to capitalize the interest because Braaten had 25 years of similar experience and had "said that there won't be an issue with capitalizing the interest." (*Id.* at 125:5–24.)

### 4. Payment of $33,000

At this time, Pape also made a payment of $33,251.02 to FIFC. (Levy SOF ¶ 49; Pacific Life SOF ¶ 63.) As the court understands the record, this payment was intended as the Year 1 "net outlay" on the spreadsheets—that is, the only out-of-pocket payment Pape was to make under the premium financing program. Pape explained that he wrote this check to the bank because Braaten directed him to do so; although Braaten had initially told Pape that he would "never have to pay any money out of pocket," at some point before Pape purchased the policies, Braaten informed him that he would need to make one payment of around $33,000 to kickstart the program. (Pape Dep. 213:9–11, 214:12–215:8.) Pape testified:

> [T]here was zero [payments] except for [the] one payment. . . . [Braaten] said this is how the program needs to work which was a $33,000 check that he asked [for] at the end. He came in here stating, again, you don't have to have any money out of pocket whether it was a loan or interest. He didn't elaborate on it. He said no money out of pocket as long as you have collateral and we can get this loan finance to take care of everything.

(*Id.* at 214:2–11.) Pape further explained, "the check was asked [for] by Mark Braaten. . . . This is how the program works. You make one payment and one payment only," and that Braaten told

him, "that's how we begin the process," and "this is how the program works. You need to make one payment as he indicated throughout all the illustrations." (*Id.* at 67:4–7, 143:1–144:8.) Whether this initial payment was intended as a policy premium or as a loan interest payment is not clear from the record.[18] What is clear is that this check for $33,241.02 is in fact the only out-of-pocket payment that Pape made in connection with the policies before surrendering them. (Braaten SOF ¶¶ 44, 47; Levy SOF ¶ 49; Pacific Life SOF ¶ 63.)

### C.     Post-Purchase

#### 1.     Policy Renewals

The record contains little information about the time period immediately after Pape purchased the policies and took out the premium finance loan. Pacific Life issued quarterly and annual statements in 2015, which reflect the policy charges and performance during this time period. (Pacific Life SOF ¶ 59.) These statements also reveal that the policies' average investment return rate in 2015 was about 4.40%—well below the projected 7% rate of return. (Exs. 18–19 to Pacific Life SOF [205-18, 205-19] at 3.) The record does not make clear how or whether Pape received these statements, nor have the parties submitted statements for other years the policies were in effect. Despite the policies' underperformance in the first year, Pape renewed the policies in January 2016 for a second year (the policy renewals occurred each year on or after January 27, the anniversary of the policies' issuance). (Pls.' Braaten Ad. SOF ¶¶ 27–28; Pls.' Levy Ad. SOF ¶ 30.) To renew the policies for a second year, Pape apparently took out an additional loan of $605,065; the only record evidence of this loan amount is an allegation in

---

[18]     Braaten told Pape that the payment was "for the first premium," leading Pape to write the words "first premium" on the check. (Pape Dep. 142:14–24, 144:1–2.) Plaintiffs assert, however, that Pape later learned the payment was actually an interest payment. (Pls.' Resp. to Braaten SOF ¶ 44.) This dispute is apparently relevant because Pacific Life's internal guidelines (discussed in more detail below) generally prohibit premium financing arrangements in which interest is capitalized into the loan; Plaintiffs seem to assert that this check was in fact an interest payment and was required in order for Pacific Life to approve the program, despite Braaten's promise that interest otherwise due from Pape would be capitalized into the loan. (*See id.*)

Plaintiffs' Complaint, though no party seems to dispute the issue.[19]  (Pls.' Braaten Ad. SOF ¶ 28; Levy SOF ¶ 51.)  The parties provide no further information about Pape's decision to renew the policies for a second year.  At some point (the parties provide no details), the lending bank agreed to capitalize Pape's interest payments for the second and third year.  (Pape Dep. 259:12–18.)

There is more information about the leadup to the January 27, 2017 policy anniversary, when Pape renewed the policies for the third year.  This information is primarily provided by Fernando Ereneta, who became Pape's financial advisor in December 2016, around the time Pape stopped working with McGee; according to McGee, their professional relationship ended because Pape thought he was "too conservative" and was not "achieving high enough returns relative to what [Pape] was trying to accomplish."  (Pls.' Braaten Ad. SOF ¶ 29; Pls.' Levy Ad. SOF ¶ 31; Pls.' Pacific Life Ad. SOF ¶ 36; McGee Dep. 19:24–20:21.)  Ereneta explained that beginning in December 2016, he and Pape discussed Pape's growing concern about the policies. (Ereneta Dep., Ex. 6 to Pls.' Resp. to Braaten SOF [220-6], Ex. 7 to Levy SOF [209-7], Ex. 27 to Pls.' Resp. to Pacific Life SOF [223-7] (hereinafter "Ereneta Dep."), at 21:13–15, 23:18–24:6.) According to Ereneta, Pape "felt stress," because the policies were not performing to the initial projections shown by Braaten and interest rates were climbing higher, meaning that Pape would need to pledge additional collateral to secure the loan balance.  (*Id.* at 21:15–22:10.)

On December 21, 2016, Braaten's assistant emailed a new spreadsheet to Pape and McGee, stating: "Mark asked me to forward this to you both to review on your conference call."

---

[19]    Levy makes several confusing assertions about this loan amount.  He first asserts that this loan matches the loan shown on a spreadsheet sent from Levy to Braaten on January 14, 2015—a different spreadsheet than the one McGee emailed Braaten on January 14, with the message that Pape had decided to go with the attached policy.  (Levy SOF ¶¶ 51–53.)  Plaintiffs object to this spreadsheet on foundation grounds, presumably because Levy cites to no evidence that Pape ever received it.  (Pls.' Resp. to Levy SOF ¶¶ 51–53.)  Next, Levy asserts that the projections in this spreadsheet are "substantially similar" to the projections on the January 14 spreadsheet selected by Pape and the actual values when Pape surrendered the policies.  (Levy SOF ¶¶ 54–55.)  The court cannot discern why Levy relies on this spreadsheet, rather than the one selected by Pape on January 14, and Levy does not expand on the vague assertion that the projections were "substantially similar" to what actually occurred with the policies.

The attached spreadsheet (like the previous ones) showed an illustrated return-on-investment rate of 7%, interest capitalizing into the loan, and the loan and accumulated interest being paid in Year 20 from the policies' cash surrender value. (Spreadsheets at 19–20.) It is not clear what happened at the referenced conference call, or whether it occurred at all, but sometime in late December, Ereneta, Pape, and Braaten met at Pape's home to discuss the policies. (Pls.' Braaten Ad. SOF ¶ 30; Pls.' Levy Ad. SOF ¶ 32.) At the meeting, Braaten provided a spreadsheet to Pape and Ereneta (Plaintiffs suggest this was the spreadsheet emailed by Braaten's assistant on December 21). (Pls.' Braaten Ad. SOF ¶ 32.) Afterwards, Pape, Braaten, and Ereneta had several more discussions on the phone or at Pape's home. (Ereneta Dep. 36:23–37:4.) During one such discussion, Ereneta first heard Braaten make what Ereneta characterized as a "misrepresentation" to Pape: Braaten told Pape that the maximum collateral amount would be $1.3 million. (*Id.* at 37:11–18.) During another unspecified discussion, Ereneta recalled asking Braaten, "why does [Pape] need this much life insurance?" and Braaten responded that it was needed for "estate taxes."[20] (*Id.* at 25:1–4.) Specifically, Braaten told Ereneta that Pape needed "$5 million in death benefit[s] to cover a potential $5 million in estate taxes" (apparently estimating the amount Pape's estate would owe at his death, based on tax laws). (*Id.* at 263:8–264:10.) This was the "rationale" offered by Braaten for the $10 million policy—even though, as Ereneta explained, this meant Pape was "overinsured" compared to his estate tax need. (*Id.*)

On December 28, after the initial meeting, Ereneta requested updated illustrations from Braaten. (Pls.' Braaten Ad. SOF ¶¶ 33–34; Pls.' Levy Ad. SOF ¶¶ 32–34; Pls.' Pacific Life Ad. SOF ¶¶ 37–38.) Ereneta wanted spreadsheet illustrations with an "updated interest rate and a

---

[20]    The Braaten Defendants object to this testimony from Ereneta about the collateral and death benefits as inadmissible hearsay. (Braaten Resp. to Ad. SOF ¶¶ 30–31.) But the statements are not offered for their truth: Ereneta uses these statements as examples of misinformation that Braaten allegedly provided. If they had been offered for their truth, would be admissible as the statements of a party-opponent. *See* FED. R. EVID. 801(d)(2). To the extent Defendants object to Ereneta's testimony about a statement purportedly made by Braaten when Pape "signed up" for the program, the court sustains the objection, as Ereneta could not have personally heard that representation. (Pls.' Braaten Ad. SOF ¶ 30 (citing Ereneta Dep. 22:3–6).)

lower rate of return," which would "be more realistic so we could see what the viability of the cash value would be going forward and the impact to the strategy." (Ereneta Dep. 108:3–8.) Ereneta believed that Braaten dragged his feet in responding to this request; but Braaten did later send an email to Ereneta and one of his colleagues in which he promised that "as soon as we have the renewal for the premium finance, we will run the illustrations as per your request."[21] (*Id.* at 89:23–90:3; 109:8–13.) According to Ereneta, this "renewal" referred to FIFC's "annual underwriting process to determine whether an additional loan will be provided to pay for premiums in the coming year." (*Id.* at 109:18–21.)

Though it is not clear whether this renewal had yet occurred, Braaten emailed Levy on January 9 about the possibility of running an updated illustration with a lower rate of return on investment (6.48%) and a reduction of the death benefits by half. (Levy Dep. 111:15–112:4.) The following day, on January 10, a Pacific Life "case designer" emailed Levy regarding the illustrations, stating that Pape's policies "were both sold with the Minimum Non MEC death benefit so we cannot show any reduction now without violating the 7 pay test (MEC)." (*Id.* at 113:14–24, 115:11–24.) According to Levy, this was a reference to IRS regulations: Pape's death benefit could not "be reduced without triggering a MEC," (*id.* at 116:23–117:3)—that is, a modified endowment contract, meaning that the IRS would no longer recognize the policy as a life insurance contract because the premiums would exceed federal tax law limits. *See New*

---

[21] This email was not submitted as an exhibit by any party, but is included as an exhibit to Ereneta's deposition, as submitted by Levy; the email is dated January 6, 2017. (Ereneta Dep., Ex. 7 to Levy SOF [209-7] at 129–131.) The Braaten Defendants also object to this statement from Braaten on hearsay grounds, but it is not a declarative statement; it is Braaten's assurance or promise of future action. If it were a declaration, it too would be admissible as the statement of a party opponent. *See* FED. R. EVID. 801(d)(2).

*Appleman* § 81.02. Levy passed this MEC information on to Braaten.[22] (Levy Dep. 117:4–8.) On January 10 and 11, Levy and Braaten prepared additional spreadsheets, which projected a 6.48% (rather than 7%) illustrated rate; as best the court can tell, they did not show reduced death benefits, or the loan and accumulated interest being paid out of policy cash values (though the annual net outlay was still projected at zero). (Spreadsheets at 22–26.) The record does not make clear when or whether Pape received these spreadsheets.[23]

At some point nearing the January 27 anniversary date (the record does not make clear when), Pape had multiple conference calls with Jerry Adams and Mark Johnson, who played some role with Pacific Life; the parties provide no specifics, but Ereneta testified that Adams "is with Pacific Life" and Johnson is "an agent with Pacific Life." (Ereneta Dep. at 27:2–28:7.) During these discussions, Ereneta explained, "we [presumably meaning Ereneta and Pape] were made aware that Pacific Life would not have approved underwriting for interest that would continue to be capitalized," and "[w]e found out that possibly the way it got approved [by Pacific Life underwriting]" was Pape's initial payment of around $33,000. (*Id.* at 28:15–24.) Pape and Ereneta also learned that Pacific Life could rescind or alter the policies within 24 months of issuance without "adverse [financial] effects" to Pape (it is not clear what, precisely, Ereneta meant by

---

[22]    The Braaten Defendants object to the testimony about the MEC contracts as inadmissible hearsay. (Braaten Resp. to Ad. SOF ¶ 35.) The court agrees that it cannot consider these statements against Braaten for the truth of the matter asserted (in other words, that the death benefits could not be reduced without triggering a MEC). The statements are, however, relevant for an admissible, non-hearsay purpose: to explain Braaten and Levy's conduct in not lowering the death benefits on the revised illustrations.

[23]    The January 10 spreadsheet was emailed by Levy to Braaten, and the January 11 spreadsheet is dated but not connected to any email. The record also contains a February 8 email from Levy to Braaten containing an updated spreadsheet, though this was after the policy renewal date. (Spreadsheets at 19–30.)

this).[24]  (*Id.* at 28:5–7, 22:23–23:3.)  Apart from Ereneta's testimony, no other information concerning this 24-month deadline appears in the record.

According to Ereneta, because of that 24-month deadline, Braaten's delays in responding to requests for new illustrations, and Pape's growing dissatisfaction and frustration concerning the policies, Pape "started seeking second opinions, third opinions, fourth opinions on the strategy itself." (*Id.* at 21:13–23:17.)  The exact timeline of this is unclear.  But through the process of talking to other insurance professionals (both Adams and Johnson and professionals outside of Pacific Life), Pape began to be "better [ ] informed of what he got into and feeling he had a case that there was misrepresentations or maybe a lack of suitability to be in that strategy." (*Id.* at 23:13–17.)  Ereneta and Pape came to believe that "this program was not suitable," Pacific Life "should not have underwritten this had they known that the interest would be capitalized," and Pape was facing "a lot of other risks" and was "overinsured," and this strategy was possibly impacting his "holistic financial plan." (*Id.* at 200:7–201:2.)

### 2. Surrender of Policies

Despite his apparent concerns about the policies before the January 27, 2017 renewal date, Pape renewed the policies for a third year.  One year later, on January 22, 2018, he surrendered the policies.  (Braaten SOF ¶ 48.)  Ereneta testified that while he advised Pape, Pape himself ultimately made the decision to terminate.  (Ereneta Dep. 160:13–20.) The record is not specific about when exactly Pape this decision; Ereneta simply confirmed it "could make sense" that Pape made the decision in the latter part of 2017.  (*Id.* at 160:1–8.)

---

[24]      Pacific Life and Braaten object to this testimony, as well as the testimony about the underwriting requirements, as inadmissible hearsay.  (Pacific Life Resp. to Ad. SOF ¶ 40; Braaten Resp. to Ad. SOF ¶ 38.)  Ereneta had personal conversations with Adams and Johnson, at least about the underwriting issue, and personally discussed the policies with the outside insurance professionals.  (Ereneta Dep. 200:7–201:19, 199:2–9).  The court finds this testimony admissible for limited purposes:  how it affected Pape's subsequent conduct, his knowledge of the policies, and when he learned of his injuries.

Ereneta advised against renewal because he knew that as interest rates increased, the bank would ask for more collateral. (*Id.* at 176:16–177:14.) According to Ereneta, the "subsequent spreadsheets" (it is not clear which spreadsheets he meant) showed the lender having a claim to collateral of over $3 million in Year 3—well in excess of the maximum $1.3 million Pape had expected would be encumbered. (*Id.* at 177:22–178:3.) Additionally, Ereneta informed Pape that the policies would be underwater even if they "hit the buckets" (presumably meaning the projected rate of return), due to the "internal costs" of the policies. (*Id.* at 178:23–179:8.) Ereneta explained, "[A]s we were understanding the [investment] allocation options, we were coming to find these internal costs," which he thought were around 3.5%. (*Id.* at 179:8–12.) Thus, in order to achieve a 7% rate of return (as illustrated), Pape would actually need to "earn at least 10-and-a-half percent before fees." (*Id.* at 179:13–16.) Ereneta did not explain how he discovered this 3.5% number or when exactly he discovered these hidden costs.

In any event, after surrendering the policies, Pape received the policies' cash surrender value and paid off the FIFC loan; the surrender charges were set by the policies and loan payoff amount was set by the FIFC promissory note. (Pls.' Resp. to Braaten SOF ¶¶ 47–49; Pls. Resp. to Levy SOF ¶ 50; Pacific Life SOF ¶ 61.) The exact amount of money at issue after Pape surrendered the policies is not clear, but the policies' cash surrender value was approximately $1.7 to $1.8 million and the outstanding loan balance was approximately $2.4 to $2.5 million; Pape paid the difference (somewhere between $719,000 to $750,000) out-of-pocket. (Levy SOF ¶ 55; Ereneta Dep. 214:21–215:18; Expert Report, Ex. A-1 to Pls.' Opp'n. to Braaten [222-2], Ex. A-1 to Pls.' Opp'n. to Levy [217-2], Ex. A-1 to Pls.' Opp'n. to Pacific Life [225-2] (hereinafter "Expert Report"), at 79–81.) These amounts suggest that the spreadsheets projecting the policies' performance were in fact overly rosy. The January 14 spreadsheet, which Pape had decided to "go with" when choosing his policy, projects a Year 3 cash surrender value of $1,940,369 and a total loan amount of $2,466,235—if the policies had performed as well as

projected in that January 14 spreadsheet, Pape would have paid $525,866 out-of-pocket, rather than upwards of $700,000.  (Spreadsheets at 16–17.)

### D.    Compliance with Pacific Life Guidelines

Plaintiffs contend that throughout these transactions, the conduct of Braaten, Levy, and Pacific Life violated Pacific Life guidelines.[25]  They offer several of these guidelines on summary judgment, which the court briefly summarizes.  Pacific Life's policies were not publicly available, but were available to Braaten and Levy through Pacific Life's internal webpage for insurance producers.  (Pls.' Braaten Ad. SOF ¶ 3; Pls.' Levy Ad. SOF ¶ 5; Pls.' Pacific Life Ad. SOF ¶ 11.) Braaten and Levy both reviewed or knew Pacific Life's guidelines.  (Pls.' Braaten Ad. SOF ¶ 4; Pls.' Levy Ad. SOF ¶ 3.)  Under their producer agreements, Braaten and Levy agreed to comply with Pacific Life policies and to use only Pacific-Life-approved sales materials.  (Braaten Agreement at 4–5, Levy Agreement at PLIL 2869–70.)

Pacific Life's Premium Financing Guide and its Eligibility Form do not allow for illustrations showing loan interest payments from policy cash values or illustrated rates that exceed 6.25%. (Eligibility Form; Pacific Life's Premium Finance Guide, Ex. 15 to Pls.' Resp. to Braaten SOF [220-15], Ex. 18 to Pls.' Resp. to Levy SOF [218-11], Ex. 31 to Pls.' Resp. to Pacific Life SOF [223-11] (hereinafter "Premium Financing Guide"), at Pape1.)  The Compliance Manual further states that supplemental illustrations must be accompanied by a basic illustration, which must depict policy values on a "guaranteed scale" (presumably meaning the guaranteed values of the policy). (Compliance Manual at 3.)  Additionally, Pacific Life's Underwriting Guidelines state that in premium financing cases, "accrued loan interest" is "unacceptable."  (Pacific Life's Financial

---

[25]     The Braaten Defendants object to Plaintiffs' introduction of the Pacific Life policies and producer agreements because they "impose no duties between the Braaten Defendants and Plaintiffs."  (*See, e.g.*, Braaten Resp. to Ad. SOF ¶ 1.)  Levy also objects to Plaintiffs' characterization of the producer agreements and guidelines as "improper legal conclusions" about contractual language and duty.  (Levy Resp. to Ad. SOF ¶¶ 4, 8–9.)  Pacific Life makes similar objections about legal conclusions.  (*See, e.g.*, Pacific Life Resp. to Ad. SOF ¶ 7.)  The court has reviewed the underlying contracts and guidelines to describe their content, and addresses any legal issues they raise in its analysis.

Underwriting Guidelines for Premium Financing Review & Process, Ex. 17 to Pls.' Resp. to Braaten SOF [221-4], Ex. 23 to Pls.' Resp. to Levy SOF [219-2], Ex. 29 to Pls.' Resp. to Pacific Life SOF [224-2], at 1.)  However, Pacific Life's premium financing consultant explained that the guidelines allow exceptions to the prohibition on capitalizing interest; that prohibition is a "hard and fast" rule only when the death benefit must be reinsured (that is, when the insurer transfers part of its assumed risk to another insurance company).  (Conover Dep., Ex. 12 to Pls.' Resp. to Braaten SOF [220-12], Ex. 16 to Pls.' Resp. to Levy SOF [218-9], Ex. 9 to Pacific Life SOF [205-9] (hereinafter "Conover Dep."), at 74:5–14, 159:11–160:8); *New Appleman* § 1.08.  No such exception to the capitalization rule was sought for Pape, but it does not appear that his death benefit needed to be reinsured.  (Conover Dep. at 74:15–75:3.)

Plaintiffs also assert that Pacific Life's producer agreements, Premium Financing Guide, and Compliance Manual require insurance producers to perform a suitability review and needs analysis, meaning that producers are required to determine whether the insurance was suitable for the client, including whether the client needs a policy with a cash value component.  (Pls.' Braaten Ad. SOF ¶¶ 7–8; Pls.' Levy Ad. SOF ¶ 9; Pls.' Pacific Life Ad. SOF ¶ 15; *see* Braaten Agreement at 5; Levy Agreement at PLIL 2870; Premium Financing Guide at Pape1; Compliance Manual Chapter 8, Ex. 13 to Pls.' Resp. to Braaten SOF [221-2], Ex. 22 to Pls.' Resp. to Levy SOF [219-1], Ex. 28 to Pls.' Resp. to Pacific Life SOF [224-1].)  Pacific Life's underwriting department has no records of a suitability review or needs analysis for Pape's case, Braaten testified that he did not recall performing a suitability determination, and Levy admits that he did not perform one.  (Pacific Life Resp. to Ad. SOF ¶ 16; Levy Resp. to Ad. SOF ¶ 10; Braaten Dep. at 49:14–50:2).

Finally, Pacific Life's premium financing marketing materials state that an individual must be able to afford to pay his premiums without relying on financing.  (Pls.' Pacific Life Ad. SOF ¶ 21.)  Pacific Life's director of financial underwriting confirmed that premium payers should be able to pay the premiums from their cash flow; Pacific Life underwriters therefore review potential

policyholders' tax returns and other documents regarding their liquid assets. (Steffen Dep., Ex. 11 to Pls.' Resp. to Braaten SOF [221-1], Ex. 10 to Pls.' Resp. to Levy SOF [219], Ex. 23 to Pls.' Resp. to Pacific Life SOF [224], at 64:14–24.) According to the underwriting director, Pacific Life's underwriting staff did, in fact, review Pape's tax and financial documents and determine that the proposed coverage fell within Pacific Life's underwriting guidelines. (*Id.* at 106:1–18.) For his part, Braaten did not recall whether he asked Pape if he could afford the premiums out-of-pocket, and did not believe it was his role to make an independent assessment on whether the program was suitable for Pape; Braaten nonetheless believed Pape's $22 million net worth made premium financing a viable option. (Braaten Dep. 190:19–192:14.) Levy also reviewed "financial documentation" to determine whether Pape qualified for premium financing under Pacific Life and the bank's guidelines. (Levy Dep. 28: 6–9.) Pape, however, testified that his net worth was $15 million, and he could not have afforded the policies without the bank loan: though he could afford "the first year" of the policies, as the "program developed" (and, presumably, as the policies underperformed) he no longer could. (Pape Dep. 240:22–241:2, 179:18–171:5.)

With this extensive factual background in mind, the court turns to the procedural posture and merits.

## **PROCEDURAL POSTURE**

On February 27, 2018, Plaintiffs filed the original Complaint [1] in this court, bringing multiple Illinois claims against Defendants Pacific Life, Braaten, MarkBraaten, Inc., and Levy.[26] Plaintiffs then filed a Second Amended Complaint [104] on January 30, 2019, claiming that Defendants made various misrepresentations about a premium financing program where Pape would purchase Pacific Life insurance policies through third-party loans. Specifically, Plaintiffs allege that Braaten assured Pape that he would only need to make one initial premium payment

---

[26] Plaintiffs' original Complaint also named Voya Financial Advisors, Inc. ("Voya"), a Minnesota corporation of which Braaten was allegedly a registered representative, as a defendant. Plaintiff's sole claim against Voya was dismissed without prejudice on July 13, 2018 [64]. Voya is not party to any summary judgment motions and remains dismissed from this case.

on the policies (and no additional payments) and that interest on the premium finance loan would capitalize into the loan.  (Second Am. Compl. ¶ 24.)  These representations were repeated on numerous documents prepared by Levy and Braaten from 2014 to 2017.  (*Id.* ¶¶ 27, 43, 46, 66–67.)  Braaten also allegedly represented that Pape could reduce the policies' death benefits and could cancel the policies at any time, without any charges.  (*Id.* ¶ 31.)  Additionally, Plaintiffs claim the policies had "undisclosed costs" and "expenses and fees," which amounted to $120,000 per year; these costs made the policies a "ticking time bomb," because they offset the policies' investment performance and caused the policies to lose money unless Pape took out more loans.  (*Id.* ¶¶ 76–77.)  Plaintiffs claim that it was not until January 2018, after the policies had been in effect for three years, that Pape learned that Defendants' representations were "false," and that the policies were "not suitable" and contained "concealed" costs.  (*Id.* ¶¶ 74, 81.)

The Braaten Defendants and Levy filed motions to dismiss the claims against them [115, 120], which this court granted in part and denied in part [147].  *See generally Pape v. Braaten*, No. 18 C 1481, 2019 WL 4750036 (N.D. Ill. Sept. 30, 2019).  The court first rejected their statute of limitations argument, finding that there were factual questions that could not be answered on a motion to dismiss.  *Id.* at *9.  The court also denied Levy's motion to dismiss his negligence and unjust enrichment claims, but dismissed the breach of fiduciary duty claim against the Braaten Defendants and the aiding and abetting claim against Levy.  *Id.* at *12–13.  The remaining claims before the court on summary judgment are:  negligence (Count I) against the Braaten Defendants and fraudulent misrepresentation (Count III) against Braaten; negligence (Count IX) and unjust enrichment/constructive trust (Count VIII) against Levy; and negligence (Count VI) and a *respondent superior* claim (Count V) against Pacific Life.  (Second Am. Compl. ¶¶ 87–93, 106–112, 127–147, 171–191.)

## DISCUSSION

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The court views

39

the facts in the light most favorable to the non-moving party by resolving all factual disputes and drawing all reasonable inferences in that party's favor. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019). The parties do not dispute that Illinois law governs this case, as a federal court sitting in diversity applies the substantive law of the forum state. *See, e.g.*, *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 392 (7th Cir. 2011).

## I.    Statute of Limitations

Defendants again raise a statute of limitations argument on summary judgment. [27] Illinois law sets a two-year statute of limitations for actions brought against insurance producers concerning the sale of insurance policies. *See* 735 ILCS 5/13-214.4. As explained in the court's earlier opinion, this two-year deadline applies to Plaintiffs' claims against Levy and the Braaten Defendants, so the claims must have accrued on or after February 28, 2016 to survive summary judgment.[28] *Pape*, 2019 WL 4750036, at *7–8.

Claim accrual in insurance cases is governed by the Illinois Supreme Court's decision in *American Family Mutual Insurance Co. v. Krop*, 2018 IL 122556, ¶ 18, 120 N.E.3d 982 (Ill. 2018). There, the court explained that because negligence relating to insurance policies is a tort arising out of a contractual relationship, the *Krop* plaintiffs were injured as soon as their insurance producer delivered an insurance policy that did not conform to their coverage request—the breach of the contract or duty. *See id.* ¶ 35, 120 N.E.3d at 991. Additionally, the court declined to apply

---

[27]    All Defendants raise the statute of limitations defense, so the court considers their arguments together. Plaintiffs point out, however, that Pacific Life failed to plead this affirmative defense in its answer (*see* Pacific Life Answer to SAC [122] at 44), meaning the court may hold this argument waived under Federal Rule of Civil Procedure 8(c). *See Williams v. Lampe*, 399 F.3d 867, 870–71 (7th Cir. 2005); *see also Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, No. 10 C 7064, 2016 WL 147654, at *18 (N.D. Ill. Jan. 13, 2016) ("The failure to plead an affirmative defense in the answer [generally] works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." (quoting *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014)). Because the defense fails on the merits, the court need not decide waiver.

[28]    The court again rejects Plaintiffs' argument that section 13-214 does not apply to claims arising from the premium financing. (Pls.' Opp'n to Levy [217] at 9–10); *see Pape*, 2019 WL 4750036, at *8 ("The text of Section 13-214.4 does not exclude actions concerning insurance policies simply because they involve other financial instruments as well.").

Illinois's "discovery rule," which "delays the start of the limitations period until the claimant knew or reasonably should have known of the injury and that the injury was wrongfully caused." *Id.* ¶ 21, 120 N.E.3d at 987–88. The court reasoned that because insurance producers are not held to a fiduciary standard, insurance customers have an obligation to read their policies to discover defects; if the plaintiffs had read their policy, they would have been aware of the "apparent" discrepancy in coverage (their injury). *Id.* ¶¶ 29, 37, 120 N.E.3d at 990–92. Nonetheless, the court recognized that "there will be a narrow set of cases in which the policyholder reasonably could not be expected to learn the extent of coverage simply by reading the policy," such as when policies "contain contradictory provisions or fail to define key terms" or when "circumstances that give rise to the liability [are] so unexpected that the typical customer should not be expected to anticipate how the policy applies." *Id.* ¶ 36, 120 N.E.3d at 992.

Thus, as this court previously explained, *Krop* does not hold that the statute of limitations is always triggered at the moment an insured receives his deficient insurance policy. Rather, a plaintiff may still invoke the discovery rule by disputing that the injury would have been reasonably apparent from his policy documents, or disputing other facts relevant to determining when he should have discovered the injury. *See Pape*, 2019 WL 4750036, at *9. The discovery rule is normally a question of fact, but may be decided by the court when the undisputed facts lead to only one conclusion. *See Krop*, 2018 IL 122556, ¶ 21, 120 N.E.3d at 988. Here, Plaintiffs' injury occurred when Pape received the allegedly negligently or fraudulently procured insurance policies. Defendants argue that, as in *Krop*, Plaintiffs' injury was apparent from the text of the policies and related documents, and the claims accrued in January or February 2015. Plaintiffs, on the other hand, argue that the discovery rule applies because until January or February 2017, Braaten and Levy's false or misleading representations prevented Plaintiffs from learning of their injury. As best this court can tell, Plaintiffs focus on the following false or misleading representations:

1. The program required Pape to make annual premium and interest payments, contrary to the "misleading" spreadsheets showing that he would make only one initial payment. (Pls.' Opp'n to Braaten at 5, 9; Pls.' Opp'n to Levy [217] at 10–11.)

2. Pape was not free to seek a reduced death benefit or withdraw from the program at any time without penalty, contrary to Braaten's representations. (Pls.' Opp'n to Braaten at 9; Pls.' Opp'n to Levy at 13.)

3. The program did not comply with Pacific Life Guidelines. (Pls.' Opp'n to Braaten at 6; Pls.' Opp'n to Levy at 10)

**A.      One Pay Policies**

A central issue in this lawsuit is whether the insurance policies were "one pay," meaning that Pape would only need to make one payment to maintain $10 million in death benefits. Defendants argue that Pape must have known the policies were not "one pay" from a reading of the policy documents, which disclosed annual premiums, interest payments, and the policies' terms and conditions. In response, Plaintiffs focus on the spreadsheet documents, and argue that their misleading nature concealed Pape's injury. Though the parties talk around the issue, the basic question on summary judgment is whether Pape reasonably believed that, under the program promised by Braaten, the policies were guaranteed to provide death benefits of $10 million for one payment of approximately $33,000, or whether he knew or should have known that he was entering into a risky investment opportunity, where the policies could underperform and the cash value may not be sufficient to cover all costs.

A reasonable jury could find that Plaintiffs' injuries were not apparent from the policies, because Braaten and Levy papered over how complex or risky the program was, and instead suggested it was a simple "one pay" policy. As Defendants presented the program, after his initial payment, Pape would make no further out-of-pocket payments for the policy premiums or loan interest: his loans would pay for the premiums, the loan interest would capitalize into the principal, and the policies' accumulated cash value would eventually pay for everything. The spreadsheets represented this by projecting that Pape would make an initial payment of about $33,000, and then no other payments until a "policy disbursement" would be available to pay off the loan and

accumulated interest in Year 20. A factfinder could reasonably conclude that several aspects of the spreadsheets misleadingly concealed how this program worked: the illustrated rate of return is high enough that only one payment is shown; the premiums disappear after Year 7 with no explanation; there are no guaranteed values showing what the premiums, loans, and interest would cost if the policies did not perform to the 7% illustrated rate; and there is only a single risk disclosure ("Hypothetical and for illustrative purposes only. Actual results will vary. Please consult your tax and legal advisor regarding all matters of tax and legal nature."), which does not explain the nature of the investment program or offer specifics about the potential risks.[29]

The court also finds significant several issues which, unfortunately, the parties do not substantially discuss. Plaintiffs assert (at least against Braaten) that at some point during the policy's third year, Ereneta discovered "internal costs" of about 3.5%, meaning that "to hit a 7% rate of return, you have to earn 10.5% before fees," which is not clear from the spreadsheets. (Ereneta Dep. 179:8–180:15; *see* Pls.' Resp. to Braaten SOF ¶ 51.) As the court understands this testimony, even if the policies performed according to the spreadsheets and generated 7% investment returns, the cash surrender value would not sufficiently cover the loan and accumulated interest. It is not clear what these "internal costs" were, or how Ereneta discovered them. But even if these costs were disclosed elsewhere, their omission in the spreadsheets would be evidence that Pape was misled. Additionally, Braaten directly represented that the policies were "one pay," which could have concealed the risky investment nature of the program. For instance, Braaten emailed McGee in September 2014, describing the program as "the 1 pay for Greg." (Expert Report at 29.) Pape's testimony (not cited by the parties) repeats this: he stated that Braaten assured him there was "no money out of pocket" except for the "one payment"—the

_____

[29] Alan J. Besnoff, Plaintiffs' expert, states in an expert report that the spreadsheets were misleading and failed to comply with Pacific Life Guidelines. (Expert Report at 27–51.) But whatever the Pacific Life Guidelines may or may not say, the important question is whether the illustrations or statements were actually misleading; the expert report is relevant only to the extent it sheds light on this inquiry.

$33,000 check written to the lending bank. (Pape Dep. 214:2–11; *see also id.* at 67:4–7, 143:18–22.)

Given the complexity of the premium financing strategy, which entailed taking out loans, interest accumulating into the loans, and then projecting how interest rates, market rates, and the policies would interact to pay off multiple costs, Pape's injury was not likely to be apparent from the policies. That injury does not stem from a straightforward coverage dispute (such as whether Pape received $10 million in death benefits) or an easily understandable risk (such as whether the 7% rates were guaranteed). *Compare Babiarz v. Stearns*, 2016 IL App (1st) 150988, ¶¶ 44, 57, 57 N.E.3d 639, 653 (rejecting the discovery rule where plaintiff's indexed annuities "clearly explained" the disputed surrender charges and tax penalties)*, with Rasgaitis v. Waterstone Fin. Grp., Inc.*, 2013 IL App (2d) 111112, *Id.* ¶¶ 9, 32–36, 985 N.E.2d at 626, 631–32 (policy documents did not put plaintiffs on notice of the risks of their "investment plan" where defendants induced plaintiffs to mortgage their home to purchase equity-funded indexed annuities and represented "100% safe and guaranteed" benefits)*, and Sommer v. United Sav. Life Ins. Co.*, 128 Ill. App. 3d 808, 815, 471 N.E.2d 606, 612 (2d. Dist. 1984) (insurance policy did not put plaintiffs on notice of the allegedly fraudulent scheme involving "complex computations involving dividends that the policy would allegedly pay out and loans taken against the policy to pay the premiums and purchase additional insurance, as well as interest to be paid on these loans").

In these circumstances, the fact that the policy documents disclosed annual premiums and interest payments does not satisfy the court that Defendants are entitled to summary judgment. Under the promised plan, neither premiums nor interest amounts were to be paid out-of-pocket. Defendants emphasize that the promissory note gave the bank discretion to capitalize the interest (apparently suggesting that Pape should have known he might well have been required to make out-of-pocket interest payments), but Braaten reassured Pape that capitalization would not be a problem and the bank *did* in fact capitalize interest while the policies were in effect. Braaten's reassurance also suggests that Pape would not have discovered his injury from the

44

placed illustrations (the effective and final illustrations for the policies, signed by the trustee on January 30, 2015), which show interest being paid out-of-pocket through a column entitled "Lender Loan Interest Paid Out-of-Pocket" in Years 1–20. And whatever other discrepancies may have existed between the placed illustrations and the terms of Pape's expected insurance policy, they were not "apparent," given the numerous misleading representations in this case. Defendants further note that the policies and other documents disclosed various costs and fees, so Pape cannot now complain of hidden costs. But policy costs affect the accumulated cash value, and are thus relevant to whether the program could truly be "one pay." As discussed, Plaintiffs assert at least some costs were omitted from the spreadsheets' projections. And *Krop* does not appear to require insurance customers to run their own financial projections to discover omitted information, or otherwise verify their insurance producer's analyses about the program.

The court also rejects Defendants' argument that Pape should have known about the risks of the program when he received his policy documents. The spreadsheets contained a single disclosure that the values were "hypothetical and for illustrative purposes only" and "actual results will vary." The policies contained a paragraph stating that policy illustrations are hypothetical and that "actual policy values will likely be more or less favorable." And the placed illustrations stated they were "hypothetical" and "seek[ ] to demonstrate the potential impact that financing premiums would have on the net out-of-pocket cost for the life insurance coverage."[30] In the court's view, this language was "mere boilerplate [ ] not sufficient to prevent misinformation," and not "detailed," "specific," or "sufficiently substantive" enough to put Plaintiffs on notice as a matter of law. *See Rasgaitis*, 2013 IL App (2d) 111112, ¶¶ 32–36, 985 N.E.2d at 631–32 (plaintiffs were not on notice where policy documents stated that illustrated values are "not guarantees, promises or

---

[30]     Pacific Life also points to the premium financing disclosure, which was signed by Pape on September 29, 2014. But Plaintiffs assert that Braaten never sent and Pape never saw the page containing the relevant disclosure (that the surrender value of the policy "may not equal or exceed your aggregate premium financing loan balance, and may not be sufficient to repay the Lender"). (Pls.' Resp. to Pacific Life SOF ¶ 37.)

warranties" and "actual results may be more or less favorable than those shown"). Though there is testimony from Pape suggesting that he knew of the program's general risks and testimony that McGee and Pape discussed some of these risks, the court is not willing to find as an undisputed fact that Pape knew or should have known about the specific risk leading to this lawsuit. There is a triable question on whether Braaten and Levy concealed the extent of the program's risks though the spreadsheets and representations.

A reasonable jury could therefore find that Pape did not learn of his injuries until after December 2016, when Ereneta became Pape's advisor and discovered hidden costs in the spreadsheets; Braaten was slow to respond with updated illustrations; and Pape learned that Pacific Life guidelines did not permit premium financing in which interest capitalizes into the loan and then consulted with other investment professionals. In reaching this conclusion, the court acknowledges significant gaps in the factual record, particularly from January 2015 until December 2016. It is not clear when exactly Pape became aware of the policies' underperformance, or the extent to which he realized this underperformance meant the policies were not "one pay." Moreover, the timeline and details surrounding the third policy renewal in January 2017 remain unclear, including exactly when and why Pape consulted with other professionals, why Pape renewed the policies for a third year (despite apparently already being aware of the policies' underperformance), and what "undisclosed costs" Ereneta discovered. That said, apart from their central argument about the policy documents, Defendants have not identified any communications from which Plaintiffs clearly should have understood, before February 28, 2016, that the policies were not "one pay."

### B. Reducing the Death Benefits

Plaintiffs also assert that Pape was not aware, before January 2017, that he would not be free to reduce the policies' death benefits (and correspondingly reduce the premiums owed). Prior to Pape's purchasing the policies, Braaten stated in an email that Pape could lower the coverage "down the road (i.e. year 3, 4 or 5)" and personally repeated these representations to Pape.

(January 2 Email; Pape Dep. 220:10–16.) The parties do not make clear when Pape learned he could not lower the death benefits, but it occurred sometime after December 2016.[31]

Viewing the facts most favorably to Plaintiffs, Braaten expressly told Pape that he was free to reduce his death benefits at any time, Pape relied on that statement to as protection against risks associated with the policies, and that representation turned out to be untrue. Defendants (including Braaten) point to nothing in the policy documents concerning Pape's ability to reduce coverage. The court itself notes that the policies make reference to the possibility of being deemed a Modified Endowment Contract, which is when an insurance policy is no longer treated as insurance for tax purposes. The policies state: "Unless and until you have given us a Written Request to accept a Modified Endowment Contract ('MEC') classification for your policy. . . . at no time shall the amount of death benefit under this policy ever be less than the minimum amount needed to avoid such MEC treatment," and refer to the "7-Pay Premium, shown on Page 3.0 . . . to determine the policy's premium limits to avoid MEC treatment." (Policy 540 at 24; Policy 550 at 24.) The 7-Pay Premiums were almost identical to the annual premiums for the two policies, which presumably means Pape could not lower his premiums without triggering a MEC. (Policy 540 at 3.0; Policy 550 at 3.0.) Nothing about these circumspect references to a modified endowment contract satisfies the court that the policies clearly expressed a direct prohibition on lowering the death benefits.

---

[31] Plaintiffs cite to deposition testimony from Levy about what a Pacific Life employee told him about lowering the death benefits, but that does not clarify when Pape learned about this issue. (Pls.' Braaten Ad. SOF ¶ 35.) However, Pape testified that in the policy's second year, the program was "under water greatly," and when he asked Braaten to change the coverage, Braaten "came back and followed up with a letter saying, no, sorry, you can't make any changes the first three years with these exceptions: You can surrender the policy, you can skip the payment or you can continue to make the payment. . . ." (Pape Dep. 220:18–221:7.) Ereneta also testified that when Pape was looking to reduce the death benefits of his policies, there were "logistical roadblocks" including "something called a modified endowment contract," which Ereneta understood to have negative tax consequences. (Ereneta Dep. 212:16–213:5.)

### C.    Pacific Life Guidelines

Plaintiffs also claim that Braaten and Levy violated Pacific Life guidelines, which Pape did not learn about until after January 2017.  Plaintiffs obliquely argue that the spreadsheets and entire program was a "misrepresentation" to the extent that it violated Pacific Life guidelines. According to Plaintiffs, Braaten "repeatedly represented to Pape that the Pacific Life program would function in a manner that it could not" (Pls.' Opp'n to Braaten at 6), and Levy provided documents "that did not accurately reflect what Pacific Life would permit under its internal guidelines."  (Pls.' Opp'n to Levy at 3–4.)  Plaintiffs themselves would have no claim arising out of the violation of those guidelines, but as the court understands their argument, Plaintiffs contend that Pacific Life would not have approved the program or issued Pape's policies, had Pacific Life known about the guidelines violations.  Specifically, Plaintiffs allege that Braaten provided false information in the October 2014 Eligibility Form, thus representing to Pacific Life that he and Levy were adhering to the guidelines, when the promised program clearly did not.  (Pls.' Ad. Braaten SOF ¶ 15; Pls.' Ad. Levy SOF ¶ 15.)

Plaintiffs' argument in this regard focuses almost exclusively on their claim that Braaten and Levy violated guidelines against illustrations showing interest payments from cash values or illustrated rates greater than 6.25%, and underwriting guidelines that prohibit permitting interest to accrue into the premium-financing loan.  But Plaintiffs have not raised a triable issue as to whether Pacific Life would have rejected the policies, had those violations been disclosed.  To the contrary, Pacific Life's premium financing consultant testified that the rule against capitalizing interest into the loan was not strict unless the death benefit had to be reinsured (which does not appear to be the case here).  At most, Plaintiffs have pointed to vague hearsay testimony:  two individuals who were internal to Pacific Life (the record does not make clear their positions) informed Ereneta and Pape that "Pacific Life would not have approved underwriting for interest that would continue to be capitalized," and that "possibly the way it got approved [by Pacific Life underwriting] . . . was a $32,000 initial premium payment cut by check by the client."  (Ereneta

Dep. 28:15–1.) This does not create a genuine dispute of fact. The alleged policy violations may nevertheless have some relevance to Plaintiffs' discovery rule argument: when Pape discovered that Braaten and Levy violated Pacific Life guidelines, that could plausibly set off red flags, leading to further inquiry. And any violation may have concealed Pape's injury, at least where Pacific Life guidelines guarded against misleading representations or spreadsheets.

The court declines to dismiss this case on timeliness grounds.

***

The court makes a few final remarks on this issue. To the court's knowledge, there is only one published Illinois Appellate Court opinion applying *Krop*. *See Austin Highlands Dev. Co. v. Midwest Ins. Agency, Inc.*, 2020 IL App (1st) 191125, 153 N.E.3d 1049. Defendants cite that case in support of their argument, but it provides limited guidance; unlike here, the *Austin* plaintiff did not allege "any facts" disputing whether the extent of coverage was clear from the policy.[32] *Id.* ¶ 19, 153 N.E.3d at 1057. Defendants also argue that because Pape had advisors (McGee and Mezmar), he should have known of his injury when he purchased their policies. A party's sophistication and professional advice may be relevant to determining when he reasonably should have learned of his injury, but based on the record before the court, this factor does not warrant summary judgment. It is far from clear the extent to which Mezmar (who also received a commission on the policies' sale) advised Pape; McGee was not an insurance expert and had

---

[32] More relevant to this case are several unpublished Illinois Appellate Court opinions. Some opinions have concluded that by citing an Indiana case as an example of the "highly unusual" exception to the *Krop* accrual rule, the Illinois Supreme Court adopted Indiana's rule that "reasonable reliance upon an agent's representations can override an insured's duty to read the policy." *Krop*, 2018 IL 122556, ¶ 36, 120 N.E.3d at 992 (quoting *Groce v. Am. Fam. Mut. Ins. Co.*, 5 N.E.3d 1154, 1559 (Ind. 2014)); *see 837-55 Irving Park, LLC v. Total Ins. Servs.*, 2021 IL App (1st) 200655-U, ¶ 15; *Cty. of Cook v. USI Ins. Servs. Corp. of Ill.*, 2020 IL App (1st) 181889-U, ¶ 107, *appeal denied* 163 N.E.3d 752 (Ill. 2021). At least one opinion has disagreed with this conclusion. *Kridner v. Est. of Padilla*, 2021 IL App (4th) 200453-U, ¶ 61, *appeal denied sub nom. Kridner v. Hough*, 175 N.E.3d 91 (Ill. 2021). The court need not reach this issue, which the parties have not briefed. Even assuming Pape's duty to read his policy applied, his injuries were not apparent in light of Braaten's representations and Pape's reliance on the spreadsheets.

49

very little experience with this type of program; and Pape testified that he relied on Braaten, in addition to McGee, to give advice about the insurance policies and the policies' investments.

Defendants may present these issues to the jury, as well as their argument that Pape himself was or should have been aware of the nature of the program when he purchased the policies. While a jury may well agree with Defendants at trial, the court will not decide this factual issue on summary judgment. Because Plaintiffs have raised triable issues as to when Pape reasonably should have discovered his injuries, the court does not reach their fraudulent concealment or equitable tolling arguments, and instead turns to Plaintiffs' substantive claims.

## II.    Fraudulent Misrepresentation

To establish their fraudulent misrepresentation claim against Braaten (Count III), Plaintiffs must show: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 228 Ill. 2d 324, 342–43, 888 N.E.2d 24, 35–36 (2008). Though Plaintiffs have been less than specific about the false statements at issue, the court understands their focus to be on representations made on the spreadsheets.[33]   (Pls.' Opp'n to Braaten at 12–13 (citing Pls.' Braaten Ad. SOF ¶¶ 3, 16–19, 22).)  Braaten argues that that any alleged statements, including the spreadsheets, focus on future developments and possibilities, and cannot support Plaintiffs' claim.

---

[33]    Plaintiffs begin their fraudulent misrepresentation argument with broad claims that fraud "embraces all the multifarious means which human ingenuity can devise . . . to gain an advantage over another by false suggestions." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (citation omitted) (discussing what constitutes fraud for purposes of a federal bankruptcy statute).  To the extent Plaintiffs argue that they do not need to point to an actual misrepresentation by Braaten, the court does not agree:  under Illinois law, both fraudulent misrepresentation and common law fraud require a false representation of material fact.  *See Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1043–44 (N.D. Ill. 2003). Additionally, it is not clear whether Plaintiffs focus on the "one pay" representation in the spreadsheets, or the fact that they violated Pacific Life guidelines.  Because the court finds a triable issue on Braaten's "one pay" representation, it need not reach any other potential issues, including Braaten's representations about lowering the death benefits.

Statements regarding future events are generally considered opinions, not statements of fact. *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 387, 618 N.E.2d 459, 463 (1st Dist. 1993). Thus, financial projections typically cannot support a claim of fraud. *See Power v. Smith*, 337 Ill. App. 3d 827, 832–33, 786 N.E.2d 1113, 1119 (4th Dist. 2003) ("[M]isrepresentations as to something to be done in the future generally do not constitute fraud. In particular, statements regarding the future profitability of an endeavor are not statements of material fact."); *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17, 653 N.E.2d 968, 973 (2d Dist. 1995) ("Generally, financial projections are considered to be statements of opinion, not fact."). However, even though false promises about future conduct are usually not actionable, Illinois recognizes an exception where the statements are part of a "fraudulent scheme." *Murphy-Knight*, 248 Ill. App. 3d at 388, 618 N.E.2d at 463. Additionally, statements of opinion may be treated as fact where the party "does not state it as the expression of the opinion of his own but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such." *Duhl v. Nash Realty Inc.*, 102 Ill. App. 3d 483, 489, 429 N.E.2d 1267, 1273 (1st Dist. 1981) (quoting *Buttitta v. Lawrence*, 346 Ill. 164, 173, 178 N.E. 390, 393 (1931)). Whether a representation is an opinion or statement of fact depends on the circumstances. *West v. W. Cas. & Sur. Co.*, 846 F.2d 387, 393 (7th Cir. 1988).

The court concludes that Braaten's representations—that the insurance policies required only one payment—can fairly be understood as statements of existing fact, rather than his opinion about the policies' future performance. For instance, in *Sommer*, 128 Ill. App. 3d at 814–15, 471 N.E.2d at 612, the defendant allegedly misrepresented the cost and amount of a policy's death benefits based on various "complex computations" involving a "policy shuffle scheme." *Id.* 128 Ill. App. 3d at 814–15, 471 N.E.2d at 612. The court held that defendant's representation that plaintiffs could purchase a life insurance policy as shown in a particular document (which set forth the expected "death benefit" and "net" annual cost) was an actionable statement of fact: defendant told plaintiffs that they "could *now* buy an insurance policy with specific benefits at a

specific price." *Id.* 128 Ill.App.3d at 812–13, 471 N.E.2d at 610–11. Braaten similarly represented that a Pacific Life insurance policy with $10 million in death benefits existed, which Pape could currently purchase for one payment of $33,000. Plaintiffs focus on language in the spreadsheets. The court notes, in addition, evidence that Braaten made statements to Pape that the "program" required an initial check of $33,000, and there were no other out-of-pocket payments.[34]

Moreover, even if Braaten's statements are characterized as financial projections rather than representations about existing policies, a reasonable jury could conclude that Braaten held himself out as an expert on these types of premium-financed insurance programs. His statements that Pape would make no out-of-pocket payments besides the $33,000 check were specific, objective, and meant to be relied upon by Pape. *Compare Rasgaitis*, 2013 IL App (2d) 111112, ¶¶ 42–43, 985 N.E.2d 621, 634 (actionable where financial advisors promised their clients "guaranteed benefits and $96,000 in returns in five years," among other things), *with Power*, 337 Ill. App. 3d at 833, 786 N.E.2d at 1119 (not actionable where a contractor told his business partner, also an experienced contractor, that a construction job would be profitable).

Braaten's alternative arguments about his statements fall short. He asserts that Mezmar and McGee "offered no testimony" that Braaten made false statements, and Mezmar testified that Braaten did not make statements about exiting the policies without financial consequences. (Braaten Mem. [204] at 11.) If Braaten believes Pape's testimony must be discounted unless corroborated by McGee and Mezmar, the court disagrees. Braaten also contends that the "one pay" representation was in fact true, because Pape testified that he only made one payment (the $33,000 check) before surrendering the policies and paying off the loans. The untenable endpoint

---

[34]     Plaintiffs also point out that in December 2016, Braaten sent a spreadsheet about the existing policies showing an illustrated rate of 7% (and therefore one payment), even though Braaten was aware that the policies were performing at a return rate of around 4% as of February 2017. (Pls.' Braaten SOF ¶ 22.)  The court notes that if Pape knew the policies were underperforming, and had underperformed in 2015 and 2016, it is not clear that Pape could have reasonably relied on that illustrated rate. Braaten does not address this issue in reply, though he argues that any misrepresentation in December 2016 could not have caused damages. (Braaten Reply [229] at 8.)

of this argument is that Pape would be required to wait until Year 20 to conclusively determine that he had made just one payment before suing Braaten for fraud. Plaintiffs' discussion of this issue is sketchy, but the court is satisfied they have at least raised a genuine issue of fact that the policies would entail more than just the $33,000 payment. Ereneta found "undisclosed costs" in the spreadsheets and discovered the policies would be "underwater" even if they reached a 7% rate of return; this presumably means that the policies would not be able to pay off the loan and accumulated interest (even assuming a high rate of return), that there would be additional out-of-pocket payments, and that the policies were not "one pay."

Braaten's arguments about the remaining elements of fraud are similarly lacking. Braaten argues that Pape could not reasonably rely on Braaten's statements, because a "person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Siegel Dev., LLC v. Peak Const. LLC*, 2013 IL App (1st) 111973, ¶ 114, 993 N.E.2d 1041, 1060 (citation omitted). In support, Braaten again points to circumstances emphasized in his statute of limitations argument: the policy documents contradicted Braaten's representations, Pape had professional advisors, and the spreadsheets included a disclaimer. Whether Pape's reliance was reasonable is a question of fact, however, and summary judgment is appropriate only in circumstances where the facts support just one conclusion. *See, e.g.*, *Parish v. Motorola, Inc.*, No. 06 C 1690, 2007 WL 967914, at *5 (N.D. Ill. Mar. 29, 2007) (granting summary judgment where plaintiff never believed the defendant's representations were true, and therefore could not have relied upon them). For reasons already discussed—including the complexity of the program, Pape's reliance on Braaten's expertise, and the disclaimers' non-detailed nature—the court does not believe that the record entitles Braaten to summary judgment, even though a jury may find that Pape did not reasonably rely on Braaten. Braaten cites *Van Den Heuvel v. AI Credit Corp.*, No. 12-C-0327, 2014 WL 12651232, at *7–8 (E.D. Wis. Apr. 11, 2014), in support of his reliance argument, but that case is distinguishable: the *Van Den Heuvel* plaintiff failed to identify any person who "made any statements to [plaintiffs]

that could constitute actionable fraud," and pointed only to the insurance illustrations, which contained significantly more extensive risk disclosures than the spreadsheets in this case.

Finally, Braaten attacks Plaintiffs' state-of-mind evidence. The only case cited by Braaten is *Brashear v. SCR Medical Transportation, Inc.*, No. 15 C 6665, 2016 WL 10611352, at *6 (N.D. Ill. Dec. 20, 2016), where the plaintiff "wholly fail[ed] to point to *any* evidence that Defendants' [ ] comments were intentional misrepresentations of fact at the time they were made." *Brashear* concerned the evidence required to establish the fraudulent scheme exception to Illinois's general prohibition on promissory fraud. The court has determined that Braaten's statements concerned existing facts, rather than opinions or predictions; as the court reads the caselaw, Plaintiffs do not need additional evidence to establish a fraudulent scheme. *Cf. Duhl*, 102 Ill. App. 3d at 490–91, 429 N.E.2d at 1274 (noting that "a statement of matters in the future . . . may amount to a fraudulent misrepresentation if it amounts to an assertion of fact"). Thus, Braaten's knowledge of falsity and his intent are both state-of-mind questions generally inappropriate for resolution on summary judgment. *See, e.g.*, *Laborers' Pension Fund v. RAI Concrete, Inc.*, No. 1:17-CV-08748, 2021 WL 4146888, at *7 (N.D. Ill. Sept. 11, 2021). Braaten points to no evidence conclusively deciding these issues in his favor.

Summary judgment as to Count III (fraudulent misrepresentation) is denied.

### III. Negligence

To establish their negligence claims, Plaintiffs must show "that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury." *Doe v. Coe*, 2019 IL 123521, ¶ 34, 135 N.E.3d 1, 12 (citation omitted). The existence of duty is a question of law; breach and proximate cause are questions of fact. *Malorney v. B & L Motor Freight, Inc.*, 146 Ill. App. 3d 265, 267–69, 496 N.E.2d 1086, 1088–89 (1st Dist. 1986).

### A.    Braaten Defendants (Count I)

In support of their negligence claim against the Braaten Defendants, Plaintiffs point to two sources of duty:  Braaten's statutory duty as an insurance producer under section 2-2201 and a general common law duty of care.  Section 2-2201 provides that insurance producers "shall exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested by the insured or proposed insured," *see* 735 ILCS 5/2-2201(a), which is a duty that arises only after an insured or proposed insured requests coverage.  *Skaperdas v. Country Cas. Ins. Co.*, 2015 IL 117021, ¶ 37, 28 N.E.3d 747, 756.  Neither party focuses on whether Braaten was an insurance producer or whether Pape requested coverage, so the court assumes that Braaten does not dispute these issues.  Rather, Braaten argues that Plaintiffs cannot prove any false statements, which is a "predicate" for their negligence claim, and that Plaintiffs' focus on suitability is a "non-starter."  (Braaten Mem. at 13–14.)  In other words, he seems to argue that only false statements by an insurance producer constitute breach under section 2-2201.

Liability under section 2-2201 "attaches only if a broker had a duty to perform the action it allegedly performed negligently."  *Landmark*, 933 F.3d at 816.  While the exact scope of this duty is unclear, it includes the duty to respond to a request for coverage "either by providing the desirable coverage or by notifying the applicant of the rejection of the risk."  *Skaperdas*, 2015 IL 117021, ¶ 37, 28 N.E.3d at 756 (quoting *Talbot v. Country Life Ins. Co.*, 8 Ill. App. 3d 1062, 1065, 291 N.E.2d 830, 832 (3d Dist. 1973)).  Illinois courts have therefore focused on whether the insured's specific request was met.  *See Off. Furnishings, Ltd. v. A.F. Crissie & Co.*, 2015 IL App (1st) 141724, ¶¶ 25–26, 44 N.E.3d 562, 568–69 (where it was "assumed" the producer would procure replacement coverage, producer had no duty to review information on the insurance application for accuracy); *Melrose Park Sundries, Inc. v. Carlini*, 399 Ill. App. 3d 915, 917, 921 927 N.E.2d 132, 134, 137 (1st Dist. 2010) (where plaintiffs generally requested "all of the requirements for insurance" for their liquor store, producer did not have a "fiduciary duty to procure workers' compensation insurance despite the fact that no such coverage was requested").

As the Seventh Circuit has explained, however, section 2-2201 also includes the duty to provide accurate information to a party seeking coverage. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 318 (7th Cir. 2017) ("[T]he [section 2-2201] duty can be breached if a broker fails to disclose information about the insurer that would be material to the insured's decision to place the insurance with that insurer."). Accordingly, courts in this district have recognized that providing false or misleading information while soliciting or negotiating with a proposed insured is an actionable breach under section 2-2201. *See Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18 C 8167, 2019 WL 4189466, at *20 (N.D. Ill. Sept. 4, 2019) (section 2-2201 includes an obligation "to warn [insureds] where there is reason to believe that an insurer will be insolvent"); *J&A Freight Sys., Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 14 C 1581, 2017 WL 4274170, at *13 (N.D. Ill. Sept. 26, 2017) ("[Section 2-2201's duty is not] so limited as to allow [insurance producers] to communicate false or misleading information about the scope of coverage under a policy while the insured is deliberating about whether to procure or renew the policy."); *Vertex Ref, NV, LLC v. Nat'l Union Fire Ins., Co. of Pittsburgh, PA*, 2017 WL 977000, at *5 (N.D. Ill. Mar. 14, 2017) ("[A]n insurance producer which is cavalier about the accuracy of the information it provides to a party seeking coverage can hardly be said to have exercised ordinary care.").

In light of this caselaw, the court rejects Braaten's argument that Plaintiffs' negligence claim fails for lack of evidence of false statements. First, as already discussed, Plaintiffs have presented evidence of a false representation: that the policies would require Pape to make just one payment of $33,000. Additionally, other representations not raised in Plaintiffs' fraudulent misrepresentation argument, such as Braaten's claim that Pape could reduce the death benefits at any time (and thus limit the need for additional loan collateral), could be evidence of negligence. Second, and more significantly, section 2-2201 is not cabined to false statements: though the statute limits the liability of insurance producers, it specifically carves out *negligence* claims from that protection. *See* 735 ILCS 5/2-2201 ("While limiting the scope of liability of an insurance

producer . . . under standards governing the conduct of a fiduciary or a fiduciary relationship, the provisions of this Section do not limit or release an insurance producer . . . from liability for negligence. . . ."). So long as Plaintiffs convince a jury that Braaten provided false *or misleading* information during the solicitation, placement, or renewal of Pape's policies, Plaintiffs may succeed on their negligence claim.

Plaintiffs' evidence of negligence beyond Braaten's false representations is thinner. Here, Plaintiffs rely primarily on their expert report from Alan J. Besnoff, which focuses on Braaten and Levy's alleged violations of Pacific Life guidelines. (Expert Report at 27–44.) The report asserts that "several" of the guidelines "are representative of, and comport with, the life insurance industry standards"—specifically, the industry standard to conduct business with honesty and fairness; to use complete, approved, and compliant illustrations; to conduct a needs and suitability analysis; and to ensure employee compliance with policies. (*Id.* at 20–25.) The report also concludes that Braaten and Levy's illustrations and spreadsheets violated the Illinois Administrative Code by providing incomplete illustrations, *see* 50 Ill. Adm. Code 1406.70(b)(6), and by referring to the policy as "one pay," *see id.* § 1406.70(b)(2), (7)–(8) (illustrations shall not describe "non-guaranteed elements in a manner that is misleading," represent that premium payments will not be required to maintain the illustrated death benefits, or use the term "vanishing premium" or "a similar term that implies the policy becomes paid up[ ] to describe a plan for using non-guaranteed elements to pay a portion of future premiums"). (Expert Report at 46–47.) Finally, the report concludes that "by violating Pacific Life guidelines and requirements and Illinois state regulations . . . Braaten and Levy also violated life insurance industry customs." (*Id.* at 48.)

Although the report refers to violations of Illinois insurance regulations, Plaintiffs have not made a negligence per se argument. And the court is unwilling to interpret Pacific Life's internal guidelines as a separate source of duty under the theory that those guidelines represent "industry custom." *See Coe*, 2019 IL 123521, ¶ 36, 135 N.E.3d at 12 (explaining that a defendant's internal guidelines do not create a legal duty). The Pacific Life guidelines do have some relevance,

however:  internal policies may be "relevant to breach" to the extent they were developed or adopted "as a means of fulfilling [ ] existing duties" under the law.  *Id.* ¶ 36, 135 N.E.3d at 12–13; *see Heastie v. Roberts*, 226 Ill. 2d 515, 553–54, 877 N.E.2d 1064, 1088 (2007) ("While [internal] policies are not determinative of the standard of care, the failure of a hospital to follow its policies can be evidence of a breach of the hospital's duty to a patient.").  At least some of Pacific Life guidelines do appear to reflect the duty, set forth in section 2-2201, to refrain from making false or misleading communications.  For instance, Pacific Life guidelines prohibit policy terms that call for interest capitalizing into a premium finance loan.  They also require that illustrations include information about guaranteed elements (meaning the policy's guaranteed value), and prohibit projections of rates of return greater than 6.25%.  These guidelines would guard against misleading "one pay" or "vanishing premiums" representations—or so a jury could find.

Plaintiffs' expert report also faults Braaten's failure to perform a suitability or cash value needs analysis (or his negligent performance of that analysis), and opines that such an analysis is required by Pacific Life guidelines, which incorporate industry standards.   (Expert Report at 23–24.)  But Plaintiffs have not identified authority for the argument that section 2-2201's duty requires a suitability or needs analysis, so they cannot base their negligence claim on Braaten's failure to perform that analysis.  *See Landmark*, 933 F.3d at 816 (7th Cir. 2019) (rejecting a negligence claim for a broker's failure to timely provide notice to insurer of the insured's claim, where plaintiff "identified no Illinois cases establishing that insurance brokers have a duty to deliver notice of claims on behalf of an insured").  Rather, an obligation to determine what coverage is best suited for an insured tilts much closer to a fiduciary standard than section 2-2201's limited duty of ordinary care.  And section 2-2201 "prevents any insurance producer from being held to the fiduciary standard," except in a narrow set of circumstances not relevant here. *Krop*, 2018 IL 122556, ¶ 28, 120 N.E.3d at 990.  Without Illinois caselaw to the contrary, the court will not impose a duty on insurance producers to determine whether the coverage is "suitable." *Cf. Moore ex rel. Moore v. Johnson Cty. Farm Bureau*, 343 Ill. App. 3d 581, 586, 798 N.E.2d 790,

794 (5th Dist. 2003) (explaining that in the absence of a fiduciary duty, an insurer "owed no duty to the insured to determine what would constitute 'adequate' insurance coverage and to provide coverage in that amount").

Finally, Plaintiffs have suggested that Braaten owed duties under common law negligence principles. Plaintiffs reason that "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act." *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662, ¶ 19, 965 N.E.2d 1092, 1097. Braaten has not responded, but the Seventh Circuit rejected a similar argument in *M.G. Skinner*, 845 F.3d at 319–20, refusing to impose a common law duty on an insurance producer and noting that Illinois courts "have been reluctant to expand the duties of brokers and agents beyond those articulated in [section 2-2201]." Plaintiffs have not provided any grounds for distinguishing this authority.

Again, Plaintiffs' negligence claim survives summary judgment because they have presented evidence that Braaten furnished false *or misleading* information during the solicitation, placement, or renewal of Pape's policies, in violation of section 2-2201. Other negligence theories are less convincing, but summary judgment on Count I is denied.

### B. Levy (Count IX)

In response to Plaintiffs' negligence claim against him, Levy argues that the economic loss doctrine bars the claim and that the evidence does not support any of the elements of negligence. The economic loss doctrine, also known as the *Moorman* doctrine in Illinois, bars a plaintiff from recovering a pure economic loss in tort. *See generally Moorman Mfg. Co. v. National Tank Co.*, 91 Ill. 2d 69, 435 N.E.2d 443 (1982). Illinois law recognizes four exceptions to this rule: (1) personal injury or property damage resulting from a sudden or dangerous occurrence; (2) fraud; (3) negligent misrepresentation made by one in the business of supplying information; and (4) where a service professional has duties to his client that arise independently of his contractual duties. *Mercola v. Abdou*, 223 F. Supp. 3d 720, 729 (N.D. Ill. 2016)

Section 2-2201 imposes a statutory duty of care on insurance producers. Thus, if the statute applies to Levy, it provides an exception to the *Moorman* doctrine (an extracontractual duty under the fourth exception) and a legal duty for Plaintiffs' negligence claim. *See id.* at 730. Levy argues that this section does not apply to him, because he was not Pape's insurance producer, and Pape did not request insurance coverage from him. The court is not convinced by these arguments, nor by Levy's arguments about the other negligence elements.

### 1. Application of Section 2-2201

The term "insurance producer" in section 2-2201 comes from the Insurance Code's statutory definition: "a person required to be licensed under the laws of this State to sell, solicit, or negotiate insurance." *Skaperdas*, 2015 IL 117021, ¶¶ 29, 43, 28 N.E.3d at 755, 757 (quoting 215 ILCS 5/500-10.) A person is required to be licensed when they "sell, solicit, or negotiate insurance" in Illinois. 215 ILCS 5/500-15(a). The court finds that, at a minimum, Levy "solicited" insurance by "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company." 215 ILCS 5/500-10.

Levy is a licensed insurance producer in Illinois and has an insurance producer agreement with Pacific Life, which authorizes him to solicit applications and estimate future contract performance using illustrations. And, in this case, Levy performed these producer duties by preparing the illustrative documents, several of which identify Levy as the insurance producer. These documents urged Pape "to apply for a particular kind of insurance" (life insurance policies with varying amounts of death benefits and premiums) "from a particular company" (Pacific Life). Levy also received commissions for the sale of Pape's insurance policies under his Pacific Life producer number. Given this record, a jury could reasonably reject Levy's argument that he did not act as Pape's producer "of record" (Levy Reply [232] at 5), to the extent this descriptor is legally significant at all. Nor does Levy's limited direct communication with Pape alter this conclusion, as Levy had multiple interactions with Pape's advisor McGee. In any event, the statutory definition of solicitation does not require direct or in-person conversations.

Levy also contends that his role was restricted to obtaining premium financing, which is not governed by section 2-2201. But the illustrative documents prepared by Levy were not limited to depictions of premium financing or loan projections; they also included information about the policies' premiums, death benefits, and cash surrender value. Given this, the only case cited by Levy is inapposite. In *Autry v. Northwest Premium Services*, 144 F.3d 1037, 1040–45 (7th Cir. 1998), the Seventh Circuit held that the McCarran-Ferguson Act, which precludes the application of federal insurance law where the state has enacted a law regulating the same insurance issue, did not bar plaintiff's federal claim regarding her premium financing agreement. In reaching this conclusion, the court explained that section 513a9, the Illinois statute regulating premium finance agreements, was not enacted for "the purpose of regulating the business of insurance" and does not regulate "the relationship between the insurance company and the policyholder" (the relevant test for the Act); rather, it regulates "the lending activities of companies involved in premium finance" and "the debtor-creditor relationship under premium financing agreements." *Id.* at 1043–1045. To the extent *Autry*—which involves a specific test developed for the McCarran Act—is relevant to this case, it is not relevant to Levy, who was not a creditor on Pape's loan contract and whose role was not limited to "lending activities." Levy has not suggested that he acts as a licensed "premium finance company" regulated by section 513a9, rather than a licensed insurance producer regulated by section 2-2201. *See* 215 ICSA 5/513a3 (requiring anyone "hold[ing] himself out to be engaged in the business of financing insurance premiums, either directly or indirectly," to obtain a license as a premium finance company).

For the first time on reply, Levy argues that section 2-2201 does not apply because Pape never made a request for insurance to Levy. The court disagrees. Braaten sent Levy the necessary "facts" for the illustrative documents (Levy Dep. 19:75–20:7), and those illustrative documents present proposed death benefits and premiums; a reasonable jury could infer that Pape discussed his preferred benefits and premiums terms with Braaten, and that Braaten relayed that information to Levy so that he could prepare the documents. Illinois law does not

appear to permit insurance producers to shield themselves from liability by communicating through other producers, rather than directly with the insured. For instance, if an insurance broker is authorized to engage sub-brokers, the section 2-2201 duty extends down the line of sub-brokers. *M.G. Skinner*, 845 F.3d at 318. Whatever the precise nature of the relationship between Braaten and Levy, there is evidence that Pape requested coverage from Braaten, and that Braaten directly asked Levy to be involved in fulfilling those requests. *Cf. id.* at 318–319 (defendant had no section 2-2201 duty where the sub-brokers never requested the defendant's involvement in procuring plaintiffs' insurance and refused to allow the defendant to become involved). While Levy notes that "a duty may not be imposed under section 2-2201(a) based on a vague request to make sure the insured is covered," *Skaperdas*, 2015 IL 117021, ¶ 42, 28 N.E.3d at 757, he makes no real argument that Pape failed to make a specific request for coverage. Instead, Levy contends that Pape made that request directly to Braaten, not to him. For the reasons discussed above, the court does not find this argument persuasive.

### 2. Breach of Section 2-2201

Having concluded that section 2-2201 applies to Levy, the court also concludes that Plaintiffs have submitted evidence sufficient to survive summary judgment on their claim that Levy breached those duties. As this court already explained, section 2-2201 includes the duty to provide accurate information to the insured or proposed insured, meaning insurance producers may not provide misleading information during the solicitation, placement, or renewal process. *See supra*. To support their claim against Levy, Plaintiffs rely on the same expert report they offer against Braaten, as well as the same alleged violations of Pacific Life guidelines. (Pls.' Opp'n to Levy at 8.) The court's analysis is largely the same: to the extent certain Pacific Life guidelines guarded against misleading spreadsheets or representations, the guidelines detailed in the expert report are relevant. Notwithstanding those guidelines, the court concludes (for reasons already exhaustively detailed) that a reasonable jury could find that the spreadsheets misled Pape about aspects of the policies he purchased. As with Braaten, some of Plaintiffs' claims—specifically the

fact that Levy did not perform or negligently performed a suitability review—are outside the scope of section 2-2201's duty.

Levy's remaining arguments on negligence and proximate cause do not entitle him to judgment as a matter of law:  both of those are typically questions for the jury, and the court sees no reason to depart from that rule here.  (*See* Levy Mem. [208] at 8–10.)  First, Levy argues that Plaintiffs' evidence does not show negligence because the spreadsheets were not "wrong."  But a communication can be confusing or misleading without being truly false, and providing misleading information may support a claim of negligence under section 2-2201.  Levy also points to various excerpts of Pape's deposition testimony, provided without context, to argue that there is no triable issue on negligence.  Pape testified that the loan worked as promised in that interest capitalized into the loan and that, as of the time of his deposition and without reading the policy terms and conditions, he had no information that any Defendant violated those terms.  The weight of this testimony is for a jury to consider; given other evidence in the record, it does not entitle Levy to judgment as a matter of law on the element of breach.

Second, Levy claims that Plaintiffs cannot show that any alleged negligence caused harm, because Pape did not rely on the spreadsheets.  Levy points to Pape's own testimony that the spreadsheets were "exploratory" and not "etched in stone," and the fact that Pape relied on his professional advisor McGee during the solicitation process (thus suggesting, presumably, that Pape could not have relied on Levy as well).  But Pape repeatedly testified that he relied on the spreadsheets in making the decision to go forward with the program.  Nor is the court persuaded by Levy's argument that Pape cannot establish reliance because the spreadsheets contained the following disclosure:  "Hypothetical and for illustrative purposes only.  Actual results will vary."  This argument is not supported by the two cases Levy cites.  In *Van Den Heuvel*, 2014 WL 12651232, at *7–8, the plaintiff relied on insurance illustrations containing numerous and detailed risk disclosures "placing the reader on notice that they were merely intended to explain the underlying theory of the financing vehicle and that the figures used in the illustrations were not

guaranteed." Here, in contrast, the spreadsheets' bare-bones disclosure does not even explain that the spreadsheets represented a "financing vehicle," let alone one with an "underlying theory" where the results could only be achieved so long as everything performed according to plan. Levy's reliance on *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 2015 IL App (2d) 140952, ¶ 25, 40 N.E.3d 264, 273, is also misplaced; there, the court held that statements in a school catalogue claiming "unprecedented" and "limitless" opportunity in a professional field were mere "puffing" and "projections of future performance." But the spreadsheets here differ from future projections or "exaggerations reasonably to be expected of a seller as to the degree of quality of [his] product." *Id.* They showed a "one pay" policy, without sufficiently warning Pape it was in fact a complex financing vehicle, dependent on various external factors. A jury must determine whether Levy breached his statutory duties as an insurance producer, causing Plaintiffs harm.

Before leaving the discussion of Levy's liability, the court notes that Plaintiffs also argued that Levy owed a duty to Pape under the general negligence principles of guarding against foreseeable injuries, *see Simpkins*, 2012 IL 110662, ¶19, and affirmative undertaking, which provides that "a person who begins a service for another must exercise reasonable care in performing it to avoid injury to the beneficiary of the undertaking." *Skaperdas*, 2015 IL 117021, ¶ 35. As already discussed, the Seventh Circuit has rejected relying on general negligence principles to expand an insurance producer's duty beyond section 2-2201. *See M.G. Skinner*, 845 F.3d at 319–20. Nor, given section 2-2201's application to this case, does the court reach Plaintiffs' argument about the economic loss doctrine's negligent misrepresentation exception, although that exception may well be available here. Summary judgment as to Count IX is denied.

### C. Direct Negligence Against Pacific Life (Count VI)

Plaintiffs bring two negligence claims against Pacific Life, one for *respondeat superior* liability based on Braaten's conduct (Count V) and one based on direct negligence (Count VI). For their direct negligence claim, Plaintiffs bring both a general negligence and a negligent supervision claim. (Second Am. Compl. ¶ 139.)

The economic loss doctrine bars both claims.[35]  As originally announced, the doctrine held that a plaintiff could not recover purely economic losses from products liability claims, *see Moorman*, 91 Ill. 2d at 88, 435 N.E.2d at 451–52, but it has been extended to bar claims for the negligent performance of services.  *See Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 115 Ill. 2d 146, 153, 503 N.E.2d 246, 249 (1986).  The Seventh Circuit has also explained that the *Moorman* doctrine precludes negligent supervision liability "where, in the course of performing a contract between the defendant and the plaintiff, the defendant's employees negligently cause the plaintiff to suffer some purely economic form of harm."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012).  While the *Moorman* doctrine was originally rooted in the distinction between contract and tort, the application of the doctrine is no longer tied to the existence of a contractual relationship, but to whether the plaintiff alleges only pecuniary damage, as opposed to personal or property damage.  *Gondeck v. A Clear Title & Escrow Exch., LLC*, 47 F. Supp. 3d 729, 746–47 (N.D. Ill. 2014).

Courts have recognized an exception to the *Moorman* doctrine where a service professional owes duties to the client that arise independently of contractual duties.  The origin of this exception is *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 163, 636 N.E.2d 503, 515 (1994), which held that the *Moorman* doctrine does not bar

---

[35]    Plaintiffs contend that Pacific Life waived its economic loss argument by not raising it in response to the complaint.  In support, Plaintiffs cite only *Metro. Water Reclamation Dist. of Greater Chi. v. Terra Found. for Am. Art*, 2014 IL App (1st) 130307, ¶ 54, 13 N.E.3d 44, 58, which held that defendant's economic loss argument was forfeited where defendant raised it for the first time at "the close of a lengthy damages trial," even though the argument "could have been easily resolved much earlier in the proceedings through a motion to dismiss or a motion for summary judgment."  That is obviously not the case here.  Nor did *Metropolitan Water Reclamation* hold that the economic loss doctrine is an affirmative defense under Illinois law.  The court relied on Illinois's procedural rule on pleading defenses, which does not apply in federal court.  That rule "encompasses both affirmative defenses *and other grounds*" that would take the opposing party by surprise if not pleaded.  *Id.* ¶ 55, 13 N.E.3d at 58–59 (emphasis added).  Plaintiffs do not suggest that they were surprised by Pacific Life's invocation of the economic loss doctrine, nor is the court certain that the doctrine must be strictly understood as an affirmative defense.  *See Anderson v. Keip*, No. 95 C 50159, 1997 WL 78860, at *1 (N.D. Ill. Feb. 24, 1997) ("[The economic loss doctrine] is not an affirmative defense. Rather, it goes to the legal sufficiency of the negligence claim. . . .") (applying Illinois law).  Pacific Life has not waived this argument.

professional malpractice claims against accountants, because an accountant's "knowledge and expertise cannot be memorialized in contract terms, but is expected independent of the accountant's contractual obligations." The exception has been extended to permit claims against attorneys, insurance brokers, surveyors, and financial advisors. *See Receivership Mgmt.*, 2019 WL 4189466, at *19 (collecting cases). But Plaintiffs have made no real argument that, as an insurance company, Pacific Life has a professional relationship with its insurance producers' clients similar to the one that an attorney or accountant has with their clients, or that Pacific Life provides intangible expertise that cannot be defined by contract. Nor has the court found any Illinois law so holding. *See Gondeck*, 47 F. Supp. 3d at 748 (holding that a title insurance provider did not have a professional relationship with their agents' clients that satisfied the *Congregation of the Passion* exception). Rather, in the context of another economic loss exception (negligent misrepresentation by information suppliers), courts have held that title insurers primarily provide a tangible product (insurance policies), and any professional services are ancillary. *See id.* at 749–50; *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 355 Ill. App. 3d 546, 562, 823 N.E.2d 168, 182 (1st Dist. 2005).

In an attempt to evade the *Moorman* bar, Plaintiffs argue that their negligence claims arise outside the contracts between Pape and Pacific Life; those contracts appear to include the premium financing disclosure signed by Pape, which by its terms limits Pacific Life's role to providing and servicing the policies, as well the policies themselves. Plaintiffs urge that the alleged negligent conduct arose prior to the policies' issuance and involved duties independent of the contracts—specifically, the contracts do not enumerate the duty to supervise or govern premium financing. Moreover, Plaintiffs contend, had Pacific Life supervised Braaten and Levy, Pacific Life "would have" prevented the sale of the policies and (presumably) the issuance of any contract. But these arguments do not defeat application of the *Moorman* doctrine, which bars negligence claims in this context even where there is no contractual relationship between the parties. *See Gondeck*, 47 F. Supp. 3d at 746–47 (collecting Illinois cases applying the doctrine

without a contract). And courts have concluded that claims—specifically negligent supervision claims—*do* arise out of the parties' contracts or commercial expectations, even where the negligent conduct was not specifically governed by the contractual language. *See Soranno v. New York Life Ins. Co.*, No. 96 C 7882, 1999 WL 104403, at *2, 16 (N.D. Ill. Feb. 24, 1999) (economic loss doctrine barred negligent supervision of an insurance agent's actions in selling insurance contracts and annuities, including his false statements to induce plaintiffs to purchase the policies, because "[t]hose acts—and the related duty to supervise them—appear to have arisen under the contract"); *cf. Anderson*, 115 Ill. 2d at 148–49, 153, 503 N.E.2d at 247, 249 (plaintiff installed precipitator units pursuant to a contract with an electric corporation; plaintiff's additional costs due to the unit manufacturer's negligent supervision of the installation work were barred by the *Moorman* doctrine, even though the plaintiff and manufacturer were not in privity, because they "arose solely from disappointed commercial expectations in that [plaintiff] lost the anticipated profits of its contract with [the electric corporation] to perform the electrical work").

Moreover, if Plaintiffs were correct in arguing that their claims arose outside the contracts, they would have to identify some extracontractual legal duty that Pacific Life owed Pape. *See, e.g.*, *Nixon v. United States*, 916 F. Supp. 2d 855, 862–64 (N.D. Ill. 2013) (noting that because there was no contract, any duty must be extracontractual, but still finding statutory and common law agency duties). They have failed to do so. Plaintiffs cite no authority holding that insurance companies owe their producers' clients an independent legal duty, nor have they identified authority for the notion that Pacific Life owed Pape extra-contractual duties "to adhere to industry standards." (Pls.' Opp'n to Pacific Life at 13.) That suggestion, if adopted, would gut the economic loss doctrine, as all commercial defendants are governed by industry standards. The court declines to so expand negligence liability without clear guidance from the Illinois courts. And because Pacific Life did not owe a duty of adherence to industry standards to Plaintiffs, their extended argument that Pacific Life guidelines reflect those standards is misplaced. (*Id.* at 13–15.) Once a legal duty has been established, such as the duty owed by hospitals to patients,

described in Plaintiffs' cited cases, internal guidelines may provide evidence of the applicable standard of care. *See Darling v. Charleston Cmty. Mem'l Hosp.*, 33 Ill. 2d 326, 332–33, 211 N.E.2d 253, 257 (1965); *Adams v. Fam. Plan. Assocs. Med. Grp., Inc.*, 315 Ill.App.3d 533, 547–48, 733 N.E.2d 766, 777 (5th Div. 2000); *see also Abbinanti v. Presence Cent. & Suburban Hosps. Network*, 2021 IL App (2d) 210763, ¶ 21, ___ N.E.3d ___ (explaining that Illinois law places an "independent responsibility" on hospitals to care for patients and supervise physicians). But Pacific Life's guidelines cannot provide evidence of breach of a nonexistent duty, and under well-settled Illinois law, the guidelines do not themselves create an independent duty. *See Gondeck*, 47 F. Supp. 3d at 745–46 (collecting cases).

Perhaps to circumvent this caselaw, Plaintiffs have suggested that a company's internal policies may provide evidence that it owed a legal duty "to control the actions of another." (Pls.' Opp'n to Pacific Life at 14–15.) Plaintiffs rely on *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 2018 IL 120951, ¶ 46, 104 N.E.3d 1110, 1125, where the Illinois Supreme Court looked to the traditional four-factor test for determining whether to impose a legal duty (foreseeability, likelihood of injury, burden of guarding against injury, and consequences of imposing a duty) and concluded that a fraternity owed a duty to its pledges to guard against hazing. In reaching this conclusion, the court noted that the third factor (burden) was "infinitesimal," because "[h]azing is not only against the law in Illinois, it is against the university's [and the fraternity's] rules." *Id.* But *Bogenberger* says nothing about the economic loss doctrine. To the extent Plaintiffs argue that Pacific Life owed Pape a duty under the general negligence principles articulated in *Bogenberger*, and this provided an extracontractual duty exempting their claim from the economic loss doctrine, the court is not convinced. Plaintiffs offer no cases suggesting this exception sweeps so broadly. Indeed, negligence and negligent supervision claims inherently require a duty or duty to supervise; if Plaintiffs' argument about the fourth *Moorman* exception were correct, all viable claims against defendants in the professional services industry would fall within that exception. Again, without Illinois precedent suggesting this broad outcome, the court will not reach it.

Plaintiff's negligence claim against Pacific Life is barred by the economic loss doctrine. Summary judgment as to Count VI is granted.

### D. *Respondeat Superior* Against Pacific Life (Count V)

To hold Pacific Life vicariously liable for Braaten's acts under *respondeat superior*, Plaintiffs must establish that Braaten was an agent of Pacific Life. *See Skaperdas*, 2015 IL 117021, ¶ 46, 28 N.E.3d at 758. Pacific Life contends that Plaintiffs cannot do so, as Braaten is an independent contractor, meaning that Pacific Life is not liable for his misconduct. Typically, a defendant is not liable for an independent contractor's acts, unless the defendant exerts sufficient control over him to negate the independent contractor status, giving rise to implied authority. *See Petrovich v. Share Health Plan of Ill., Inc.*, 188 Ill. 2d 17, 42, 719 N.E.2d 756, 770 (1999).[36] Plaintiffs, on the other hand, argue that Braaten had both express and apparent authority.

Express authority exists when the principal explicitly grants authority to perform a particular act. *Zahl v. Krupa*, 365 Ill. App. 3d 653, 660–61, 850 N.E.2d 304, 311 (2d Dist. 2006). Plaintiffs argue that Pacific Life granted Braaten authority to solicit and sell policies on behalf of Pacific Life. They primarily point to Braaten's producer agreement, which authorized him "to solicit and procure applications for and/or service those Contracts offered by Pacific Life." (Braaten Agreement at 2.) The agreement also states, however, that nothing in the agreement or otherwise "shall be deemed to make a Producer an employee or agent of Pacific Life," and that only Pacific Life has the right and authority to: "make, alter, modify or discharge any Contract, certificate, supplemental contract, or form issued by Pacific Life," "waive or modify any provision with respect

---

[36] Another line of caselaw, unremarked by the parties here, holds that insurance agents (who have a fixed relationship to the insurer) are traditionally agents of the insurer, while insurance brokers (who act as a middleman between the insurer and insured) are agents of the insured. *See Austin*, 2020 IL App (1st) 191125, ¶ 12, 153 N.E.3d at 1054–55. Illinois courts developed a four-part test for determining when an insurance broker is nonetheless acting as an agent of the insurer. *See Mizuho Corp. Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 654 (7th Cir. 2003). It is not clear whether this test survives more recent caselaw holding that section 2-2201 eliminates the distinction between brokers and agents with respect to their standard of care. *See Krop*, 2018 IL 122556, ¶ 28, 120 N.E.3d at 990. Because the court concludes that there is a triable issue on whether Braaten had express authority, it need not address this issue.

to any Contract," "incur indebtedness or liability, or expend or contract for expenditure of any funds," or "extend the time for payment of any premiums, bind Pacific Life to reinstate any terminated Contracts, or accept notes for payment of premiums."  (*Id.* at 3.)  Braaten confirmed in his testimony that he had no authority "to enter into a contract in the name of Pacific Life as though [he] worked for them" or "enter into a contract as [Pacific Life]," nor could he alter, modify, terminate, or discharge any contract in the name of Pacific Life.  (Braaten Dep. 284:1–18.)  Yet in his answer to Plaintiffs' Complaint, Braaten acknowledged that he was "expressly authorized by Pacific Life to act as its agent for the purposes of soliciting the public to purchase Pacific Life insurance products and to act as its agent in soliciting, accepting and preparing applications for Pacific Life insurance policies."[37]  (Braaten Answer to SAC, Ex. 26 to Pls.' Resp. to Pacific Life SOF [223-6] ¶ 20.)  Finally, in an interrogatory, Pacific Life stated Braaten was "appointed as [an] insurance producer[ ] pursuant to Illinois law to sell insurance product on behalf of Pacific Life, including soliciting and procuring applications for and delivering and servicing Pacific Life's products pursuant to Pacific Life's rules, procedures, and guidelines." (Interrogs. ¶ 2.)

The parties provide limited guidance on the question of analyzing when insurance producers have express authority to act on behalf of insurers with respect to claims relating to inadequate procurement of coverage.  It appears, however, that the touchstone is whether the producer had authority to bind the insurer to provide insurance coverage.  *Compare Zannini v. Reliance Ins. Co. of Illinois*, 147 Ill. 2d 437, 441, 451, 590 N.E.2d 457, 458, 463 (1992) (express authority where the agreement provided that the broker was "an agent" and had authority to "bind

---

[37]     Pacific Life objects to this admission, arguing that a plaintiff cannot use a defendant's "deemed admissions" as evidence against a co-defendant.  (Pacific Life Resp. to Ad. SOF ¶ 4.)  But Braaten's response to Plaintiffs' Complaint is not a "deemed" admission.  *See Allen v. Destiny's Child*, No. 06 C 6606, 2009 WL 2178676, at *2 (N.D. Ill. July 21, 2009) (where a defendant fails to respond to a request for admission, all matters in those requests are "deemed admitted" under Federal Rule of Civil Procedure 36, and cannot be used against co-defendants); FED. R. CIV. P. 36 ("An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.").  Pacific Life also objects to this admission as requiring a legal conclusion.  The court does not simply accept Braaten's conclusion, but finds the admission relevant to what authority Pacific Life granted Braaten.

coverage and execute contracts in accordance with the guidelines furnished from time to time by the Company"), *with Mizuho Corp. Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 646, 655 (7th Cir. 2003) (no express authority where the agreement granted authority to solicit applications, but disavowed an agency relationship and "expressly withheld" authority to bind the insurer). Based on Braaten's authorization to sell policies on Pacific Life's behalf, the court finds that there is a triable issue as to whether Pacific Life expressly authorized Braaten to bind Pacific Life to the promised insurance policies. While Braaten's producer agreement only authorizes him to solicit applications and service contracts under the "Authorization" subheading, the "Responsibilities of the Producer" section includes the subheading "Marketing, Sale, and Servicing of Contracts," and provides: "Producer agrees to use best efforts in marketing, selling and servicing the Contracts in accordance with the terms of this Agreement." (Braaten Agreement at 2–3.) Moreover, as noted, Pacific Life stated in its interrogatories that Braaten was appointed to "sell insurance product on behalf of Pacific Life."

Pacific Life has not directly challenged Plaintiffs' assertion that Braaten could sell policies on its behalf, nor has Pacific Life substantially addressed the express authority argument. Pacific Life instead emphasizes that Braaten lacked authority to enter into contracts on behalf of Pacific Life, which is the "hallmark" of an agency relationship. (Pacific Life Mem. [201] at 9.) While Braaten testified that he could not enter contracts "as" Pacific Life, the producer agreement only states that he cannot "make, alter, modify, or discharge" any contract issued by Pacific Life. It thus appears that Braaten could bind Pacific Life to insurance policies authorized by Pacific Life, but could not "make" an insurance policy that Pacific Life did not authorize, or "alter" or "modify" an offered Pacific Life policy. Pacific Life also notes that Pape's policy applications (on the page Pape undisputedly signed) include a declaration that no producer has the authority to "make or change contracts or insurance policies," "alter the terms of [the] application," or "waive any of Pacific Life's rights or requirements." (Applications at PLIL 3957, 0064.) As the court reads this limitation, it simply reiterates the limitations in the producer agreement, and defeats Plaintiffs'

express authority argument only if Pacific Life did not allow issuance of insurance policies that had terms promised by Braaten. On the record before the court, there appears to be a triable issue on this point. Pacific Life itself denies that Braaten deviated from any Pacific Life internal guidelines. (Pacific Life Mem. at 12; Pacific Life Reply [227] at 2.) And while Pacific Life contends that the loan agreement was outside the scope of its role in providing insurance policies, the placed illustrations (approved by Pacific Life and provided by Braaten) also show loan projections.

Pacific Life's extended argument that Pape was put on notice of the limitations in Braaten's authority and failed to investigate those limitations does not bar a claim of vicarious liability either. In support of the notice argument, Pacific Life primarily points to the declaration in Pape's applications. Whatever notice Pape had, and whatever investigation he could have conducted about that declaration, there is no evidence that he would have discovered any information concerning Braaten's express authority beyond what the court has described above. Moreover, none of the cases cited by Pacific Life hold that one must affirmatively investigate a putative agent's scope of authority even where express authority is the source of vicarious liability. Rather, the cases all discuss the reasonable inquiry principle in the context of apparent authority. *See Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 300 F. Supp. 2d 606, 618 (N.D. Ill. 2003); *Int'l Union of Operating Eng'rs, Loc. 150 v. Triad Constr. Servs.*, No. 97 C 6218, 1999 WL 571053, at *8 (N.D. Ill. July 29, 1999); *Schoenberger v. Chi. Transit Auth.*, 84 Ill. App. 3d 1132, 1138, 405 N.E.2d 1076, 1081 (1st Dist. 1980); *Gen. Refrigeration & Plumbing Co. v. Goodwill Indus. of St. Louis,* 30 Ill. App. 3d 1081, 1085–86, 333 N.E.2d 607, 611 (5th Dist. 1975).

The court concludes that, regardless of Braaten's status, Pacific Life may be liable for conduct within his express authority for a specific purpose. Summary judgment as to Count V is therefore denied. Having so ruled, the court declines to address Pacific Life's argument that Braaten was an independent contractor, or Plaintiffs' apparent authority argument.

## IV.    Unjust Enrichment

Plaintiffs bring an unjust enrichment and constructive trust claim against Levy (Count VIII). These claims rise and fall together.  *See Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 27, 47 N.E.3d 579, 584 ("A constructive trust is a remedy for unjust enrichment.").  "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989).  In *HPI Health Care*, the Illinois Supreme Court explained that where a plaintiff seeks benefits transferred to the defendant by a third party, the following circumstances constitute unjust enrichment: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant."  *Id.* (citations omitted); *accord Banco Panamericano, Inc. v. City of Peoria,* 880 F.3d 329, 333 (7th Cir. 2018).

Plaintiffs' unjust enrichment claim is predicated on Levy's retention of the commissions for Pape's policies.  These commissions were issued to Levy by Pacific Life, and so *HPI Health Care*'s guidance on third-party transfers applies.  Plaintiffs do not directly address this law, but instead point to the wrongful conduct underlying Levy's negligence claim and alternatively argue that wrongful conduct is not necessary for unjust enrichment.  While the first and third situations listed in *HPI Health Care* do not require wrongful conduct, Plaintiffs have not put forth any argument that either circumstance applies here, and such an argument would not be successful. Pacific Life did not "mistakenly" give the commissions to Levy instead of Plaintiffs, nor do Plaintiffs have any superior claim to legal ownership of the funds—in fact, as Levy points out, Plaintiffs do not have any legal interest in the funds.  (Levy Mem. at 15.)  That means the only remaining *HPI Health Care* situation—wrongful conduct—cannot support unjust enrichment either.

In a line of cases not directly addressed by the parties, numerous courts in this district have held that wrongful conduct alone does not support unjust enrichment for third-party transfers; rather, "the plaintiff must also have some interest in the property that a third party gave to the defendant." *Indep. Tr. Corp. v. Fid. Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1050 (N.D. Ill. 2008); *accord Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1234 (N.D. Ill. 2005) (collecting cases). This is true even where the third-party funds relate to the defendant's wrongful conduct. *See, e.g.*, *Cement-Lock v. Gas Tech. Inst.*, 523 F. Supp. 2d 827, 863 (N.D. Ill. 2007) (plaintiffs were not entitled to defendants' "increased salaries and bonuses," which plaintiffs argued were "a cut of the profits generated by the [fraud]"); *Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00 C 3290, 2003 WL 22232801, at *1, 7 (N.D. Ill. Sept. 26, 2003) (defendant-debt collector wrongfully allowed interest to accrue on plaintiffs' debts owed to a third-party; plaintiffs were not entitled to the fees paid by the third-party to defendant, even though the fees were based on a percentage of the debts collected by defendants).

The funds Plaintiffs claim a right to here were commissions *directly* based on Pape's purchase of insurance policies and payment of money for policy premiums to Pacific Life, which arguably distinguishes this case from others. But Plaintiffs, who fail to respond to Levy's claim that they had no interest in the commissions, do not provide any authority suggesting that a customer has a property interest in commissions paid to a salesperson by a third party. Summary judgment as to Count VIII is granted.

## V. Plaintiffs' Damages

Finally, the Braaten Defendants claim that Plaintiffs have not shown that they suffered any damages, as Defendants did not cause Pape to pay anything more than the amounts that he himself agreed to pay under the policies and loan agreement. (Braaten Mem. at 14.) In response, Plaintiffs argue that Pape suffered out-of-pocket losses (the $750,560.91 Pape spent to pay off the premium finance loan) and benefit-of-the-bargain losses (the difference between the expected and actual economic benefit of the financial program). (Expert Report at 79–85.)

It is unlikely that benefit-of-the-bargain damages are available in this case. Under Illinois law, a "plaintiff is entitled to recover all damages which naturally flow from the commission of the tort." *Keiser-Long v. Owens*, 2015 IL App (4th) 140612, ¶ 37, 37 N.E.3d 914, 919 (quoting *Kritzen v. Flender Corp.*, 226 Ill. App. 3d 541, 557, 589 N.E.2d 909, 921 (2d Dist. 1992)). Benefit-of-the-bargain damages can be recovered only in narrow situations, however: in fraud actions, "where the transaction between the parties has actually been consummated based on the fraudulent misrepresentation." *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 274 (7th Cir. 1996) (quoting *Gold v. Dubish*, 193 Ill. App. 3d 339, 352, 549 N.E.2d 660, 667 (5th Dist. 1989)). But Plaintiffs only bring a fraud claim against Braaten; the court is aware of no Illinois case holding that these damages are available for negligence claims, and Plaintiffs have not identified any such case. Nor is this damages theory appropriate in all cases involving fraud, either. *See In re Collazo*, 613 B.R. 650, 668 (N.D. Ill. 2020) (explaining that in fraud cases involving investments, benefit-of-the-bargain damages may be too speculative); *Wafra Leasing Corp. 1999-A-1 v. Prime Cap. Corp.*, 339 F. Supp. 2d 1051, 1056 (N.D. Ill. 2004) (holding that a plaintiff cannot recover benefit-of-the-bargain damages from a defendant who was not a party to the underlying contract).

The court need not decide this issue. Plaintiffs may recover compensatory damages in the form of out-of-pocket losses that "flow directly from plaintiff's having acted on defendant's representations." *Roboserve*, 78 F.3d at 274 (quoting *Gold*, 193 Ill. App. 3d at 351–52, 549 N.E.2d at 666–67). There is evidence that Plaintiffs suffered at least some out-of-pocket losses. If proven at trial, Plaintiffs may recover these damages, which may well be limited to the amount Pape spent to pay off the loan, plus the incremental additional amount that life insurance would cost today, when Pape is older. Summary judgment on the damages claim is therefore denied.

## CONCLUSION

For the reasons stated above, the Braaten Defendant's motion for summary judgment [203] on Count III (fraudulent misrepresentation) and Count I (negligence) is denied. Levy's motion for summary judgment [207] on Count IX (negligence) is denied, but granted as to Count

VIII (unjust enrichment). Pacific Life's motion for summary judgment [200] on Count V (*respondeat superior*) is denied, but granted as to Count VI (negligence).

ENTER:

Dated:  March 25, 2022

_____
REBECCA R. PALLMEYER
United States District Judge